# EXHIBIT 1

**From:** David, Dawn M.
**To:** contact@histrips.com; sam@future-labs.co; sam.posthuma@future-labs.co
**Cc:** Shirreff, Elizabeth M.; Saugstad, Carly
**Subject:** Letter re: Infringement of Intake"s IP Rights [QBLLP-ACTIVE.FID60443328]
**Date:** Tuesday, February 10, 2026 7:33:28 PM
**Attachments:** quarles_200.pnginline1
image001.png
2026-02-10 Letter re Infringement.pdf

---

Dear Mr. Posthuma,

Please see the attached letter sent on behalf of Intake Breathing Technology LLC.

Regards,
Dawn

Quarles
**Dawn M. David | Partner**
dawn.david@quarles.com | D. 414-277-5342
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2400, Milwaukee, WI 53202-4428
Bio | quarles.com | LinkedIn
Assistant: Carly Saugstad, 414-277-5302

CONFIDENTIALITY NOTICE: This electronic mail transmission and any attachments are confidential and may be privileged. They should be read or retained only by the intended recipient. If you have received this transmission in error, please notify the sender immediately and delete the transmission from your system. This communication is not intended to constitute an electronic signature unless expressly stated otherwise.

Quarles
**Dawn M. David | Partner**
dawn.david@quarles.com | D. 414-277-5342
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2400, Milwaukee, WI 53202-4428
Bio | quarles.com | LinkedIn
Assistant: Carly Saugstad, 414-277-5302

CONFIDENTIALITY NOTICE: This electronic mail transmission and any attachments are confidential and may be privileged. They should be read or retained only by the intended recipient. If you have received this transmission in error, please notify the sender immediately and delete the transmission from your system. This communication is not intended to constitute an electronic signature unless expressly stated otherwise.

Quarles

Quarles & Brady LLP
Attorneys at Law
411 East Wisconsins Avenue
Suite 2400
Milwaukee, WI 53202
414-277-5000
Fax 414-271-3552
quarles.com

Writer's Direct Dial: 414-277-5342
E-Mail: Dawn.David@quarles.com

February 10, 2026

**VIA EMAIL AND CERTIFIED MAIL**

Stay Limitless LLC, d/b/a HiStrips
Attn: Sam Posthuma
228 Park Ave S PMB 43559
New York, New York 10003
contact@histrips.com

Sam Posthuma
Stay Limitless LLC d/b/a/ HiStrips
225 Cherry St # 14F
New York, New York 10002

**RE: Infringement of Intake's Intellectual Property Rights**

Dear Mr. Posthuma:

We represent Intake Breathing Technology, LLC ("Intake") with respect to its intellectual property rights. As you may know, Intake was founded around the groundbreaking invention of its unique nasal dilation system, including a magnetic nasal band that works together with Intake's nasal adhesives to afford users with nasal dilation superior to that offered by other nasal dilation products on the market. In fact, Intake's magnetic nasal dilating product is the first of its kind in the world. Intake's products have been wildly successful, garnering considerable attention particularly on social media and e-commerce platforms as consumers became aware of the quality and value of Intake's nasal dilation system. As you also may know, since Intake went viral on social media, hundreds of disreputable sellers have begun to copy Intake's products without authorization, seeking to illegally trade on and benefit from Intake's research and development of its hard-earned and highly-marketable invention in violation of U.S. law.

Intake is the owner of all intellectual property rights associated with Intake's nasal dilator system. Intake's intellectual property includes without limitation all related patents, copyrights, trademarks, trade dress, and other rights associated with that system, including U.S. Patent No. 10,675,174 (the '174 Patent) covering Intake's nasal dilation system including its magnetic nasal

bands and nasal adhesives, and U.S. Patent Nos. 10,556,095 (the ’095 Patent) and 9,510,969 (the ’969 Patent) covering Intake’s nasal adhesives, which are used with its magnetic nasal bands. Copies of the ’174 Patent, the ’095 Patent, and the ’969 Patent are attached as **Exhibits 1–3** to the Complaint enclosed with this letter.

Intake invested considerable time and resources in researching and developing its patented products, including its nasal adhesives; under U.S. patent law, Intake has the exclusive right to that patented technology.

Intake is also the owner of all rights in the distinctive trade dress for its nasal dilation system and its component parts, *e.g.*, its magnetic nasal bands, applicator, and nasal tabs representative examples of which are depicted below:




Furthermore, Intake is the owner of all copyrights in its images related to its nasal dilation system and products, its images of the product packaging associated with that product, and its

images of models demonstrating how to wear and use that product, including at least the five images below:







In fact, dozens of Intake's images have been copyrighted via Registration No. VAu 1-542-204 (the "'204 Registration"), duly and legally issued to Intake by the United States Copyright Office on January 2, 2025, and attached as **Exhibit 4** to the attached Complaint.

Intake has recently learned that Stay Limitless LLC, operating as HiStrips ("HiStrips"), is offering for sale "HiStrips Magnetic Nasal Strips," which include nasal bands and "HiStrips Nasal Tabs," at least at HiStrips's website at https://histrips.com/products/magnetic-nasal-strips and at https://shop.app/products/15528048132440/histrips-magnetic-nasal-strip. These products directly and blatantly infringe on Intake's intellectual property rights, including those discussed above. HiStrips's infringing products, as depicted on its website, are shown below and in **Exhibit 5** to the attached Complaint:




As set forth in the attached Complaint, the HiStrips Magnetic Nasal Strips directly infringe on Intake’s rights in the ’174, ’095, and ’969 Patent; willfully infringe upon Intake’s common law trade dress rights in the distinctive design of its nasal dilation system and its component parts; and willfully infringe Intake’s copyrighted images.

As demonstrated in the representative claim charts attached as **Exhibits 6–8** to the enclosed Complaint, HiStrips Magnetic Nasal Strips meet all the limitations of representative claim 1 of all three patents.

HiStrips Magnetic Nasal Strips and HiStrips Nasal Tabs themselves, and the products depicted in images advertising them, are also nearly identical to Intake’s nasal dilation system and its component parts, blatantly infringing upon Intake’s trade dress rights in the unique, source-identifying design of Intake’s nasal dilation system and its component parts, as can be seen by comparing HiStrips’s infrining product and advertising images on the left with Intake’s genuine products on the right in the table below:

| **Infringing HiStrips Knockoff** | **Intake's Authentic Product** |
|---|---|
|   |  |
|  |  |
|  |  |

In addition, HiStrips' marketing and product packaging for the infringing products infringe upon Intake's copyright in photographs of its products, packaging, and models demonstrating the use of its products, as can be seen in the images from HiStrips's advertising and product packaging depicted below:

February 10, 2026
Page 6

<table>
<tr><th>HiStrips Infringing Image</th><th>Intake Copyrighted Image</th></tr>
<tr><td>
</td><td></td></tr>
<tr><td></td><td>
</td></tr>
<tr><td>
</td><td></td></tr>
</table>

February 10, 2026
Page 7







HiStrips is not authorized to use Intake's patented technology, its trade dress, or its copyrighted images; and HiStrips's unauthorized uses violates at least 35 U.S.C. § 271; 17 U.S.C. § 501, and common law rights. Intake takes its intellectual property rights seriously and is committed to protecting them against infringers like HiStrips. Accordingly, enclosed is a courtesy copy of a Complaint filed today in the Southern District of New York detailing HiStrips's infringement and liability. We have not yet formally served this Complaint on you.

In light of the foregoing, Intake demands that HiStrips immediately:

1. Cease selling, displaying, or advertising the HiStrips Magnetic Nasal Strip and the HiStrips Nasal Tabs products or any variations thereof on any website, including but not limited to on HiStrips's own website, any other websites controlled by or affiliated with you, on any third-party websites, marketplaces, or platforms, and/or through any physical locations;

2. Confirm in writing that the HiStrips Magnetic Nasal Strip and HiStrips Nasal Tabs products are no longer advertised or available for sale;

3. Provide the contact information for any supplier or vendor from whom HiStrips purchased, or planned to purchase, the HiStrips Magnetic Nasal Strip and/or HiStrips Nasal Tabs products or any variations thereof;

4. Provide a complete list of all websites, retail locations, markets, online marketplaces, and distributor locations through which HiStrips has advertised or offered the HiStrips Magnetic Nasal Strip and/or HiStrips Nasal Tabs products, or any variations thereof, for sale;

5. Provide the amount of HiStrips Magnetic Nasal Strip and HiStrip Nasal Tabs products in inventory and on order at the time of this letter;

6. Destroy all remaining HiStrips Magnetic Nasal Strip and HiStrip Nasal Tabs products in inventory with written confirmation or send them to Intake for destruction;

7. Immediately cease any and all advertising using Intake's distinctive trade dress or any other confusingly similar variations thereof;

8. Immediately cease any and all use of images infringing on Intake's copyrights in its photographs, including without limitation removing all such images from HiStrips's website, from all other websites you operate, control, and/or are affiliated with, from HiStrips's marketing materials, and from HiStrips's product packaging, and provide written confirmation of the same;

9. Provide monetary relief to Intake by providing an accounting of all revenues made from the sale of the infringing HiStrips Magnetic Nasal Strip and HiStrips Nasal Tabs products and by remitting payment for damages, including but not limited to Intake's actual damages and HiStrips's profits, in the amount of at least $500,000, and statutory damages in the amount of $150,000 for each registered Intake image HiStrips used without authorization.

Please contact me within **five (5) business days** from the date of receiving this letter to confirm in writing that HiStrips will comply with the demands above. If we do not hear from you by that time, we will assume that Intake must take further action to protect its valuable intellectual property, including formally serving the attached Complaint. In addition, please note that ***at a minimum***, HiStrips is on notice of its infringement of the '174 Patent, the '095 Patent, and the '969 Patent, as well as its trade dress infringement, as of receiving this letter and/or the filing of the attached Complaint. HiStrips has also known of its copyright infringement since such conduct began. Thus, Intake is entitled to treble damages for willful patent infringement pursuant to 35 U.S.C. § 284 for its damages incurred ***at least*** from the date of your receipt of this letter and/or the filing of the Complaint. In addition, Intake is entitled to treble damages in connection with its willful infringement of Intake's trade dress pursuant to 15 U.S.C. § 1117, as

well as to $150,000 per image for HiStrips's willful infringement of its copyrighted images pursuant to 17 U.S.C. § 504(c).

The foregoing is not an exhaustive statement of all the relevant facts and law. Intake expressly reserves all of its legal and equitable rights and remedies, including but not limited to the right to seek injunctive relief and recover monetary damages. Please direct any and all further communications regarding this matter to me directly.

Sincerely,

Dawn M. David
QUARLES & BRADY, LLP

Encls.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTAKE BREATHING TECHNOLOGY, LLC,<br><br>Plaintiff,<br>v.<br><br>STAY LIMITLESS LLC D/B/A/ HISTRIPS,<br><br>Defendant. | Case No. ____________<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Plaintiff Intake Breathing Technology, LLC ("Intake" or "Plaintiff"), by and through its undersigned counsel, brings this action for patent infringement under 35 U.S.C. § 271, trade dress infringement, and copyright infringement against Stay Limitless LLC d/b/a HiStrips ("Defendant" or "HiStrips"), and alleges as follows:

**NATURE OF THE ACTION**

2. This is a civil action for (i) patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq*., (ii) common law trade dress infringement, and (iii) copyright infringement under 17 U.S.C. § 501. By this action, Plaintiff seeks to prevent Defendant from infringing Plaintiff's intellectual property rights, causing confusion in the marketplace, and unfairly benefiting from Plaintiff's reputation and goodwill.

3. Plaintiff seeks (i) monetary damages and equitable relief in the form of an injunction both preliminarily and permanently enjoining HiStrips from infringing Intake's U.S. Patent Nos. 10,675,174; 10,556,095; and 9,510,969 (collectively, the "Asserted Patents") and damages, expenses, and attorneys' fees arising from Defendant's willful infringement of the Asserted Patents; (ii) monetary damages and equitable relief in the form of an injunction both

preliminarily and permanently enjoining HiStrips from using Intake's common law trade dress in connection with the manufacture, distribution, advertising, promotion, offering for sale, and/or sale of HiStrips' goods; and (iii) monetary damages, expenses, and attorneys' fees arising from the willful infringement by Defendant, of Plaintiff's registered copyrights on valuable photographic images, and to obtain injunctive relief against Defendant to cease and desist its infringement and to prevent it from any further unlawful copying and infringement of Intake's copyrights, including Copyright Registration Number VAu 1-542-204.

## JURISDICTION AND VENUE

4. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). This action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*., and the copyright laws of the United States, 17 U.S.C. §§ 101 *et seq*.

5. The Court has supplemental jurisdiction over Plaintiff's common law trade dress infringement claim pursuant to 28 U.S.C. § 1367(a).

6. This Court has personal jurisdiction over Defendant because, among other reasons and upon information and belief, Defendant is incorporated in Delaware, and therefore is domiciled in this District, and has committed acts of infringement in this District, including at least through providing, advertising, promoting, offering to sell, using, making, selling, and/or importing its infringing "HiStrips Magnetic Nasal Strip" product and "HiStrips Nasal Tabs" (the "Accused Products") in or into this District. Upon information and belief, Defendant conducts substantial, systemic, and continuous business activities within this District, has purposefully availed itself of the privilege of doing business in the State of Delaware, and has purposefully directed its infringing activities at the State of Delaware.

7. Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Defendant is incorporated in this District, and is therefore domiciled in Delaware, and has committed acts of infringement in this District, including the manufacture, use, sale, marketing, offer for sale, and/or importation of infringing products in or into this District and directed to customers within this District. Upon information and belief, a substantial part of the events giving rise to Plaintiff's copyright and trade dress claims also occurred in this District.

## THE PARTIES

8. Plaintiff, Intake Breathing Technology, LLC is a California limited liability company with its principal place of business at 614 Santa Barbara Street, Ste. A, Santa Barbara, CA 93101, and is the owner of all rights asserted in this action.

9. On information and belief, Defendant Stay Limitless LLC d/b/a HiStrips is a Delaware limited liability company with a principal place of business at 225 Cherry St. #14F, New York, NY 10002.

## FACTS AND BACKGROUND

### A. Plaintiff's Intellectual Property Rights

10. Plaintiff is the owner of all right, title, and interest in and to U.S. Patent Nos. 10,675,174 (the "'174 Patent"); 10,556,095 (the "'095 Patent"); and 9,510,969 (the "'969 Patent"). True and correct copies of the Asserted Patents are attached as **Exhibits 1–3**.

11. The '174 Patent issued on June 9, 2020. *See* Ex. 1.

12. The '095 Patent issued on February 11, 2020. *See* Ex. 2.

13. The '969 Patent issued on December 6, 2016. *See* Ex. 3.

14. The Asserted Patents were and are valid and enforceable at all times relevant to this action and are entitled to a presumption of validity under 35. U.S.C. § 282.

15. The ’174 Patent is directed to a breathing system adapted to open a nasal passage. A representative picture of Plaintiff’s magnetic nasal dilator system embodying the Asserted Patents, including the ’174 Patent, is shown below:




16. The ’095 and ’969 Patents are directed to nasal adhesives that attach to the user’s nose and interact and cooperate with a breathing system apparatus. A representative picture of Plaintiff’s nasal adhesive product embodying the ’095 and ’969 Patents is shown below:




17. Plaintiff’s patented nasal adhesives are used as part of Plaintiff’s innovative nasal dilator system, which includes at least the nasal adhesives, a magnetic band, and an applicator to apply the nasal adhesives.

18. The patented nasal dilator technology in the Asserted Patents was invented by James D. Castillo, a prolific inventor and motorsports enthusiast who holds multiple patents across various fields. The idea for the nasal dilator system was first conceived during a motorcycle excursion. While wearing goggles, Mr. Castillo experienced discomfort and difficulty breathing due to the pressure on his nose. This experience prompted him to improvise a device that would keep the nostrils open—even under pressure—leading to the initial development of the technology.

19. The concept resurfaced during a family gathering, where Mr. Castillo realized that this innovation could have a broader application for athletes of all kinds and for people struggling with nasal breathing in everyday life. What started as a solution for a breathing problem in motor-sports evolved into a novel and widely useful device. That idea became a reality through years of design, development, and refinement, ultimately resulting in the patented technology at issue in this case.

20. Plaintiff's product line embodying the Asserted Patents and displaying Plaintiff's distinctive trade dress under the brand name "Intake®" ("Plaintiff's Products") are sold exclusively under the Intake brand by Plaintiff and its distributor, including through Intake's website (www.intakebreathing.com) and by Plaintiff on e-commerce platforms such as Amazon.com and TikTok.

21. Plaintiff's Products have been hugely successful and after being used and worn by many professional athletes, including in televised interviews, Plaintiff's Products went viral on social media, including on TikTok.

22. Plaintiff has developed and owns common law trade dress rights in the distinctive overall commercial image and appearance of its nasal dilatory products, including its magnetic nasal band (marketed as the "Relief Band"), magnetic applicator, and nasal adhesive tabs.

23. Each of these product components and products constitutes a separate and independently protectable trade dress.

24. The Relief Band trade dress consists of the total image and overall appearance of Intake's magnetic nasal band, including at least the following distinctive, non-functional, ornamental elements: signature color options, specific aesthetic contours, curves, and proportions of the band, the ornamental finish and texture, and the overall visual impression created by the combination of these elements.

25. The Relief Band trade dress has acquired secondary meaning and distinctiveness through Intake's continuous, exclusive, and substantially widespread use in interstate commerce since at least 2019.

26. In the minds of consumers, the Relief Band trade dress has come to identify Intake as the single source of origin of products bearing this trade dress. This secondary meaning has been established through: (a) Intake's continuous and exclusive use of the Relief Band trade dress for approximately seven years; (b) Intake's substantial expenditures on advertising and promotional efforts featuring the Relief Band trade dress; (c) Intake's sales of over one million units to consumers throughout the United States; (d) unsolicited media coverage and consumer reviews recognizing the distinctive appearance of the Relief Band; and (e) consumer association of the Relief Band trade dress with Intake as the source of the product.

27. The Relief Band trade dress is non-functional.

28. Alternative designs exist that would permit competitors to manufacture rigid, magnetic, nasal bands without copying the distinctive overall appearance of Intake's Relief Band.




29. The magnetic applicator trade dress consists of the total image and overall appearance of Intake's applicator device, including at least the following distinctive, non-functional, ornamental elements: the specific aesthetic shape, contours, and configuration of the applicator; the color and ornamental surface finish; the coordinated visual design with Intake's travel case; and the overall visual impression created by the combination of these elements.

30. The magnetic applicator trade dress has acquired secondary meaning and distinctiveness through Intake's continuous, exclusive, and substantially widespread use in interstate commerce since at least 2019.

31. In the minds of consumers, the magnetic applicator trade dress has come to identify Intake as the single source of origin of products bearing this trade dress. This secondary meaning has been established through: (a) Intake's continuous and exclusive use of the magnetic applicator trade dress for approximately seven years; (b) Intake's substantial expenditures on advertising and promotional efforts featuring the magnetic applicator trade dress; (c) Intake's sales of over one million units to consumers throughout the United States; (d) unsolicited media coverage and consumer reviews recognizing the distinctive appearance of the magnetic applicator; and (e) consumer association of the magnetic applicator trade dress with Intake as the source of the product.

32. The magnetic applicator trade dress is non-functional.

33. Alternative designs exist that would permit competitors to manufacture applicator devices without copying the distinctive overall appearance of Intake’s magnetic applicator.

34. The nasal adhesive tab trade dress consists of the total image and overall appearance of Intake’s adhesive tabs, including the following distinctive, non-functional, ornamental elements: the specific aesthetic shape and outline of the tabs; the particular visual appearance created by the surface texture and ornamental color; the overall proportions and dimensions of the tab; and the overall visual impression created by the combination of these elements.

35. The nasal adhesive tab trade dress has acquired secondary meaning and distinctiveness through Intake’s continuous, exclusive, and substantially widespread use in interstate commerce since at least 2019. In the minds of consumers, the nasal adhesive tab trade dress has come to identify Intake as the single source of origin of products bearing this trade dress. This secondary meaning has been established through: (a) Intake’s continuous and exclusive use of the nasal adhesive tab trade dress for approximately seven years; (b) Intake’s substantial expenditures on advertising and promotional efforts featuring the nasal adhesive tab trade dress; (c) Intake’s sales of over one million units to consumers throughout the United States; (d) unsolicited media coverage and consumer reviews recognizing the distinctive appearance of the nasal adhesive tabs; and (e) consumer association of the nasal adhesive tab trade dress with Intake as the source of the product.

36. The nasal adhesive tab trade dress is non-functional.

37. Alternative designs exist that would permit competitors to manufacture nasal adhesive tabs without copying the distinctive overall appearance of Intake's nasal adhesive tabs.

38. In addition to the independently protectable trade dress of each component, Intake also owns common law trade dress rights in the overall presentation of its integrated nasal dilator system, including the distinctive packaging and unified product offering.

39. The overall product system trade dress has acquired secondary meaning and distinctiveness through Intake's continuous, exclusive, and substantially widespread use in interstate commerce since at least 2019.

40. In the minds of consumers, the overall product system trade dress has come to identify Intake as the single source of origin of products bearing this trade dress. This secondary meaning has been established through: (a) Intake's continuous and exclusive use of the overall product system trade dress for approximately seven years; (b) Intake's substantial expenditures on advertising and promotional efforts featuring the overall product system trade dress; (c) Intake's sales of over one million units to consumers throughout the United States; (d) unsolicited media coverage and consumer reviews recognizing the distinctive appearance of the overall product system; and (e) consumer association of the overall product system trade dress with Intake as the source of the product.

41. The overall product system trade dress is non-functional.

42. Through Intake's extensive marketing efforts, consistent product presentation, and service to over one million customers, consumers encountering products displaying any of the foregoing trade dress immediately identify such products as originating from Intake.

43. Intake possesses valid and enforceable common law trade dress rights in each of the foregoing trade dress elements.

44. Plaintiff is also the owner of all rights in the copyrights for its images related to its nasal dilator system, including, but not limited to, images of related product components, packaging, and models demonstrating the use of its products.

45. On January 2, 2025, the Copyright Reg. No. VAu 1-542-204 (the "'204 Registration"), entitled "Intake Breathing System", was duly and legally issued by the United States Copyright Office. A copy of the '204 Registration is attached as **Exhibit 4**.

46. The '204 Registration covers a group of Plaintiff's copyrighted photographs of its nasal dilator system, models demonstrating the use of the system, and product packaging associated with the system, including the two registered images below:




47. Plaintiff's copyrighted images also include photographs with models displaying how to wear and use the nasal dilator system, such as the registered photographs below:




48. Defendant is not licensed under the Asserted Patents or any other Intake patents and is not authorized to practice the inventions claimed therein.

49. Defendant is not authorized to use, copy, or mimic Plaintiff's trade dress nor any confusingly similar variation thereof.

50. Defendant is not authorized to use, reproduce, copy, display, or distribute Plaintiff's copyrighted images of its products, packaging, and models demonstrating the use of the products, nor any derivative thereof.

**B. Defendant's Unlawful Conduct**

51. Defendant makes, uses, offers for sale, sells, and/or imports into the United States the Accused Products in this action.

52. The viral success of Plaintiff's Products has resulted in significant and exponential infringement of Plaintiff's Patent. Due to the growing popularity and demand for Plaintiff's highly-effective and high-quality patented nasal dilator technology, opportunistic sellers including Defendant have entered the market with infringing products that attempt to mimic Plaintiff's products and that infringe on its patents. Because of this ongoing infringement, Plaintiff is

currently losing sales in at least the six-figure range on a monthly basis, severely affecting its ability to capitalize on its own innovation and recover its investment in product development and marketing.

53. Defendant is making, using, selling, advertising, offering for sale, and/or importing into the United States a nasal dilator system, including nasal adhesives, that imitate Plaintiff's genuine products, infringe the Asserted Patents, and infringe on Plaintiff's copyrighted images. A representative picture of the Accused Products, as advertised on Defendant's website where they are labeled "HiStrips Magnetics Nasal Strips," is shown below, taken from a true and correct webcapture of Defendant's website at https://histrips.com/products/magnetic-nasal-strips, attached as **Exhibit 5**.




54. Defendant also offers the same Accused Products for sale with the same infringing images on at least one additional site, located at https://shop.app/products/15528048132440/histrips-magnetic-nasal-strip.

55. The Accused Products meet multiple claims of the Asserted Patents.

56. Publicly available materials, including the product itself and Defendant's advertising, confirm that the Accused Products practice the claimed elements of the Asserted Patents.

57. Specifically, Plaintiff's claim charts show that the Accused Products infringe at least claim 1 of the '174 Patent, at least claim 1 of the '095 Patent, and at least claim 1 of the '969 Patent. The representative claim charts are attached as **Exhibits 6–8**.

58. The unauthorized manufacture, use, sale, offer to sell, and importing into the United States of the Accused Products constitutes infringement under 35 U.S.C. § 271(a) and (c).

59. Defendant has had notice of the Asserted Patents and that the Accused Products infringe the Asserted Patents since at least the filing of this Complaint.

60. On information and belief, Defendant is willfully infringing Plaintiff's patents and knowingly seeking to trade off the success of Plaintiff's inventions without Plaintiff's authorization.

61. Defendant's products also imitate Plaintiff's trade dress in its nasal dilator system and products, creating a likelihood that consumers will be confused into believing Defendant's products are offered by Plaintiff or otherwise associated or affiliated with Plaintiff.

62. The Accused Products convey the same distinctive overall commercial image and appearance of Plaintiff's nasal dilatory system and each of its component parts including because the Accused Products use the total image and overall appearance of Plaintiff's magnetic nasal band, including at least its signature color options, specific aesthetic contours, curves, and proportions of the band, the ornamental finish and texture, and the overall visual impression created by the combination of those elements.

63. The Accused Products also convey the same distinctive overall commercial image and appearance of Plaintiff's nasal dilatory system and each of its component parts because the Accused Products use the specific aesthetic shape, contours, and configuration of Plaintiff's applicator, as well as the color and ornamental surface finish, the coordinated visual design with Intake's travel case, and the overall visual impression created by the combination of these elements.

64. The Accused Products convey the same distinctive overall commercial image and appearance of Plaintiff's nasal dilatory system and each of its component parts including because the Accused Products use images of nasal tabs that use the specific aesthetic shape and outline of Plaintiff's tabs; the particular visual appearance created by the surface texture and ornamental color; the overall proportions and dimensions of the tab; and the overall visual impression created by the combination of these elements.

65. For example, a comparison of the Accused Products with Plaintiff's genuine products demonstrates Defendant's infringement of Plaintiff's trade dress in the overall commercial image and appearance of Plaintiff's nasal dilatory products and each of its component parts:

| **Infringing HiStrips Knockoff** | **Intake's Authentic Product** |
| --- | --- |
|  |  |

| **Infringing HiStrips Knockoff** | **Intake's Authentic Product** |
| --- | --- |
|  |  |
|  |  |

66. On information and belief, in a deliberate effort to benefit from Plaintiff's reputation and trade on the valuable common law rights, goodwill, and consumer trust and recognition established by Intake's trade dress, Defendant has blatantly infringed the same with its ornamental design of the Accused Products as well as by advertising the Accused Products using images of products that use Plaintiff's trade dress.

67. Defendant also advertises the Accused Products using images that infringe on Plaintiff's copyrighted images, including at least the images below, exactly and/or as infringing derivative works:

<table>
<tr><th>HiStrips Infringing Image</th><th>Intake Copyrighted Image</th></tr>
<tr><td>
</td><td>
</td></tr>
<tr><td>
</td><td>
</td></tr>
</table>

68. Defendant is not authorized to use any of Plaintiff's intellectual property, including Plaintiff's patents, trade dress, or copyrighted images.

**COUNT I**
**PATENT INFRINGEMENT (35 U.S.C. § 271) – THE ’174 PATENT**

69. Plaintiff repeats, re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

70. Plaintiff is the exclusive owner of all rights, title, and interest in and to the ’174 Patent, titled “Breathing System,” duly and legally issued by the United States Patent and Trademark Office on June 9, 2020, including the right to bring this suit for injunctive relief and damages. A true and correct copy of the ’174 Patent is attached hereto as **Exhibit 1.**

71. The ’174 Patent is valid and enforceable.

72. Defendant makes, uses, offers for sale, sells, and/or imports the Accused Products, including, without limitation, the HiStrips Magnetic Nasal Strip and HiStrips Nasal Tabs, that directly infringe, whether literally or under the doctrine of equivalents, one or more claims of the ’174 Patent, including at least representative claim 1.

73. The Accused Products satisfy all claim limitations of at least one claim of the ’095 Patent. A claim chart comparing representative claim 1 of the ’095 Patent to a representative sample of the Accused Products is attached as **Exhibit 6**. This showing of infringement is based on publicly available information, and Plaintiff reserves the right to identify additional infringing activities and products, including, for example, on the basis of information obtained during discovery.

74. Defendant is not licensed or otherwise authorized by Plaintiff to practice the claims of the ’174 Patent.

75. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Defendant has injured and irreparably harmed Plaintiff and is liable for infringement of the ’174 Patent pursuant to 35 U.S.C. § 271(a).

76. Defendant has actual knowledge of the ’174 Patent and that the Accused Products infringe the ’174 Patent since at least the filing of this Complaint.

77. Defendant has profited from its sales of the Accused Products and its infringement of the ’174 Patent.

78. As a direct and proximate cause of Defendant’s infringing activities, Plaintiff has suffered and will continue to suffer substantial damages in an amount to be proven at trial. Plaintiff is entitled monetary judgment pursuant to 35 U.S.C. §§ 154(d) and 284 in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court, and Plaintiff will continue to suffer damages in the future unless Defendant’s infringing activities are immediately enjoined.

79. Defendant’s manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products since at least the filing of this Complaint constitutes willful infringement entitling Plaintiff to treble damages under 35 U.S.C. § 284.

80. Defendant’s infringement of the ’174 Patent is exceptional and entitles Plaintiff to attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**COUNT II**
**PATENT INFRINGEMENT (35 U.S.C. § 271) – THE ’095 PATENT**

81. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1–68 as if separately repeated herein.

82. Plaintiff is the exclusive owner of all rights, title, and interest in and to the ’095 Patent, titled “Google Breathing Set,” duly and legally issued by the United States Patent and Trademark Office on February 11, 2020, including the right to bring this suit for injunctive relief and damages. A true and correct copy of the ’095 Patent is attached hereto as **Exhibit 2**.

83. The ’095 Patent is valid and enforceable.

84. Defendant makes, uses, offers for sale, sells, and/or imports the Accused Products, including, without limitation, the HiStrips Magnetic Nasal Strip and HiStrips Nasal Tabs, that directly infringes, whether literally or under the doctrine of equivalents, one or more claims of the ’095 Patent, including at least representative claim 1.

85. The Accused Products satisfy all claim limitations of at least one claim of the ’095 Patent. A claim chart comparing representative claim 1 of the ’095 Patent to a representative sample of the Accused Products is attached as **Exhibit 7**. This showing of infringement is based on publicly available information, and Plaintiff reserves the right to identify additional infringing activities and products, including, for example, on the basis of information obtained during discovery.

86. Defendant is not licensed or otherwise authorized by Plaintiff to practice the claims of the ’095 Patent.

87. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Defendant has injured and irreparably harmed Plaintiff and is liable for infringement of the ’095 Patent pursuant to 35 U.S.C. § 271.

88. Defendant has actual knowledge of the ’969 Patent and that the Accused Products infringe the ’095 Patent since at least the filing of this Complaint.

89. Defendant has profited from its sales of the Accused Products and its infringement of the ’095 Patent.

90. As a direct and proximate cause of Defendant’s infringing activities, Plaintiff has suffered and will continue to suffer substantial damages in an amount to be proven at trial. Plaintiff is entitled monetary judgment pursuant to 35 U.S.C. §§ 154(d) and 284 in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty, together

with interest and costs as fixed by the Court, and Plaintiff will continue to suffer damages in the future unless Defendant's infringing activities are immediately enjoined.

91. Defendant's manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products since at least after the filing of this Complaint constitutes willful infringement entitling Plaintiff to treble damages under 35 U.S.C. § 284.

92. Defendant's continuing acts of infringement have caused and will continue to cause Plaintiff irreparable harm, for which Plaintiff has no adequate remedy at law, unless Defendant's continuing acts of infringement are enjoined by the Court under 35 U.S.C. § 283. The hardships that an injunction would impose are less than those faced by Plaintiff should an injunction not issue. The public interest would be served by issuance of an injunction.

93. Defendant's infringement of the '969 Patent is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**COUNT III**
**PATENT INFRINGEMENT (35 U.S.C. § 271) – THE '969 PATENT**

94. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1–68 as if separately repeated herein.

95. Plaintiff is the exclusive owner of all rights, title, and interest in and to the '969 Patent, titled "Nasal Element For A Breathing System," duly and legally issued by the United States Patent and Trademark Office on December 6, 2016, including the right to bring this suit for injunctive relief and damages. A true and correct copy of the '969 Patent is attached hereto as **Exhibit 3**.

96. The '969 Patent is valid and enforceable.

97. Defendant makes, uses, offers for sale, sells, and/or imports the Accused Products, including, without limitation, the HiStrips Magnetic Nasal Strip including HiStrips Nasal Tabs,

that directly infringes, whether literally or under the doctrine of equivalents, one or more claims of the ’969 Patent, including at least representative claim 1.

98. The Accused Products satisfy all claim limitations of at least one claim of the ’969 Patent. A claim chart comparing representative claim 1 of the ’969 Patent to a representative sample of the Accused Products is attached as **Exhibit 8**. This showing of infringement is based on publicly available information, and Plaintiff reserves the right to identify additional infringing activities and products, including, for example, on the basis of information obtained during discovery.

99. Defendant is not licensed or otherwise authorized by Plaintiff to practice the claims of the ’969 Patent.

100. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Defendant has injured and irreparably harmed Plaintiff and is liable for infringement of the ’969 Patent pursuant to 35 U.S.C. § 271.

101. Defendant has actual knowledge of the ’969 Patent and that the Accused Products infringe the ’969 Patent since at least the filing of this Complaint.

102. Defendant has profited from its sales of the Accused Products and its infringement of the ’969 Patent.

103. As a direct and proximate cause of Defendant’s infringing activities, Plaintiff has suffered and will continue to suffer substantial damages in an amount to be proven at trial. Plaintiff is entitled monetary judgment pursuant to 35 U.S.C. §§ 154(d) and 284 in an amount adequate to compensate for Defendant’s infringement, but in no event less than a reasonable royalty, together with interest and costs as fixed by the Court, and Plaintiff will continue to suffer damages in the future unless Defendant’s infringing activities are immediately enjoined.

104. Defendant's manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products since at least after the filing of this Complaint constitutes willful infringement entitling Plaintiff to treble damages under 35 U.S.C. § 284.

105. Defendant's continuing acts of infringement have caused and will continue to cause Plaintiff irreparable harm, for which Plaintiff has no adequate remedy at law, unless Defendant's continuing acts of infringement are enjoined by the Court under 35 U.S.C. § 283. The hardships that an injunction would impose are less than those faced by Plaintiff should an injunction not issue. The public interest would be served by issuance of an injunction.

106. Defendant's infringement of the '969 Patent is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT IV
## TRADE DRESS INFRINGEMENT (COMMON LAW)

107. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1–68 as if separately repeated herein.

108. Plaintiff owns trade dress rights in its nasal dilatory system and each of its component parts.

109. Plaintiff's trade dress consists of (1) the total image and overall appearance of Intake's magnetic nasal band, including at least the following distinctive, non-functional, ornamental elements: signature color options, specific aesthetic contours, curves, and proportions of the band, the ornamental finish and texture, and the overall visual impression created by the combination of these elements; (2) the total image and overall appearance of Intake's applicator device, including at least the following distinctive, non-functional, ornamental elements: the specific aesthetic shape, contours, and configuration of the applicator; the color and ornamental surface finish; the coordinated visual design with Intake's travel case; and the overall visual

impression created by the combination of these elements; and (3) the total image and overall appearance of Intake's adhesive tabs, including the following distinctive, non-functional, ornamental elements: the specific aesthetic shape and outline of the tabs; the particular visual appearance created by the surface texture and ornamental color; the overall proportions and dimensions of the tab; and the overall visual impression created by the combination of these elements; including each of these sets of features together in Plaintiff's dilatory nasal system as well as individually as its component parts.

110. Plaintiff's trade dresses are non-functional and do not yield any utilitarian advantage.

111. Numerous alternative designs are available that would permit competitors to manufacture and sell non-infringing nasal dilation systems, nasal dilator products, applicators, and adhesive tabs without copying Intake's distinctive trade dress. For example, competitors could employ different aesthetic shapes, outlines, contours, curves, configurations, proportions, colors, ornamental surface finishes, ornamental textures, and visual designs that differ from Intake's unique, signature ornamental designs. The availability of these alternative designs demonstrates that Intake's trade dress elements are not competitively necessary and that competitors could effectively compete in the nasal dilator market without imitating Intake's distinctive product appearance.

112. Plaintiff's trade dresses have secondary meaning; and Plaintiff is the originator of the unique design for its nasal dilator system and its component parts.

113. Plaintiff has been advertising and selling its patented nasal dilator system since at least 2019 as a unique and original creation.

114. Defendant's public display, advertising, promoting, offering for sale, and sale of the Accused Products is likely to cause confusion in the marketplace as to the source of the product.

115. Plaintiff's trade dress is strong, unique, and has secondary meaning. Defendant's Accused Products is substantially similar to Plaintiff's trade dress in terms of overall image and appearance—the designs, shape, and overall visual impression are identical.

116. Specifically, the Accused Products convey the same distinctive overall commercial image and appearance of Plaintiff's nasal dilatory system and each of its component parts at least because Defendant's nasal strips use the total image and overall appearance of Plaintiff's magnetic nasal band, including at least its signature color options, specific aesthetic contours, curves, and proportions of the band, the ornamental finish and texture, and the overall visual impression created by the combination of those elements.

117. The Accused Products convey the same distinctive overall commercial image and appearance of Plaintiff's nasal dilatory system and each of its component parts at least because Defendant's applicator uses the specific aesthetic shape, contours, and configuration of Plaintiff's applicator, as well as the color and ornamental surface finish, the coordinated visual design with Intake's travel case, and the overall visual impression created by the combination of these elements.

118. The Accused Products convey the same distinctive overall commercial image and appearance of Plaintiff's nasal dilatory system and each of its component parts at least because Defendant's advertisements use images of nasal tabs that use the specific aesthetic shape and outline of Plaintiff's tabs; the particular visual appearance created by the surface texture and ornamental color; the overall proportions and dimensions of the tab; and the overall visual impression created by the combination of these elements.

119. The Accused Products and Plaintiff's Products are both nasal dilator systems which have been presented to customers in the same channels of trade, namely, via e-commerce. On information and belief, the goods travel in the same marketing channels, including on social media.

120. Defendant's advertising, promoting, offering for sale, and sale of the Accused Products infringes upon Intake's trade dress in violation of New York common law.

121. As a direct and proximate result of Defendant's trade dress infringement, Defendant has caused, is causing, and unless immediately enjoined by this Court, will continue to cause immediate and irreparable harm to Intake, for which there is no adequate remedy at law, and for which Intake is entitled to injunctive relief.

122. As a direct and proximate result of Defendant's infringement of Intake's trade dress, Intake has been damaged in an amount to be proven at trial and is entitled to collect damages from Defendant.

**<u>COUNT V</u>**
**COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)**

123. Plaintiff repeats, realleges and incorporates by reference the allegations contain in paragraphs 1–68 as if separately repeated herein.

124. Intake is the sole owner of its registered copyrights covering images of Intake's nasal dilator system, its packaging, and models demonstrating how to wear and use the system, including but not limited to the photographs registered in the '204 Registration.

125. By Defendant's unauthorized copying, display, reproduction, distribution, modification, and use of the copyrighted images to solicit sales and promote the business and reputation of HiStrips, Defendant has willfully infringed Plaintiff's copyright registration by copying, reproducing, creating derivative works of, displaying, and/or distributing Plaintiff's copyrighted works, all without Plaintiff's permission or authorization.

126. Defendant knew or should have known of Plaintiff's rights in the copyrighted images since Defendant's first infringing conduct and has willfully and intentionally infringed Intake's exclusive rights in the copyrighted images under 17 U.S.C. § 106.

127. As a result of their wrongful conduct, Defendant is liable to Plaintiff for copyright infringement under 17 U.S.C. § 501.

128. As a direct and proximate result of the copyright infringement detailed herein, Plaintiff has incurred and continues to incur damages in an amount unknown at present and to be determined at trial. Plaintiff is also entitled to any profits of Defendant attributable to the infringement and not taken into account in computing actual damages.

129. In the alternative and at its election, Plaintiff is entitled to seek statutory damages for Defendant's willful acts of infringement in an amount of up to $150,000 per infringement.

130. Plaintiff Intake has suffered and continues to suffer irreparable injury from Defendant's conduct, and Plaintiff has no adequate remedy at law to protect its rights in its copyrighted images and to prevent Defendant from continuing its infringement and continuing the resulting injury to Plaintiff.

131. As a direct and proximate result of the copyright infringement detailed herein, Plaintiff is entitled to preliminary and permanent injunctive relief enjoining and restraining Defendant from infringing its copyrighted images.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant on the claims set forth above and respectfully requests that this Court:

A. Enter judgment against Defendant finding that Defendant (i) has directly infringed, literally or under the doctrine of equivalents, one or more claims of the Asserted Patents, (ii) has

infringed Plaintiff's trade dress rights in violation of common law trade dress rights, and (iii) has violated Plaintiff's copyrights through its unauthorized use of Plaintiff's copyrighted images;

B. Enter judgment against Defendant finding that Defendant has willfully infringed one or more claims of the Asserted Patents, Plaintiff's common law trade dress rights, and Plaintiff's copyrights;

C. Temporarily, preliminarily, and permanently enjoin Defendant, its affiliates, officers, agents, employees, assigns, representatives, and all persons acting for, with, by, through, under, or in active concert with Defendant:

a. from making, using, offering for sale, selling and/or importing into the United States for subsequent sale or use any products that infringe upon the Asserted Patents, including the Accused Products;

b. from any further acts of trade dress infringement, including selling or advertising the Accused Products; and

c. from any further acts of copyright infringement;

D. Award Plaintiff all available and legally permissible damages and relief adequate to compensate Plaintiff for Defendant's patent infringement that occurred pursuant to 35 U.S.C. § 284 to the full extent permitted, an award of Plaintiff's profits from its patent infringement pursuant to 35 U.S.C. § 289, together with prejudgment interest and costs and reasonable attorneys' fees, pursuant to 35 U.S.C. §§ 284 and 285 and all other applicable statutes and rules in common law as may apply;

E. Award Plaintiff its actual damages resulting from Defendant's trade dress infringement;

F. Award Plaintiff any profits that Defendant derived from its patent infringement and trade dress infringement;

G. Award Plaintiff statutory damages in the amount of $150,000 per infringing work for Defendant's copyright infringement in an amount to be determined at trial, to be increased to the maximum permitted by law, for Defendant's acts of willful infringement;

H. Award Plaintiff its actual damages, direct and indirect, for Defendant's copyright infringement in an amount to be determined at trial, to be increased to the maximum permitted by law, for Defendant's acts of willful infringement;

I. Award Plaintiff supplemental damages or profits for any prejudgment interest and post-judgment interest, continuing post-verdict infringement up until entry of the final judgment, with an accounting as needed;

J. Declare Defendant's patent infringement willful and order an enhancement of damages up to three times during the period of willful infringement;

K. Declare this to be an exceptional case under 35 U.S.C. § 285 and award Plaintiff its reasonable attorneys' fees, costs, and expenses incurred in connection with this action under 35 U.S.C. § 285 and all other applicable statutes and rules in common law as may apply;

L. Award Plaintiff its costs, including attorneys' fees, and an assessment of interest, for Defendant's copyright infringement;

M. Award Plaintiff its costs and expenses incurred in bringing and prosecuting this action pursuant to 35 U.S.C. § 284, Rule 54(d) of the Federal Rules of Civil Procedure, and all other applicable statutes and rules in the common law as may apply; and

N. Award Plaintiff any and all other relief that this Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b) and D. Del. LR 38.1, Plaintiff hereby demands a trial by jury on all issues so triable by a jury as of right in this action.

Dated: February 10, 2026

OF COUNSEL:

Dawn M. David (*pro hac vice forthcoming*)
QUARLES & BRADY LLP
411 E Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
(414) 277-5000
dawn.david@quarles.com

YOUNG CONAWAY STARGATT &
TAYLOR LLP

Anne Shea Gaza (No. 4093)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com

*Attorneys for Plaintiff*
*Intake Breathing Technology, LLC*

# Exhibit 1

US010675174B2

(12) **United States Patent**
**Castillo**

(10) **Patent No.: US 10,675,174 B2**
(45) **Date of Patent: *Jun. 9, 2020**

(54) **BREATHING SYSTEM**

(71) Applicant: **James D. Castillo**, Los Alamos, CA (US)

(72) Inventor: **James D. Castillo**, Los Alamos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 246 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/016,087**

(22) Filed: **Feb. 4, 2016**

(65) **Prior Publication Data**

US 2016/0151194 A1 Jun. 2, 2016

**Related U.S. Application Data**

(60) Division of application No. 14/622,448, filed on Feb. 13, 2015, now Pat. No. 9,283,106, which is a continuation-in-part of application No. 14/502,348, filed on Sep. 30, 2014, now Pat. No. 9,675,493.

(60) Provisional application No. 61/918,826, filed on Dec. 20, 2013, provisional application No. 61/937,018, filed on Feb. 7, 2014.

(51) **Int. Cl.**
***A61F 5/08*** (2006.01)

(52) **U.S. Cl.**
CPC .................................... ***A61F 5/08*** (2013.01)

(58) **Field of Classification Search**
CPC ....................................................... A61F 5/08
USPC .................................. 606/199, 201, 204.45
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,835,848 | A | 9/1974 | Berner |
| 4,835,506 | A | 5/1989 | Leupold |
| 4,886,349 | A | 12/1989 | Willis |
| 5,533,503 | A | 7/1996 | Doubek et al. |
| 5,566,503 | A | 7/1996 | Doubek et al. |
| 5,719,655 | A | 2/1998 | Peschel et al. |
| 5,913,873 | A | 6/1999 | Blach et al. |
| 5,957,126 | A | 9/1999 | Neeser |
| 6,006,746 | A | 12/1999 | Karell |
| 6,033,422 | A | 3/2000 | Blach et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 1389185 | 1/2003 | |
| EP | 0855175 A1 * | 7/1998 | .............. A61F 5/08 |

(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion of International Application No. PCT/US15/67530, dated May 16, 2016, 11 pages.

(Continued)

*Primary Examiner* — Vy Q Bui
(74) *Attorney, Agent, or Firm* — Stetina Brunda Garred and Brucker

(57) **ABSTRACT**

A breathing system is provided which enhances the ability of a user to breathe through the user's nasal passageways. The breathing system generally includes a bridge member and a pair of nasal appliques which are attachable to the lateral portions of the user's nose. The bridge member is positionable adjacent the appliques to activate the system and impart a dilating force onto the user's nose. The system may be deactivated by removing the bridge member from the appliques, and thereby removing the dilating force from the user's nose.

**18 Claims, 7 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,352,548 B1 | 3/2002 | Blach et al. | |
| 6,533,415 B2 | 3/2003 | Wang et al. | |
| 6,540,349 B1 | 4/2003 | Liesegang | |
| 6,648,471 B1 | 11/2003 | Dalrymple et al. | |
| 6,676,681 B1 | 1/2004 | Blach et al. | |
| 6,823,864 B2 | 11/2004 | Blach et al. | |
| 7,091,634 B2 | 8/2006 | Yi et al. | |
| 7,118,210 B2 | 10/2006 | Landers | |
| 7,793,661 B2 * | 9/2010 | Macken .................... | A61F 5/56 128/846 |
| D639,762 S | 6/2011 | Brogden et al. | |
| D644,324 S | 8/2011 | Brunner et al. | |
| D644,325 S | 8/2011 | Brunner et al. | |
| 8,042,542 B2 | 10/2011 | Ging et al. | |
| 8,292,427 B2 | 10/2012 | Zelazowski | |
| 8,459,254 B1 | 6/2013 | Jassir et al. | |
| D696,400 S | 12/2013 | Brogden et al. | |
| D701,957 S | 4/2014 | Brunner et al. | |
| D703,318 S | 4/2014 | Brunner et al. | |
| 2002/0029408 A1 | 3/2002 | Lindahl | |
| 2003/0000521 A1 | 1/2003 | Beaudry | |
| 2007/0105824 A1 | 5/2007 | Erickson-Miller et al. | |
| 2007/0252946 A1 | 11/2007 | Welchel | |
| 2008/0097517 A1 | 4/2008 | Holmes et al. | |
| 2008/0119885 A1 | 5/2008 | Yazdi | |
| 2009/0183734 A1 | 7/2009 | Kwok et al. | |
| 2009/0188023 A1 | 7/2009 | Hsu | |
| 2010/0309425 A1 | 12/2010 | Zelazowski | |
| 2011/0000483 A1 | 1/2011 | Matthias et al. | |
| 2012/0024639 A1 | 2/2012 | Castro | |
| 2012/0036607 A1 | 2/2012 | Beliveau | |
| 2012/0172923 A1 | 7/2012 | Fenton et al. | |
| 2014/0296904 A1 | 10/2014 | Andre | |
| 2014/0375946 A1 | 12/2014 | Rochford et al. | |
| 2015/0001014 A1 | 1/2015 | Noborio et al. | |
| 2015/0173933 A1 | 6/2015 | Castillo | |
| 2015/0173934 A1 | 6/2015 | Castillo | |
| 2016/0193070 A1 | 7/2016 | Castillo | |
| 2017/0106222 A1 | 4/2017 | Mayer et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | H10192412 | 7/1998 |
| JP | 2009-535079 | 10/2009 |
| KR | 200404740 | 12/2005 |
| WO | WO2002/003125 | 1/2002 |

OTHER PUBLICATIONS

International Search Report and Written Opinion of International Application No. PCT/US2016/022637, dated Jun. 9, 2016, 10 pages.

International Search Report and Written Opinion for International Application No. PCT/US14/69817, dated Mar. 11, 2015, 11 pages.

Australian Government IP Australia, Examination report No. 1 for standard patent application, Oct. 24, 2017, 5 pages.

Office Action for corresponding Japanese Patent Application No. 2016-560622 with English translation, dated Nov. 1, 2017, 5 pages.

International Search Report and Written Opinion for International Application No. PCT/US 17145688, Oct. 31, 2017, 11 pages.

First Office Action of CN Application 201480075735.9, dated May 2, 2017, 9 pages.

Summary of First Office Action of CN Application 2014800757359, dated May 2, 2017, 5 pages.

European Patent Office, extended European search report for Application No. EP 14871764, dated Jul. 7, 2017, 10 pages.

Patent Cooperation Treaty, International Preliminary Report on Patentability for Application No. PCT/US16/22637, dated Aug. 3, 2017, 9 pages.

Patent Cooperation Treaty, International Search Report and Written Opinion for International Application No. PCT/US2018/066312, dated Mar. 5, 2019, 12 pages.

* cited by examiner




FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8




FIG. 9




FIG. 10




FIG. 11




FIG. 12




FIG. 13




FIG. 14




FIG. 15




FIG. 16




FIG. 17




FIG. 18




FIG. 19




FIG. 20




FIG. 21




FIG. 22




FIG. 23




FIG. 24




FIG. 25




FIG. 26




FIG. 27




FIG. 28




FIG. 29




FIG. 30




FIG. 31




FIG. 32




FIG. 33




FIG. 34




FIG. 35




FIG. 36

## BREATHING SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a divisional of U.S. patent application Ser. No. 14/622,448, filed Feb. 13, 2015, which is a continuation-in-part of U.S. patent application Ser. No. 14/502,348, filed Sep. 30, 2014, which claims the benefit of U.S. Provisional Application No. 61/918,826, filed Dec. 20, 2013, and U.S. Provisional Application No. 61/937,018, filed Feb. 7, 2014, the contents of each of the foregoing applications being expressly incorporated herein by reference.

### STATEMENT RE: FEDERALLY SPONSORED RESEARCH/DEVELOPMENT

Not Applicable

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to a breathing system, and more specifically to a breathing system designed to enhance nasal airflow for the user by urging the user's nostrils to a more open position, wherein the breathing system may optionally be used with an optical lens as a stabilizing mechanism for the lens.

2. Description of the Related Art

It is readily understood that breathing is important when playing sports or taking part in physical competition due to the increased demand for oxygen by the body. Breathing may be achieved by drawing air into the body through an individual's nostrils and/or through the individual's mouth. However, in some instances, it is preferable to breathe almost exclusively through the nostrils, as there may be a downside to breathing through one's mouth. Along these lines, breathing through the mouth may lead to rapid water loss and heat loss, both of which increase the likelihood of exercise-induced asthma. Exclusive breathing through the mouth may also lead to an increased heart rate, hyperventilation and reduced athletic ability.

It is also understood that eyewear is commonly used when participating in many sports and activities. Such eyewear may include protective eyewear, or vision-enhancing (e.g., prescription) eyewear. For instance, goggles are readily worn by many athletes participating in snowboarding, skiing, motocross, automotive racing, basketball, baseball, hockey, etc. Goggles are typically configured such that a portion of the goggle frame extends over the user's nose, and thus, goggles may impact one's ability to breathe through the user's nasal passage.

Moreover, many goggles are fitted with a foam liner which interfaces with the user's face to create a barrier or seal which prevents snow, rain, dirt or other debris from entering the goggles and creating a potential irritant in the user's eye. In order to create an effective seal or barrier around the goggles, the goggles are compressed against the user's face, typically through the use of an elastic band which is worn around the head. The compression of the foam liner against the user tends to compress the nasal passages of the user, which further inhibits the ability of the user to breathe through the nose.

In view of the foregoing drawbacks associated with conventional goggles, Applicant has developed a goggle breathing system directed toward alleviating the pressure on



the nostrils and improving the user's ability to breathe when wearing goggles. More information regarding Applicant's goggle breathing system can be found in U.S. patent application Ser. No. 14/502,348, entitled Goggle Breathing System.

However, in some instances, eyewear or goggles are not worn by the user. For instance, sports such as basketball, baseball, soccer, running, volleyball, hockey, and skateboarding typically do not require the use of goggles or other eyewear. However, there remains a need for enhancing one's ability to breathe.

Accordingly, there is a need in the art for a device specifically adapted for enhancing the user's ability to breathe through the user's nasal passage. Various aspects of the present invention address this particular need, as will be discussed in more detail below.

### BRIEF SUMMARY OF THE INVENTION

In accordance with one embodiment of the present invention, there is provided a breathing system which enhances the ability of a user to breathe through the user's nasal passageways. Various embodiments of the breathing system do not require the use of goggles or other eyewear. Rather, the breathing system generally includes a bridge member and a pair of nasal appliques which are attachable to the lateral portions of the user's nose. The bridge member is positionable adjacent the appliques to activate the system and impart a dilating force onto the user's nose. The system may be deactivated by removing the bridge member from the appliques, and thereby removing the dilating force from the user's nose. The dilating force may be selectively turned ON and OFF. The dilating effect may be most noticeable when the bridge member is first applied. This may allow the user to have the advantage only when engaged in the activity for which the user is using the breathing system.

According to one embodiment, the breathing system includes a bridge member having a pair of distal portions and a middle portion positioned between the pair of distal portions. The bridge member is configured to be positionable adjacent the user's nose, with each distal portion residing adjacent a respective lateral region of the user's nose. A pair of nasal appliques are adapted to be attachable to the respective lateral regions of the user's nose, with each nasal applique being magnetically attractable to respective ones of the pair of distal portions. The attraction between the pair of nasal appliques and the bridge member impart a dilating force on the user's nose to dilating the nasal passage.

Each nasal applique may include a flexible base layer including a first surface and an opposing second surface. The first surface may include an adhesive disposed thereon to enable the first surface to be selectively attachable to the nose of the user. A metallic element may be coupled to the second surface of the base layer. The bridge member may include a main body and a pair of magnets coupled to the main body at respective ones of the distal portions of the bridge member. The metallic element in each nasal applique may be magnetically attractable to a respective one of the pair of magnets.

The bridge member may include a first surface and an opposing second surface, the first surface facing toward the user's nose and the second surface facing away from the user's nose when the bridge member is positioned adjacent the user's nose. A pair of spacers may extend from the first surface and away from the second surface, with each spacer

being positioned at a respective one of the pair of distal portions. The spacers may be integrally formed with the main body.

The bridge member may be substantially inflexible.

The bridge member may be configured to be selectively flexible between a neutral position and a flexed position. The bridge member may be configured to substantially remain in the flexed position once transitioned thereto. The bridge member may include at least one flexible member and a pair of distal members coupled to opposed ends of the at least one flexible member. The at least one flexible member may be selectively bendable to place the bridge member in a prescribed orientation. The bridge member may be biased toward the neutral position.

The bridge member may include a flexible band and a pair of distal members coupled to opposed ends of the flexible band. The flexible band may be bendable between neutral and flexed positions, with the band being biased toward the neutral position.

The bridge member may be adapted to be attachable to eyewear, such as a lens. The bridge member may be configured to stabilize or support the lens on the face of the user.

According to another embodiment, there is provided a breathing system including a pair of nasal appliques configured to be attachable to an outer surface of a user's nose adjacent a user's nostrils. A bridge member is configured to be selectively positionable adjacent the nose of the user and to interact with the pair of nasal appliques. The pair of nasal appliques and the bridge member are configured to selectively transition between an ON state wherein the pair of nasal appliques interact with the bridge member to apply a dilating force on the nose of the user, and an OFF state wherein the bridge member is moved away from the pair of nasal appliques to cease application of the dilating force on the nose of the user.

The present invention will be best understood by reference to the following detailed description when read in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other features and advantages of the various embodiments disclosed herein will be better understood with respect to the following description and drawings, in which:

FIG. **1** is an upper perspective view of a breathing system constructed in accordance with a first embodiment of the present invention, the breathing system including a pair of nasal appliques and a bridge member which interacts with the nasal appliques;

FIG. **2** is a side view of a nasal applique applied to a lateral region of a user's nose;

FIG. **3** is a top view of the bridge member depicted in FIG. **1**;

FIG. **4** is a rear perspective view of the bridge member depicted in FIG. **1**;

FIG. **5** is a front view of the bridge member depicted in FIG. **1**;

FIG. **6** is a side view of the bridge member depicted in FIG. **1**;

FIG. **7** is an upper perspective view of the bridge member engaged with the pair of nasal appliques (depicted in dashed lines);

FIG. **8** is a side view of the bridge member and the pair of nasal appliques (depicted in dashed lines) illustrated in FIG. **7**;

FIG. **9** is a cross sectional view of the bridge member and the pair of nasal appliques taken along line **9-9** depicted in FIG. **8**;

FIG. **10** is an upper perspective view of a second embodiment of a breathing system including a bridge member having a pair of spacers, and a pair of nasal appliques;

FIG. **11** is a rear perspective view of the bridge member depicted in FIG. **10**;

FIG. **12** is a top view of the bridge member depicted in FIG. **10**;

FIG. **13** is a front view of the bridge member depicted in FIG. **10**;

FIG. **14** is a side view of the bridge member depicted in FIG. **10**;

FIG. **15** is an upper perspective view of the bridge member depicted in FIG. **10** engaged with the pair of nasal appliques (depicted in dashed lines);

FIG. **16** is a side view of the bridge member and the nasal applique (depicted in dashed lines) illustrated in FIG. **15**;

FIG. **17** is a cross sectional view of the bridge member and the pair of nasal appliques taken along line **17-17** depicted in FIG. **16**;

FIG. **18** is a top view of a third embodiment of a bridge member, the bridge member being transitional between a neutral position and a flexed position (depicted in dashed lines);

FIG. **19** is an upper perspective view of the bridge member depicted in FIG. **18**, the bridge member being shown in a flexed position;

FIG. **20** is a front view of the bridge member depicted in FIG. **18**;

FIG. **21** is a rear view of the bridge member depicted in FIG. **18**;

FIG. **22** is a top view of a fourth embodiment of a bridge member being transitional between a neutral position and a flexed position (depicted in dashed lines), wherein the bridge member includes a pair of spaces coupled thereto;

FIG. **23** is an upper perspective view of the bridge member depicted in FIG. **22**, the bridge member being shown in a flexed position;

FIG. **24** is a front view of the bridge member depicted in FIG. **22**;

FIG. **25** is a rear view of the bridge member depicted in FIG. **22**;

FIG. **26** is a top view of a fifth embodiment of a bridge member being transitional between a neutral position and a flexed position (shown in dashed lines);

FIG. **27** is an upper perspective view of the bridge member depicted in FIG. **26**, the bridge member being shown in a flexed position;

FIG. **28** is a front view of the bridge member depicted in FIG. **26**;

FIG. **29** is a rear view of the bridge member depicted in FIG. **26**;

FIG. **30** is a top view of a sixth embodiment of a bridge member being transitional between a neutral position and a flexed position (shown in dashed lines);

FIG. **31** is an upper perspective view of the bridge member depicted in FIG. **30**, the bridge member being shown in a flexed position;

FIG. **32** is a front view of the bridge member depicted in FIG. **30**;

FIG. **33** is a rear view of the bridge member depicted in FIG. **30**;

FIG. **34** is a rear view of a seventh embodiment of a bridge member adapted to interface with eyewear, the bridge member being disengaged from the eyewear;

FIG. **35** is a rear view of the bridge member depicted in FIG. **34**, the bridge member being engaged with the eyewear; and

FIG. **36** is a front upper perspective view of the bridge member depicted in FIGS. **34** and **35**.

Common reference numerals are used throughout the drawings and the detailed description to indicate the same elements.

## DETAILED DESCRIPTION OF THE INVENTION

The detailed description set forth below in connection with the appended drawings is intended as a description of certain embodiments of a breathing system and is not intended to represent the only forms that may be developed or utilized. The description sets forth the various structure and/or functions in connection with the illustrated embodiments, but it is to be understood, however, that the same or equivalent structure and/or functions may be accomplished by different embodiments that are also intended to be encompassed within the scope of the present disclosure. It is further understood that the use of relational terms such as first and second, and the like are used solely to distinguish one entity from another without necessarily requiring or implying any actual such relationship or order between such entities.

Referring now to the drawings, wherein the showings are for purposes of illustrating preferred embodiments of the present invention only, and are not for purposes of limiting the same, there is depicted several embodiments of breathing system for enhancing the ability of a user to breathe through the user's nose by opening the user's nasal passageways. As will be described in more detail below, the embodiments depicted in FIGS. **1-33** are specifically configured and adapted to interface with the user's nose without relying upon eyewear, such as glasses, goggles, or the like, to support the breathing system on the user's nose. However, in the event the user does wear a lens, such as a prescription lens, uv-protective lens, or other lens, other embodiments are specifically configured and adapted to interface with such a lens, specifically the embodiment depicted in FIGS. **34** and **35**.

Various aspects of the present invention are directed toward imparting a dilating force on the user's nose to open the user's nasal passageways. Along these lines, the anatomy of the human nose **10** generally includes a nasal ridge **12**, a pair of nasal passageways **14**, which are separate by a nasal septum **16**. The nose **10** also includes skin extending over the lateral regions **18** (see FIGS. **1** and **2**) thereof, which may be referred to as the "ala of the nose." The dilating force is applied on the lateral regions **18** of the nose **10** to cause the lateral regions **18** to flare outwardly, thereby increasing the volume of the nasal passageways **14**.

Referring now specifically to FIGS. **1-9**, there is depicted a first embodiment of a breathing system **20** which generally includes a bridge member **22** and a pair of nasal appliques **24**. The bridge member **22** includes an arcuate main body **26** having a concave inner surface **28** and an opposing convex outer surface **30**. The main body **26** includes a middle portion **32** defining an apex which is located between two distal portions **34**, wherein each distal portion terminates **34** at a respective distal tip **36**. The two distal tips **36** are spaced from each other by a distance, $D_1$ which allows the bridge member **22** to fit over the user's nose **10**, with the distal portions **34** being positioned adjacent opposing lateral regions **18** of the user's nose **10**. The bridge member **22** may



be fabricated in various sizes to accommodate differently sized noses. Along these lines, the distance $D_1$ may be anywhere from 1.0 inch for use on a small nose (e.g., for a child), to over 2.5 for use on a larger nose. For an average nose, the distance $D_1$ may be approximately equal to 1.75 inches.

The main body **26** includes a pair of opposed longitudinal edges **38** (see FIG. **5**) and a pair of opposed transverse edges **40**, which essentially define the aforementioned distal tips **36**. The distance between the opposed longitudinal edges **38** defines a bridge member thickness, $T_1$, which may be equal to approximately 0.5 inches, although other thickness dimensions may be used without departing from the spirit and scope of the present invention.

The main body **26** is rigidly formed so as to substantially maintain its shape. Along these lines, the main body **26** is preferably more resistant to bending, or flexing than is the skin of the user's nose **10**. In this respect, the main body **26** is capable of being disposable in compression, that is to say, the main body **26** is capable of having a force applied thereto.

The bridge member **22** further includes a plurality of magnets **42** coupled to the concave inner surface **28** adjacent the distal portions **34** of the main body **26**. In the exemplary embodiment, the bridge member **22** includes a pair of magnets **42** at each distal portion **34**. The magnets **42** may be received within a cavity or recess formed within the main body **26** that is substantially complimentary in shape and size to the pair of magnets **42**. The magnets **42** may be adhered or otherwise coupled to the main body **26** using fastening mechanisms known by those skilled in the art.

The nasal applique **24** includes a metallic element **44**, preferably a ferrous metal, that is captured between a base layer **46** and an cover layer **48**. It is understood that the cover layer **48** is optional, as there may be other embodiments wherein the metallic element **44** is coupled to the base layer **46**, with the metallic element **44** being uncovered. The metallic element **44** includes a first surface which interfaces with the base layer **46** and a second surface which interfaces with the cover layer **48**. According to one embodiment, the second surface defines a convex, arcuate, or "domed" configuration, to facilitate contact with the magnets **42** without flat-to-flat attachment, which may create uncomfortable torque on the user's nose **10**. As alluded to above, it is understood that the dual-layer design is optional, and that in other embodiments, the nasal applique **24** may comprise a single layer with the metallic element **44** coupled to the single layer. In this regard, the metallic element **44** may be position on an upper surface of the single layer, wherein the single layer resides between the metallic element **44** and the user when the applique **24** is applied to the user's nose. Alternatively, the metallic element **44** may be positioned on a lower surface of the single layer, such that the metallic element **44** resides between a portion of the single layer and the user's nose during use. It is also contemplated that the metallic element **44** may be encapsulated or captured within that single layer.

The base layer **46** includes an inner surface and an opposing outer surface. The inner surface is adapted to engage with the metallic element **44** and the cover layer **48**, while the outer (lower) surface is adapted to engage with the user's nose **10**. The outer (lower) surface may be coated with an adhesive to allow the base layer **46** to be adhered to the user's nose **10**. A tear-away layer (not shown) may extend over the outer surface to preserve the adhesive until the nasal applique **24** is applied to the user's nose **10**. The cover layer **48** also includes an inner surface and an opposing exposed

surface. The inner surface of the cover layer **48** is adapted to interface with the metallic element **44** and the base layer **46**, while the exposed surface of the cover layer **48** is adapted to engage with the magnets **42** of the bridge member **22**.

The preferred peripheral contour of the nasal applique **24** is an hour-glass like configuration, having two enlarged end portions and a narrow middle portion, with the metallic element **44** being located at the narrow middle portion. The narrow middle portion is defined by a pair of opposed cutouts. When the nasal applique **24** is applied to the nose, the cutouts are placed over the crease on the user's nose that extends generally around a flared nostril. This provides a cutout around the crease, which becomes very active when breathing. Having that portion of the nose uncovered allows for dilating and breathing motion without initiating peeling of the applique **24**. The opposed cutouts allow for use of the applique **24** on either side of the user's nose. However, it is also contemplated that the applique **24** may be specifically formed for use on only one side of the nose, and thus, such appliques **24** may only have one cutout.

It is contemplated that the nasal appliques **24** may have logos, trademarks, or other indicia emblazoned thereon. The indicia may be emblazoned on the base layer **46** and/or the cover layer **48**.

According to one embodiment, the base layer **46** and cover layer **48** are both configured to extend radially outward beyond the outer periphery of the metallic element **44** to define a peripheral ring portion **50**. As such, the metallic element **44** is positioned over a central region of the base layer **46** and is surrounded by a peripheral region of the base layer **46**. In the exemplary embodiment, depicted in FIG. **9**, the outer peripheries of the cover layer **48** and the base layer **46** are substantially equal. However, it is understood that prior to being joined to the metallic element **44** and base layer **46**, the cover layer **48** may define a peripheral dimension that is larger than the base layer **46** so as to accommodate the thickness of the metallic element **44**.

In order to use the breathing system **20**, the user first applies the nasal appliques **24** to both sides of the user's nose **10**. If the outer surface of the base layer **46** is covered by a tear-away layer, the user removes the tear-away layer to expose the adhesive. The user then places a first nasal applique **24** on a first lateral region **18** (e.g., the ala of the nose) adjacent a first nostril opening **14**, and a second nasal applique **24** on a second lateral region **18** adjacent a second nostril opening **14**. Typically, the appliques **24** are placed on the nose near the transition of the nose bone.

Once both nasal appliques **24** are applied to the respective lateral regions **18** of the nose **10**, the user may place the bridge member **22** over the nose **10**, with the magnets **42** on the bridge member **22** being placed adjacent respective ones of the nasal appliques **24** to allow the metallic elements **44** in the nasal appliques **24** to be magnetically drawn to the magnets **42** in the bridge member **22**. The interaction between the metallic elements **44** and the magnets **42** creates dilating forces which are imparted to the respective lateral regions **18** of the nose **10** via the interconnection of the nasal appliques **24** to the nose **10**. The dilating forces urge the lateral regions **18** of the nose **10** outward, which increases the size of the nasal passageways **14** to enhance the user's ability to breathe. The bridge member **22** substantially retains its shape as it is placed over the user's nose **10**, despite the increased magnetic attraction between the magnets **42** and the metallic elements **44**. Along these lines, the bridge member's resistance to bending or flexing causes the lateral regions **18** of the nose to be drawn to the bridge member **22**, rather than the bridge member **22** being drawn to the nose **10**.

Furthermore, the central positioning of the metallic element **44** relative to the underlying base layer **46** causes the central portion of the base layer **46** to be pulled toward the magnet **42** when the magnet **42** is placed adjacent the metallic element **44**. The centrally applied force on the base layer **46** creates a shear force between the base layer **46** and the user's nose **10**. In this respect, although the magnetic attraction between the magnet **42** and the metallic element **44** pulls the metallic element **44** along an axis extending between the magnet **42** and the metallic element **44**, the generally central location of the metallic element **44** within the applique **24** distributes a portion of the force created by the attraction of the metallic element **44** in the applique **24** and the positioned magnets **42** to the compliant area around the metallic element **44** which substantially translates the force to shear in a plane along the skin of the user's nose, which is generally offset from the axis extending between the magnet **42** and the metallic element **44**, and in some instances, may be perpendicular to such axis. The shear component allows for a much more aggressive dilation compared to systems that pull generally perpendicularly to the skin, as the adhesives are much stronger in shear.

The bridge member **22** remains on the user's nose **10** as long as the user desires. Along these lines, the bridge member **22** is specifically configured and adapted to allow the user to compete in a sporting event or other activities with the bridge member **22** coupled to the user's nose **10**. In this respect, the attraction between the magnets **42** and the metallic elements **44** is strong enough to maintain the bridge member **22** in place while the user participates in such events or activities under normal circumstances and impact.

One particular advantage of the breathing system **20** is the ability of the system **20** to selectively transition between an ON (engaged) state and an OFF (disengaged) state without removing the nasal appliques **24** from the user's nose **10**. In the ON state, the nasal appliques **24** are applied to the user's nose **10**, and the bridge member **22** is engaged with the nasal appliques **24**, which results in the dilating force being imparted on the user's nose **10**. The breathing system **20** may transition from the ON state to the OFF state by disengaging the bridge member **22** from the nasal appliques **24**, which stops the application of the dilating force on the user's nose **10**. In this regard, when the system **20** is in the OFF state, the system **20** is inactive. If the user subsequently wants to turn the system **20** back ON, the user simply re-applies the bridge member **22** over the nose **10** and into engagement with the nasal appliques **24**.

The ability to selectively transition the system **20** between ON and OFF states may be particularly advantageous, particularly when participating in sports-related activities, where the user may take breaks from time-to-time. For instance, many sports relates activities are divided into heats, periods, quarters, halves, etc., such that the user experiences extended periods of inactivity between extended active periods. The user may want to transition the system **20** to the OFF state during periods of inactivity, and to the ON state during periods of activity. The configuration of the nasal appliques **24** and the associated bridge member **22** allows for such quick and easy transition to give the user the enhanced ability to breathe when needed during the active periods. The selective transition of the system **20** between an ON state and an OFF state may be analogous to a quarterback taking his mouthpiece out between plays.

Referring now to FIGS. **10-17**, there is depicted a second embodiment of a breathing system. The breathing system includes a bridge member **122** and a pair of nasal appliques **24**. The primary distinction between the first and second embodiments is the inclusion of a spacer **125** on the bridge member **122** for spacing the magnets **142** farther from the nasal appliques **24** to enhance the dilating force (e.g., the nasal appliques **24** are pulled farther). In this respect, the nasal appliques **24** used in the second embodiment are similar to the nasal appliques **24** discussed above in connection with the first embodiment. Thus, the following discussion will focus on the unique configuration of the bridge member **122**.

The bridge member **122** includes an arcuate main body **126** having a concave inner surface **128** and an opposing convex outer surface **130**. The main body **126** includes a middle portion **132** defining an apex which is located between two distal portions **134**, wherein each distal portion **134** terminates at a respective distal tip **136**. The two distal tips **136** are spaced from each other by a distance, $D_2$ which allows the bridge member **122** to fit over the user's nose **10**, with the distal portions **134** being positioned adjacent opposing lateral regions **18** of the user's nose **10**. The bridge member **122** may be fabricated in various sizes to accommodate differently sized noses, as well as to create different amounts of dilation. Along these lines, the distance $D_2$ may be anywhere from 1.0 inch for use on a small nose (e.g., for a child), to over 2.5 for use on a larger nose. For an average nose, the distance $D_2$ may be approximately equal to 1.75 inches.

The main body **122** includes a pair of opposed longitudinal edges **138** and a pair of opposed transverse edges **140**, which essentially define the aforementioned distal tips **136**. The distance between the opposed longitudinal edges **140** defines a bridge member thickness, $T_2$, which may be equal to approximately 0.5 inches, although other thickness dimensions may be used without departing from the spirit and scope of the present invention.

The main body **126** is rigidly formed so as to substantially maintain its shape. Along these lines, the main body **126** is preferably more resistant to bending, or flexing than is the skin of the user's nose **10**. In this respect, the main body **126** is capable of being disposable in compression, that is to say, the main body **126** is capable of having a force applied thereto.

The bridge member **122** further includes a plurality of magnets **142** coupled to the concave inner surface **128** adjacent the distal portions **134** thereof. In the exemplary embodiment, the bridge member **122** includes a pair of magnets **142** at each distal portion **134**. The magnets **142** may be received within a cavity or recess formed within the main body **126** that is substantially complimentary in shape and size to the pair of magnets **142**. The magnets **142** may be adhered or otherwise coupled to the main body **126** using fastening mechanisms known by those skilled in the art.

Additionally coupled to the main body **126** at respective distal portions thereof is a pair of spacers **125**. Each spacer **125** is located adjacent a respective distal portion **134** of the main body **126** and includes a contact surface **127** and an opposing outer surface **129**, wherein the contact surface **127** is adapted to engage with the wearer's nose **10**. When viewed from the perspective shown in FIG. **17**, which is a cross-sectional view of the breathing system in use on a user's nose **10**, shown in phantom, the inner surface **128** of the main body **126** resides between the contact surface **127** of the spacer **125** and the outer surface **130** of the main body **126**. In this respect, the contact surface **127** is offset from the inner surface **128**.

Each spacer **125** additionally protrudes from the main body **126** beyond one of the longitudinal edges **138** and terminates at a tip **131**. In the exemplary embodiment, the spacer **125** defines an arcuate peripheral contour, although it is understood that in other embodiments, the peripheral contour of the spacer **125** may assume any shape or configuration.

During use of the breathing system, the nasal appliques **24** are applied to the user's nose **10**, as described above. Once the appliques **24** are applied, the user places the bridge member **122** over the nose **10**, with the contact surface **127** of the spacers **125** contacting respective lateral regions **18** of the user's nose **10**. As the bridge member **122** is moved closer to the nasal appliques **24**, the magnetic attraction between the magnets **142** and the metallic elements **44** pulls the appliques **24** outwardly, thereby imparting a dilating force on the lateral regions **18** of the nose **10**, causing the nose **10** to dilate. The presence of the spacer **125** allows the metallic elements **44** to be drawn further to engage with the magnets **142**, which enhances the dilating effect.

The bridge member **122** may be disengaged from the nasal appliques **24** by pulling the bridge member **122** away from the appliques **24**. Once disengaged, the dilating force is no longer applied to the user's nose **10**, thereby allowing the nose **10** to retract and assume its normal position. In this respect, the breathing system may be selective transitioned between an ON state and an OFF state, as described above.

Referring now to FIGS. **18-33**, there is depicted several embodiments of bridge members adapted for use with the nasal appliques **24** described above. The bridge members shown in FIGS. **18-33** differ from the bridge members **22**, **122** previously shown and described by virtue of the ability of the bridge members shown in FIGS. **18-33** to flex and conform to the anatomy of the user's nose **10**. In some instances, the bridge members are flexible and capable of assuming a specific position (see FIGS. **18-25**), while other bridge members are flexible between a neutral position and a flexed position, with the bridge members being biased toward the neutral position.

Referring now specifically to FIGS. **18-21**, there is depicted a third embodiment of a bridge member **222** which includes a flexible middle portion **232** disposed between a distal members **234**. In the exemplary embodiment, the flexible middle portion **232** is comprised of a plurality of flexible bars **250**, specifically three bars **250**, although the number of bars **250** may vary without departing from the spirit and scope of the present invention. The bars **250** are flexible, and yet are of sufficient rigidity to independently maintain a desired configuration, similar to the ability of a conventional paperclip to be bent and assume a particular configuration, although the bars **250** are preferably of a more rigid stiffness than a conventional paperclip.

Each bar **250** is coupled to each distal member **234** at a respective end portion of the bar. Each distal member **234** includes a main body **252** having an inner surface **254**, an opposing outer surface **256**, and a set of engagement sleeves **258** coupled to the outer surface **256**, wherein the number of engagement sleeves **258** equals the number of bars **250**. Thus, in the exemplary embodiment, each main body **252** includes three engagement sleeves **258**, wherein each engagement sleeve **258** is specifically adapted to receive one of the bars **250** at a respective end portion thereof. Each main body **252** also defines a distal edge **260**, which is spaced away from the bars **250** and extend generally per-

Case 1:20-cv-00152-JLH Document 109-1 Filed 03/31/26 Page 56 of 157 PageID #: 1447



pendicular to the bars **250**. The distal edges define a bridge member length, $L_1$, which may be equal to approximately 2.0-3.0 inches when the bars **250** are generally linear (e.g., when the bridge member **222** is in a generally flat configuration).

Each distal member **234** additionally includes one or more magnets **242** coupled to the main body **252**. In the exemplary embodiment, each distal member **234** includes two magnets **242** coupled thereto. The magnets **242** may be received within a recess formed within the main body **252**.

The bridge member **222** is configured to be selectively bent or flexed into a prescribed configuration which generally conforms to the anatomy of the user's nose **10**. When the bridge member **22** is bent, the bars **250** are bent about a bend axis **265**, such that the distal members **234** are moved toward each other and the bend axis **265**. FIG. **19** depicts a user's hand (in phantom), pressing the distal members **234** together to bend the bridge member **222** into the desired configuration. As noted above, the bars **250** are preferably configured such that when the bars **250** are bent into the desired configuration, the bars **250** are capable of staying in that desired configuration.

In use, the bridge member **222** is bent or flexed into the prescribed configuration based on the particularly anatomy or configuration of the user's nose **10**. Along these lines, the bridge member **222** is bent until the main bodies **252** are spaced slightly farther than the distance between the lateral regions **18** of the user's nose **10**. The bridge member **222** will maintain the prescribed, bent configuration due to the mechanical properties of the bars **250**.

After the bridge member **222** is bent and the nasal appliques **24** are applied to the nose **10**, the bridge member **222** is placed over the user's nose **10**, which causes the magnets **242** in the bridge member **222** to interact with the metallic elements **44** in the nasal appliques **24**. The interaction imparts a dilating force on the user's nose **10**, which in turn opens the nasal passageways **14** to enhance the user's ability to breathe. When the bridge member **222** is placed on the nasal appliques **24**, the system is considered to be "active" and in an ON state, whereas when the bridge member **222** is removed from the nasal appliques **24**, the system is considered to be "inactive" and in an OFF state.

Referring now to FIGS. **22-25**, there is depicted a fourth embodiment of a bridge member **322**, which is similar to the bridge member **222** depicted in FIGS. **18-21**, although the bridge member **322** includes a pair of spacers **325** coupled to respective ones of the main bodies **352**. In particular, the bridge member **322** generally includes a plurality of bars **350**, a pair of distal members **334**, wherein each distal member **334** includes a main body **352** and a plurality of sleeves **358** which engage with the bars **350**, similar to the sleeves described above.

Each spacer **325** is coupled to a respective one of the pair of main bodies **352** and includes a contact surface **327** and an opposing outer surface **329**, wherein the contact surface **327** is adapted to engage with the wearer's nose **10**. An inner surface **328** of the main body **352** resides between the contact surface **327** of the spacer **325** and an outer surface **330** of the main body **352**. In this respect, the contact surface **327** is offset from the inner surface **328**.

Each spacer **325** additionally protrudes from the main body **352** beyond one of the longitudinal edges and terminates at a tip **331**. In the exemplary embodiment, the spacer **325** defines an arcuate peripheral contour, although it is understood that in other embodiments, the peripheral contour of the spacer **325** may assume any shape or configuration.

The use of the bridge member **322** is similar to the use of the bridge member described above in relation to FIGS. **18-21**. However, the presence of the spacers **325** allows the metallic elements **44** to be drawn further to engage with the magnets **342**, which enhances the dilating effect.

Referring now to FIGS. **26-29**, there is depicted a fifth embodiment of a bridge member **422**, which is distinguishable from the bridge members discussed above primarily because of a flexible band **450** which allows the bridge member **422** to flex between a neutral position and a flexed position.

The bridge member **422** includes a flexible middle portion comprised of the flexible band **450**. The flexible band **450** is transitional between a neutral position, shown in FIGS. **26**, **28** and **29**, and a flexed position, shown in FIG. **26** (in phantom) and FIG. **27**. The flexible band **450** differs from the flexible bars discussed above because the flexible band **450** is not capable of independently maintaining the flexed position. Rather, the flexible band **450** is biased toward the neutral position, such that when the band **450** is not acted upon by an outside force, the band **450** returns to the neutral position.

The band **450** is coupled to a pair of distal members **434** at a respective end portions of the band **450**. Each distal member **434** includes an inner surface **428**, an opposing outer surface **430**, and an engagement pocket adapted to receive an end portion of the band **450**. In the exemplary embodiment, the engagement pocket extends from a medial end of the distal member **434**. The inner surface **428** may also include a cutout in communication with the pocket, wherein the cutout is sized to accommodate one or more magnets **442**, as described below. Each distal member **434** also defines a distal edge **460**, with the pair of distal edges **460** defining a bridge member length $L_2$ therebetween, which may be equal to approximately 2.0-3.0 inches when the band **450** is generally linear (e.g., when the bridge member **422** is in a generally flat configuration). The band **450** may optionally be coated in a soft, flexible material, such as rubber or fabric, to make the bridge member **422** more comfortable to wear.

Each bridge member **422** additionally includes one or more magnets **442** coupled to the distal members **434** and/or the band **450**. In the exemplary embodiment, each end portion of the band **450** includes two magnets **442** coupled thereto. As noted above, the magnets **442** are received within a cutout formed in the distal member **434**, such that the distal member **434** partially surrounds the magnets **442**.

In use, the nasal appliques **224** are applied to the lateral regions **18** of the user's nose **10** and the bridge member **422** is placed over the nasal appliques **24**. In particular, the band **450** is bent or flexed to generally conforms to the anatomy of the user's nose **10**. When the band **450** is bent, the band **450** bends about a bend axis **465**, such that the distal members **434** are moved toward each other and the bend axis **465**. FIG. **27** depicts a user's hand (in phantom), pressing the distal members **434** together to bend the bridge member **422**. As the bridge member **422** is moved closer to the nasal appliques **24**, the magnets **442** in the bridge member **422** interact with the metallic elements **44** in the nasal appliques **24**. The magnetic attraction accomplishes two purposes: the first purpose is that the nasal appliques **24** are drawn toward the magnets **442**, which imparts a dilating force on the nose **10** causing the nasal passageways **14** to open; the second purpose is that the magnetic attraction maintains the bridge member **422** in the flexed configuration. As noted above, the bridge member **422** is biased toward the neutral position,

Optionally, the biasing force may be strong enough to further dilate the user's nose **10**.

The bridge member **422** is configured to selectively transition the breathing system between ON (e.g., active) and OFF (e.g., inactive) states by simply engaging or disengaging the bridge member **422** with the nasal appliques **24**, similar to the bridge members discussed above.

Referring now to FIGS. **30-33**, there is depicted a sixth embodiment of a bridge member **522**, which is similar to the bridge member **422** discussed above, although the bridge member **522** includes a pair of spacers **525** coupled to respective ones of the distal members **534**. In particular, the bridge member **522** generally includes a flexible band **550**, a pair of distal members **534**, wherein each distal member **534** includes a pocket configured to engage with the band **550**.

Each spacer **525** is coupled to a respective one of the pair of distal members **534** and includes a contact surface **527** and an opposing outer surface **529**, wherein the contact surface **527** is adapted to engage with the wearer's nose **10**. The inner surface **528** of the distal member **534** resides between the contact surface **527** of the spacer **525** and the outer surface **530** of the distal member **534**. In this respect, the contact surface **527** is offset from the inner surface **528**.

Each spacer **525** additionally protrudes from the distal member **534** beyond one of the longitudinal edges and terminates at a tip **531**. In the exemplary embodiment, the spacer **525** defines an arcuate peripheral contour, although it is understood that in other embodiments, the peripheral contour of the spacer **525** may assume any shape or configuration.

The use of the bridge member **522** is similar to the use of the bridge member **422** described above in relation to FIGS. **26-29**. However, the presence of the spacers **525** allows the metallic elements **44** to be drawn out further to engage with the magnets **542**, which enhances the dilating effect.

Referring now to FIGS. **34-36**, there is depicted a seventh embodiment of a bridge member **622** that is specifically configured and adapted to not only interface with nasal appliques **24**, but is also adapted to interface with a lens **660**, such as a glasses lens, goggle lens, or other optical lens. The interaction between the bridge member **622** and the lens **660** may be sufficient to stabilize the lens on the user's nose to allow the lens **660** to reside over the wearer's eyes without the use of a support strap or arms, as are commonly employed with goggles and glasses frames, respectively. In particular, the lens **660** includes a peripheral edge defining a bridge section **662** and a pair of lower sections **664**, with each lower section **664** transitioning to a respective side section **668**. The bridge section **662** may include a pair of tabs **670** for engaging with the bridge member, as will be described in more detail below.

The bridge member **622** includes a main body **626** having a concave inner surface **628** and a convex outer surface **630**. The bridge member **622** defines a middle portion **632** and a pair of distal portions **634**. Attached to each distal portion **634** is at least one magnet **642**. The magnet **642** may reside within a recess which extends into the main body **626** from the concave inner surface **630**. The bridge member **622** may further include a lens receiving recess or opening **635** extending into the bridge member **622** from the convex outer surface **628**. The lens receiving opening **635** may be adapted to receive respective ones of the tabs **670** for connecting the lens **660** to the bridge member **622**.

The bridge member **622** may be selectively transitioned relative to the lens between a disengaged configuration (see FIG. **34**) and an engaged configuration (see FIG. **35**). The user may engage the bridge member **622** with the lens **660** by pressing the convex outer surface **630** against the bridge section **662** of the lens **660**, until the bridge section **662** is received within the lens receiving opening **635** (as shown in FIG. **35**).

The bridge member-lens assembly may be attached to the user's nose **10** via the nasal appliques **24**. In particular, as the bridge member **622** is moved closer to the nasal appliques **24**, the magnets **642** in the bridge member **622** interact with the metallic elements **44** in the nasal appliques **24**, such that the magnetic force therebetween holds the lens **660** in place over the user's nose **10**. Furthermore, the magnetic attraction also imparts a dilating force on the user's nose **10** causing the nasal passageways **14** to open for enhancing the user's ability to breathe.

While FIGS. **34-36** show bridge member **622** as being adapted to for use in stabilizing and securing the lens **660** in place on the user, it is understood that any one of the foregoing embodiments of the bridge member described above and shown in the Figures may be adapted for use with the lens **660**.

Although the foregoing describes the nasal appliques **24** as including the metallic elements, and the magnets as being part of the bridge member, it is understood that in other embodiments, the location of the magnets and metallic elements may be reversed. In particular, the metallic elements may be part of the bridge member and the magnets may be part of the nasal appliques. Alternatively, it is also understood that the metallic elements may be replaced with magnets, such that both the bridge members and nasal appliques have magnets which are polar opposites, and thereby are attracted to each other.

The particulars shown herein are by way of example only for purposes of illustrative discussion, and are not presented in the cause of providing what is believed to be most useful and readily understood description of the principles and conceptual aspects of the various embodiments of the present disclosure. In this regard, no attempt is made to show any more detail than is necessary for a fundamental understanding of the different features of the various embodiments, the description taken with the drawings making apparent to those skilled in the art how these may be implemented in practice.

What is claimed is:

**1**. A breathing system adapted to open a nasal passage of a user's nose, the breathing system comprising:

a bridge member having a pair of distal portions, a middle portion positioned between the pair of distal portions, and an inner surface that defines a concave configuration, the bridge member being configured to be positionable adjacent the user's nose, with the inner surface facing the user's nose and each distal portion residing adjacent a respective lateral region of the user's nose; and

at least one nasal applique adapted to be attachable to a respective lateral region of the user's nose, each nasal applique being magnetically attractable to a respective one of the pair of distal portions, the attraction between the at least one nasal applique and the bridge member imparting a dilating force on the user's nose to dilate the nasal passage;

the bridge member being of sufficient rigidity so as to retain the concave configuration of the inner surface when the bridge member is detached from the at least one nasal applique.

**2**. The breathing system recited in claim **1**, wherein each nasal applique includes:

a flexible base layer including a first surface and an opposing second surface, the first surface having an adhesive disposed thereon to enable the first surface to be selectively attachable to the nose of the user; and

a metallic element coupled to the second surface of the base layer.

3. The breathing system recited in claim 2, wherein the bridge member includes a main body and a pair of magnets coupled to the main body at respective ones of the distal portions of the bridge member, the metallic element in each nasal applique being magnetically attractable to a respective one of the pair of magnets and having an arcuate surface over which the respective one of the pair of magnets is moveable when the metallic element is magnetically coupled to the respective one of the pair of magnets.

4. The breathing system recited in claim 1, wherein the bridge member includes:

a first surface and an opposing second surface, the first surface facing toward the user's nose and the second surface facing away from the user's nose when the bridge member is positioned adjacent the user's nose; and

a pair of spacers extending from the first surface and away from the second surface, each spacer being positioned at a respective one of the pair of distal portions.

5. The breathing system recited in claim 4, wherein the pair of spacers are integrally formed with the main body.

6. The breathing system recited in claim 1, wherein the bridge member is resistant to bending when attached to the at least one nasal applique.

7. The breathing system recited in claim 1, wherein the bridge member is adapted to be attachable to eyewear.

8. A breathing system attachable to a nose of a user for selectively dilating comprising:

at least one nasal applique configured to be attachable to an outer surface of a user's nose; and

a bridge member having an inner surface that is of a concave configuration, the bridge member being configured to be selectively positionable adjacent the nose of the user such that the inner surface faces the nose of the user and to magnetically interact with the at least one nasal applique, the bridge member being of sufficient rigidity so as to retain the concave configuration of the inner surface when the bridge member is disengaged from the at least one nasal applique;

the at least one nasal applique and the bridge member being configured to selectively transition between an ON state wherein the at least one nasal applique interacts with the bridge member to apply a dilating force on the nose of the user, and an OFF state wherein the bridge member is moved away from the at least one nasal applique to cease application of the dilating force on the nose of the user.

9. The breathing system recited in claim 8, wherein the bridge member includes a main body and a pair of magnets coupled to the main body at respective ones of the distal portions of the bridge member, the metallic element in each nasal applique being magnetically attractable to a respective one of the pair of magnets.



10. The breathing system recited in claim 8, wherein the bridge member is resistant to bending when attached to the at least one nasal applique.

11. A bridge member adapted for use with a pair of nasal appliques to dilate a nose of a user, the bridge member comprising:

an arcuate main body having a pair of distal portions, a middle portion defining an apex, and an inner surface that is of a concave configuration, with each distal portion being located on a respective side of the apex;

the main body being configured to be positionable over the nose of the user to assume a first position wherein the pair of distal portions of the main body extend over opposed regions of the nose of the user;

the pair of distal portions being magnetically interactable with respective ones of the pair of nasal appliques when the pair of nasal appliques are coupled to the nose of the user and the main body is in the first position to cause dilation of the nose of the user;

the main body being of sufficient rigidity so as to retain the concave configuration of the inner surface when the main body is disengaged from the pair of nasal appliques.

12. The bridge member recited in claim 11, further comprising at least two magnets coupled to the main body and positioned at respective ones of the pair of distal portions.

13. The bridge member recited in claim 12, wherein each distal portion extends from the apex to define a respective distal tip, the at least two magnets being spaced from the distal tips.

14. The bridge member recited in claim 11, further comprising a first pair of magnets coupled to the main body at a first one of the pair of distal portions and a second pair of magnets coupled to the main body at a second one of the pair of distal portions.

15. The bridge member recited in claim 11, each distal portion extends away from the apex to define a distal tip, wherein the distal tips of the distal portions are spaced from each other by 1.0-2.5 inches.

16. The bridge member recited in claim 11, wherein the main body includes a pair of opposed longitudinal edges spaced apart from each other by approximately 0.5 inches.

17. The bridge member recited in claim 11, wherein the main body is capable of being selectively transitioned between an ON state and an OFF state, the main body being magnetically engaged with the pair of nasal appliques to impart the dilating force on the nose of the user when the main body is in the ON state and the main body being magnetically disengaged from the pair of nasal appliques to cease imparting of the dilating force on the nose of the user.

18. The bridge member recited in claim 11, wherein the main body is adapted to be attachable to eyewear.

* * * * *

# Exhibit 2

US010556095B2

(12) **United States Patent**
**Castillo**

(10) **Patent No.: US 10,556,095 B2**
(45) **Date of Patent: *Feb. 11, 2020**

(54) **GOOGLE BREATHING SYSTEM**

(71) Applicant: **James D. Castillo**, Los Alamos, CA (US)

(72) Inventor: **James D. Castillo**, Los Alamos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 338 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/799,192**

(22) Filed: **Jul. 14, 2015**

(65) **Prior Publication Data**

US 2015/0314113 A1 Nov. 5, 2015

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 14/622,448, filed on Feb. 13, 2015, now Pat. No. 9,283,106, which is a continuation-in-part of application No. 14/502,348, filed on Sep. 30, 2014, now Pat. No. 9,675,493.

(Continued)

(51) **Int. Cl.**
*A61M 29/00* (2006.01)

(52) **U.S. Cl.**
CPC .................................. *A61M 29/00* (2013.01)

(58) **Field of Classification Search**
CPC .. A61F 5/08; A61F 5/56; A61M 29/00; A61B 17/24
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,835,848 A 9/1974 Berner
4,835,506 A 5/1989 Leupold
(Continued)

FOREIGN PATENT DOCUMENTS

CN 1389185 1/2003
JP H10192412 7/1998
(Continued)

OTHER PUBLICATIONS

"3M Micropore Surgical Tapes: Commonly Asked Questions", Apr. 29, 2003, p. 1.*
(Continued)

*Primary Examiner* — Ashley L Fishback
(74) *Attorney, Agent, or Firm* — Stetina Brunda Garred and Brucker

(57) **ABSTRACT**

A breathing enhancement system for use with eyewear having a compressible liner. The breathing enhancement system includes a pair of clips configured to be selectively attachable to the eyewear and adapted to compress the compressible liner when attached to the eyewear to define a compressed portion of the compressible liner. A clip liner is adapted to engage with and extend between the pair of clips, with the clip liner being configured to reside within the compressed portion of the compressible liner. A pair of nasal appliques are configured to be selectively placeable on respective lateral portions the nose of a user, with each nasal applique being adapted to be magnetically urged toward a respective one of the pair of clips in response to placement of the eyewear adjacent the nose of the user to cause the nasal passage of the user to open.

**20 Claims, 11 Drawing Sheets**



**Related U.S. Application Data**

(60) Provisional application No. 61/937,018, filed on Feb. 7, 2014, provisional application No. 61/918,826, filed on Dec. 20, 2013.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 4,886,349 | A | 12/1989 | Willis | |
| 5,533,503 | A | 7/1996 | Doubek et al. | |
| 5,566,503 | A | 7/1996 | Doubek et al. | |
| 5,546,929 | A * | 8/1996 | Muchin | A61F 5/08 128/200.24 |
| 5,719,655 | A | 2/1998 | Peschel et al. | |
| 5,890,486 | A * | 4/1999 | Mitra | A61F 5/08 128/200.24 |
| 5,913,873 | A | 6/1999 | Blach et al. | |
| 5,957,126 | A | 9/1999 | Neeser | |
| 6,006,746 | A | 12/1999 | Karell | |
| 6,033,422 | A | 3/2000 | Blach et al. | |
| 6,352,548 | B1 | 3/2002 | Blach et al. | |
| 6,533,412 | B1 | 3/2003 | Wang et al. | |
| 6,540,349 | B1 | 4/2003 | Liesegang | |
| 6,648,471 | B1 | 11/2003 | Dalrymple et al. | |
| 6,676,681 | B1 | 1/2004 | Blach et al. | |
| 6,823,864 | B2 | 11/2004 | Blach et al. | |
| 7,091,634 | B2 | 8/2006 | Yi et al. | |
| 7,118,210 | B2 | 10/2006 | Landers | |
| 7,793,661 | B2 | 9/2010 | Macken | |
| D639,762 | S | 6/2011 | Brogden et al. | |
| D644,324 | S | 8/2011 | Brunner et al. | |
| D644,325 | S | 8/2011 | Brunner et al. | |
| 8,042,542 | B2 | 10/2011 | Ging et al. | |
| 8,292,427 | B2 | 10/2012 | Zelazowski | |
| 8,459,254 | B1 | 6/2013 | Jassir et al. | |
| D696,400 | S | 12/2013 | Brogden et al. | |
| D701,957 | S | 4/2014 | Brunner et al. | |
| D703,318 | S | 4/2014 | Brunner et al. | |
| 2002/0029408 | A1 | 3/2002 | Lindahl | |
| 2003/0000521 | A1 | 1/2003 | Beaudry | |
| 2007/0105824 | A1 | 5/2007 | Erickson-Miller et al. | |
| 2007/0252946 | A1 | 11/2007 | Welchel | |
| 2008/0097517 | A1 | 4/2008 | Holmes et al. | |
| 2008/0119885 | A1 | 5/2008 | Yazdi | |
| 2009/0183734 | A1 | 7/2009 | Kwok et al. | |
| 2009/0188023 | A1 | 7/2009 | Hsu | |
| 2010/0309425 | A1 | 12/2010 | Zelazowski | |
| 2011/0000483 | A1 | 1/2011 | Matthias et al. | |
| 2011/0230952 | A1 * | 9/2011 | Kassab | A61B 17/12113 623/1.11 |
| 2012/0024639 | A1 | 2/2012 | Castro | |
| 2012/0036607 | A1 | 2/2012 | Beliveau | |
| 2012/0172923 | A1 | 7/2012 | Fenton et al. | |
| 2014/0296904 | A1 | 10/2014 | Andre | |
| 2014/0375946 | A1 | 12/2014 | Rochford et al. | |
| 2015/0001014 | A1 | 1/2015 | Noborio et al. | |
| 2015/0173933 | A1 | 6/2015 | Castillo | |
| 2015/0173934 | A1 | 6/2015 | Castillo | |
| 2016/0193070 | A1 | 7/2016 | Castillo | |
| 2017/0106222 | A1 | 4/2017 | Mayer et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2009-535079 | 10/2009 |
| KR | 200404740 | 12/2005 |
| WO | WO2002/003125 | 1/2002 |

OTHER PUBLICATIONS

International Search Report and Written Opinion for International Application No. PCT/US14/69817, dated Mar. 11, 2015, 11 pages.

International Search Report and Written Opinion of International Application No. PCT/US15/67530, dated May 16, 2016, 11 pages.

International Search Report and Written Opinion of International Application No. PCT/US2016/022637, dated Jun. 9, 2016, 10 pages.

Australian Government IP Australia, Examination report No. 1 for standard patent application, dated Oct. 24, 2017, 5 pages.

Office Action for corresponding Japanese Patent Application No. 2016-560622 with English translation, dated Nov. 1, 2017, 5 pages.

International Search Report and Written Opinion for International Application No. PCT/US 17/45688, dated Oct. 31, 2017, 11 pages.

European Patent Office, extended European search report for Application No. EP 14871764, dated Jul. 7, 2017, 10 pages.

Patent Cooperation Treaty, International Preliminary Report on Patentability for Application No. PCT/US16/22637, dated Aug. 3, 2017, 9 pages.

First Office Action of CN Application 201480075735.9, dated May 2, 2017, 9 pages.

Summary of First Office Action of CN Application 2014800757359, dated May 2, 2017, 5 pages.

Patent Cooperation Treaty, International Search Report and Written Opinion for International Application No. PCT/US2018/066312, dated Mar. 5, 2019, 12 pages.


* cited by examiner




*Fig. 1*




Fig. 2




Fig. 2A




Fig. 3




Fig. 4




*Fig. 5*




*Fig. 6*




*Fig. 7*




*Fig. 8*

Case 1:19-cv-01529-JLH Document 109-1 Filed 02/13/26 Page 265 of 1157 PageID #: 14336






Fig. 9




Fig. 10




Fig. 11




Fig. 12




Fig. 13




Fig. 14




*Fig. 15*




*Fig. 16*


10
14
115
18
18
117
117
18
12
136
128
134
126
124
122
120
170
170
116
130
132

*Fig. 17*


12
117
117
18
115
116
120
170
170
123
125
132

*Fig. 18*


12
116
117
117
120
170
170
125
18
115

*Fig. 19*




*Fig. 20*




*Fig. 21*




*Fig. 22*




*Fig. 23*




Fig. 24




Fig. 25




Fig. 26


216
214
214
228
228
240
230
230

*Fig. 27*


216
232
234
234
232
226
240
226
214
214

*Fig. 28*

# GOOGLE BREATHING SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. patent application Ser. No. 14/622,448, filed Feb. 13, 2015, which is a continuation-in-part of U.S. patent application Ser. No. 14/502,348, filed Sep. 30, 2014, which claims the benefit of U.S. Provisional Application No. 61/918,826, filed Dec. 20, 2013, and U.S. Provisional Application No. 61/937,018, filed Feb. 7, 2014, the contents of each of the foregoing applications being expressly incorporated herein by reference.

## STATEMENT RE: FEDERALLY SPONSORED RESEARCH/DEVELOPMENT

Not Applicable

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to a breathing enhancement system, and more specifically to a breathing enhancement system including a nasal applique wearable on a user's nose and adapted for use with eyewear to dilate the user's nose when the eyewear is worn by the user.

2. Description of the Related Art

It is readily understood that breathing is important when playing sports or taking part in physical competition due to the increased demand for oxygen by the body. Breathing may be achieved by drawing air into the body through an individual's nostrils and/or through the individual's mouth. However, in some instances, it is preferable to breathe almost exclusively through the nostrils, as there may be a downside to breathing through one's mouth. Along these lines, breathing through the mouth may lead to rapid water loss and heat loss, both of which increase the likelihood of exercise-induced asthma.

It is also understood that eyewear is commonly used when participating in many sports and activities. Such eyewear may include protective eyewear, or vision-enhancing (e.g., prescription) eyewear. For instance, goggles are readily worn by many athletes participating in snowboarding, skiing, motocross, automotive racing, basketball, baseball, hockey, etc. Goggles are typically configured such that a portion of the goggle frame extends over the wearer's nose, and thus, goggles may impact one's ability to breathe through the wearer's nasal passage.

Moreover, many goggles are fitted with a foam liner which interfaces with the wearer's face to create a barrier or seal which prevents snow, rain, dirt or other debris from entering the goggles and creating a potential irritant in the wearer's eye. In order to create an effective seal or barrier around the goggles, the goggles are compressed against the wearer's face, typically through the use of an elastic band which is worn around the head. The compression of the foam liner against the wearer tends to compress the nasal passages of the wearer, which further inhibits the ability of the wearer to breathe through the nose.

Accordingly, there is a need in the art for a device which can be used with a goggle or other eyewear for enhancing the wearer's ability to breathe through the wearer's nasal passage. Various aspects of the present invention address this particular need, as will be discussed in more detail below.



## BRIEF SUMMARY OF THE INVENTION

In accordance with one embodiment of the present invention, there is provided a goggle kit including a goggle clip attachable to the goggle frame, and a corresponding nose element (e.g., applique), which adheres to the wearer's nose. The goggle clip attaches to the goggle frame to compress the foam liner to create space for the nose element to enable the nose element to move outward toward the clip. The nose element and the goggle clip are configured to be attachable to each other, such that the nose element is moved in an outward direction and/or forward direction to engage with the clip. The outward and/or forward movement of the nose element causes the nasal opening of the wearer to dilate. Therefore, even though the wearer is using goggles, the wearer can breathe more freely through his or her nasal passageway.

The goggle clip may include a pair of clip members which are transitional between an extended position and a clamping position for securing the goggle clip to the goggle frame. The clip members may move toward each other as the clip transitions from the extended position toward the clamping position. The goggle clip may include a spring clip, or may include a hinge to allow the clip to transition between the extended and clamping positions.

The nose element may include a pair of nose pieces positionable over respective ones of the user's nostrils. The nose element may also include a single strip which is extendable over the user's nose between the user's nostrils. The nose element may include an adhesive for temporarily securing the nose element to the user.

Engagement between the goggle clip and the nose element may be by way of magnetic attraction, hook and loop fasteners (e.g., VELCRO), adhesives, snaps, clips, friction, or other mechanical engagement mechanisms known in the art.

According to one embodiment, there is provided an eyewear system adapted to open a nasal passage of a user. The eyewear system includes a wearable frame having a bridge section configured to be placeable adjacent the nose of the user. A nasal attachment member is configured to be selectively placeable on the nose of the user adjacent the nasal passage. The nasal attachment member is adapted to be urged toward the wearable frame in response to placement of the wearable frame adjacent the nose of the user to cause the nasal passage of the user to open.

The system may include a liner coupled to the wearable frame and configured to interface with the user when the wearable frame is placed on the user. The liner may be formed from a compressible material. The system may additionally include a clip configured to be selectively attachable to the wearable frame and adapted to urge the nasal attachment member toward the wearable frame in response to placement of the wearable frame adjacent the nose of the user. A peripheral barrier member may be coupled to the clip and configured to interface with the user to mitigate the passage of particulate between the wearable frame and the user when the clip is attached to the wearable frame and the wearable frame is placed adjacent the nose of the user.

The clip may include a first clip member and a second clip member pivotally coupled to the first clip member. The first clip member may be pivotable relative to the second clip member between an open position and a closed position. An angle between the first and second clip members may decrease as the first and second clip members pivot from the open position toward the closed position. The first and

second clip members may be configured to become locked when the first and second slip members are in the closed position.

The nasal attachment member may be configured to be magnetically urged toward the wearable frame. The system may include a frame magnet coupled to the wearable frame and magnetically attractable to the nasal attachment member.

According to another embodiment, there is provided a method of enhancing a nasal airway of a user wearing goggles having a compressible barrier member. The method includes compressing the compressible barrier member on the goggles to form a recess within the barrier member, attaching a nasal attachment member to the user adjacent the user's nostrils, and placing the goggles on the wearer after the compressible barrier member has been compressed, placement of the goggles on the wearer urges the nasal attachment member to move into the recess formed within the barrier member, movement of the nasal attachment member into the recess causes the nasal airway of the user to dilate.

According to yet another embodiment, there is provided a disposable apparatus attachable to a nose of a wearer and configured for use with an external magnetic element positioned adjacent to the nose of the wearer. The disposable apparatus includes a flexible base layer including a first surface and an opposing second surface, and an adhesive disposed on the first surface of the flexible base layer and configured to produce an adhesive force between the flexible base layer and the wearer for attaching the flexible base layer to the nose of the wearer. The adhesive is configured to increase the adhesive force after the flexible base layer has been attached to the nose of the wearer. A metallic element is coupled to the second surface of the base layer and is configured to magnetically interact with the magnetic element when the magnetic element is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, with the magnetic interaction between the metallic element and the magnetic element imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate.

The adhesive may be adapted to increase the adhesive force after the flexible base layer has been attached to the nose of the wearer for a prescribed residency period. The adhesive may include at least one of polyethylene tape and polyolefin tape.

The metallic element may include a metallic powder.

According to yet another embodiment, there is provided a breathing enhancement system for use with eyewear having a compressible liner. The breathing enhancement system includes a pair of clips configured to be selectively attachable to the eyewear and adapted to compress the compressible liner when attached to the eyewear to define a compressed portion of the compressible liner. A clip liner is adapted to engage with and extend between the pair of clips, with the clip liner being configured to reside within the compressed portion of the compressible liner. A pair of nasal appliques are configured to be selectively placeable on respective lateral portions the nose of a user, with each nasal applique being adapted to be magnetically urged toward a respective one of the pair of clips in response to placement of the eyewear adjacent the nose of the user to cause the nasal passage of the user to open.

The present invention will be best understood by reference to the following detailed description when read in conjunction with the accompanying drawings.



## BRIEF DESCRIPTION OF THE DRAWINGS

These and other features and advantages of the various embodiments disclosed herein will be better understood with respect to the following description and drawings, in which:

FIG. **1** is a front view of a user wearing a pair of nasal elements and goggles having clips attached thereto which cooperate with the nasal elements to open the nasal passage;

FIG. **2** is rear perspective view of the goggles and clips depicted in FIG. **1**;

FIG. **2**A is an upper perspective view of the clip shown in FIG. **2** having a barrier member attached thereto;

FIG. **3** is a perspective view of the clip shown in FIG. **2** with the foam liner removed, wherein the clip is in an open position;

FIG. **4** is a perspective view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **5** is a top view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **6** is a front view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **7** is a side view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **8** is a rear view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **9** is a front upper perspective view of a second embodiment of a clip having a foam liner and a pair of magnets;

FIG. **10** is a rear upper perspective view of the clip shown in FIG. **9**, wherein an end portion of the foam liner has been moved relative to its position shown in FIG. **9**;

FIG. **11** is a top view of the clip shown in FIG. **9**;

FIG. **12** is an upper perspective view of the clip depicted in FIG. **9**;

FIG. **13** is a front view of the clip depicted in FIG. **9**;

FIG. **14** is a side view of the clip depicted in FIG. **9**;

FIG. **15** is a side sectional view of a nose element having a peel-away liner partially removed therefrom;

FIG. **16** is a bottom view of the goggle being brought into alignment with the wearer and nasal elements worn by the wearer;

FIG. **17** is a front view of a user wearing a nasal strip and goggles having embedded magnets which urge the nasal strip toward the goggles to open the user's nasal passage when the goggles are worn;

FIG. **18** is a bottom view of the goggles and clips being brought into alignment with the wearer and the nasal strip;

FIG. **19** is a bottom view of the goggles and the clips urging the nasal strip toward the goggle frame to open the wearer's nasal passage;

FIG. **20** is a front view of another embodiment of a breathing enhancement system;

FIG. **21** is a side view of a user's nose having a nasal applique of the breathing enhancement system shown in FIG. **20** applied to the user's nose;

FIG. **22** is an exploded rear perspective view of a goggle and a pair of clips attached to a clip liner;

FIG. **23** is a rear perspective view of the pair of clips and the clip liner attached to the goggle;

FIG. **24** is an exploded perspective view of the clips and clip liner of the breathing enhancement system depicted in FIG. **20**;

FIG. **25** is a side view of a clip depicted in FIG. **24**;

FIG. **26** is a side view of the clip depicted in FIG. **25** attached to the clip liner depicted in FIG. **24**;

FIG. **27** is a rear view of the clips attached to the clip liner; and

Case 1:26-cv-00152-JLH Document 1-1 Filed 02/03/26 Page 75 of 157 PageID #: 14436



FIG. 28 is a front view of the clips attached to the clip liner.

Common reference numerals are used throughout the drawings and the detailed description to indicate the same elements.

## DETAILED DESCRIPTION OF THE INVENTION

The detailed description set forth below in connection with the appended drawings is intended as a description of certain embodiments of a goggle breathing system and is not intended to represent the only forms that may be developed or utilized. The description sets forth the various structure and/or functions in connection with the illustrated embodiments, but it is to be understood, however, that the same or equivalent structure and/or functions may be accomplished by different embodiments that are also intended to be encompassed within the scope of the present disclosure. It is further understood that the use of relational terms such as first and second, and the like are used solely to distinguish one entity from another without necessarily requiring or implying any actual such relationship or order between such entities.

Referring now to the drawings, wherein the showings are for purposes of illustrating a preferred embodiment of the present invention only, and are not for purposes of limiting the same, there is depicted a system **10** configured to open or dilate the nasal passages **12** of an individual **14** wearing eyewear, such a goggles **16**. The system **10** generally includes a nasal attachment member **15** including a pair of nasal elements (e.g., nasal appliques) **17** which are worn by the wearer **14** adjacent the wearer's nostrils. The system **10** is configured such that when the goggles **16** are placed on the wearer **14**, the nasal attachment member **15** is urged toward the goggle frame **20**, which results in dilation of the nasal opening, thereby making it easier for the wearer **14** to breathe, despite the existence of the goggles **16** extending over the wearer's nose **18**.

Referring now specifically to FIG. **1**, there is depicted a set of goggles **16** having a wearable frame **20** including a frame opening, within which is positioned a lens **22**. The frame **20** includes opposed lateral end portions **24**, **26**, a top portion **28**, and an opposing bottom portion **30** having a bridge section **32** which fits over the nose **18** of the wearer **14**. The frame **20** may be fabricated from plastic, rubber, or other materials known by those skilled in the art. A headband or strap **34** may be connected to the opposed lateral end portions **24**, **26** of the frame **20** for securing the frame **20** to the wearer's head.

Although the exemplary embodiment shows the wearable frame **20** as being a frame for goggles **16**, it is understood that the term wearable frame may broadly refer to other eyewear frames which may be worn by a wearer, such as frames associated with various helmet systems and the like.

A foam liner **36** extends around an inner peripheral portion of the frame **20** and rests against the wearer's head when the goggles **16** are worn by the wearer **14**. The foam liner **36** is designed to interface with the wearer's face to create a seal or barrier around the frame **20** so as to prevent unwanted debris or particulate from passing between the goggles **16** and the wearer **14** so as to protect the wearer's eyes. The liner **36** is preferably formed of a breathable material so as to allow air to pass therethrough to allow for ventilation within the goggles **16**.

It is understood that goggles **16** come in various shapes, sizes and configurations depending on the particular size of the wearer **14**, as well as the intended use of the goggles **16**. Consequently, the term "goggles" refers broadly to any eyewear that is worn while snowboarding, snow skiing, motorcycle racing (e.g. motocross), automobile racing, or playing a wide variety of sports such as basketball, baseball, football, hockey, etc., for the purpose of protecting the wearer's eyes, or for providing enhanced visibility.

One embodiment of system **10** additionally includes a goggle attachment member or clip(s) **38**, which may be selectively and securely attached to the frame **20** of the goggle **16**. Each clip **38** is specifically adapted to engage with a corresponding nasal element **17** through complimentary fastening members. The engagement between the clip **38** and the nasal element **17** causes dilation of the nasal passageways, as will be described in more detail below. When the clip **38** is attached to the goggle **16**, the clip **38** compresses the liner **36** to create space around the wearer's nose **18** to allow the nasal element **17** to be drawn outwardly and forwardly thereby causing the nose **18** to dilate.

According to one embodiment, and referring now specifically to FIGS. **2-8**, a first embodiment of a clip **38** is shown, which includes a first clip member **42** and a second clip member **44** pivotally connected to the first clip member **42** via a hinge **45**. The first and second clip members **42**, **44** form opposing locking tabs defining a clip channel **46** (see FIG. **7**) therebetween sized and adapted to receive a portion of the goggle frame **20** to allow the clip **38** to clamp onto the goggle frame **20**.

As shown in FIGS. **3-8**, the first clip member **42** includes a pair of opposing lateral arms **48**, **50** which are interconnected by a connecting arm **52**. The opposing lateral arms **48**, **50** and the connecting arm **52** collectively define a first clamping surface **54** (see FIG. **7**), which faces the clip channel **46**. The first clip member **42** further includes a locking arm **56** extending from the connecting arm **52**, wherein the locking arm **56** includes a first locking surface **58** (see FIG. **3**), a second locking surface **60**, and an outer cam surface **61**, the purposes of which will be described in more detail below.

The second clip member **44** includes a primary wall **62** having a second clamping surface **64** facing the clip channel **46** in opposed relation to the first clamping surface **54** of the first clip member **42**. The first and second clamping surfaces **54**, **64** define an angle Θ(see FIG. **7**) therebetween. The second clip member **44** further includes an outer surface **65** (see FIG. **7**) opposite the second clamping surface **64**. A secondary wall **66** extends from the primary wall **62** and includes a pair of lateral arms **63**, **67**, and a distal arm **69** extending between the lateral arms **63**, **67**. An opening **68** is formed within the secondary wall **66**, wherein the opening **68** is sized and adapted to receive the locking arm **56** of the first clip member **42**.

The first clip member **42** is adapted to be selectively transitional relative to the second clip member **44** between an open position and a closed position. In particular, the angle Θ between the first clamping surface **54** and the second clamping surface **64** decreases when the first and second clip members **42**, **44** transition from the open position toward the closed position. Conversely, the angle Θ between the first clamping surface **54** and the second clamping surface **64** increases when the first and second clip members **42**, **44** transition from the closed position toward the open position.

When the clip **38** is in the open position (see FIG. **3**), the locking arm **56** of the first clip member **42** extends through the opening **68** formed in the secondary wall **66** of the second clip member **44**. Furthermore, the distal arm **69** rests

against the outer cam surface **61**, which prevents the clip **38** from freely moving from the open position toward the closed position. For the clip **38** to be transitioned from the open position toward the closed position, the user presses the first clip member **42** toward the second clip member **44**. This causes the locking arm **56** to flex, which in turn, allows the distal arm **69** to move along the locking arm **56** toward the locking surfaces **58**, **60**, and the locking arm **56** to retract through the opening **68** until a portion of the secondary wall **66** interfaces with the first and second locking surfaces **58**, **60** of the locking arm **56**. Once the clip **38** is in the closed position, the engagement between the secondary wall **66** and the locking arm **56**, specifically, the second locking surface **60**, prevents the clip **38** from moving from the closed position toward the open position. Therefore, the clip **38** may be adapted to prevent free movement between the open position and the closed position.

In order to move the clip **38** from the closed position toward the open position, the locking arm **56** is disengaged from the secondary wall **66**, typically by pressing the locking arm **56** toward the primary wall **62** of the second clip member **44** until the locking arm **56** can be advanced through the opening **68**. In this respect, the first clip member **42** is constructed from a material having suitable flexibility to enable flexing of the locking arm **56** relative to the connecting arm **52**.

One or more magnets **70** is connected to the clip **38** at an engagement region of the clip **38**. The magnet **70** is nested within a cavity extending into the clip **38** from the outer surface **65**. The magnet **70** and the cavity within which the magnet **70** is nested are preferably configured such that the outer surface of the magnet **70** is substantially flush with the outer surface **65** of the second clip member **44** when the magnet **70** is nested within the cavity. The magnet **70** is adapted to magnetically urge the nasal attachment member **15** worn by the wearer **14** toward the goggle frame **20** for purposes of opening or dilating the nasal passages of the wearer **14**.

According to one embodiment, the magnet **70** is a neodymium, N42 grade magnet, although magnets of differing grades or materials may also be used without departing from the spirit and scope of the present invention. Furthermore, the size of the magnet **70** may range from approximately 0.25"-0.75" in diameter. For instance, the magnet **70** may be ⅜" or ½" in diameter, although other sizes and shapes may also be used.

When the clip **38** is placed on the goggle frame **20**, the clip **38** compresses the foam **36** lining the inner perimeter of the goggle **16** to create a cavity. This cavity creates space within the liner **36** adjacent the wearer's nostril to allow the nasal element **17** to move outwardly causing the nostril to dilate. However, compressing the foam **36** on the goggle **16** may compromise the seal or barrier around the goggle **16** and allow rain, snow, dirt or other particulate to enter the goggle **16** and interfere with the wearer's vision. Therefore, according to one embodiment, and referring now to FIGS. **2** and **2A**, a peripheral foam liner **74** is coupled to the clip **38** and is compressed against the foam **36** on the goggle **16** when the nasal element **17** is magnetically drawn to the clip **38**, as described in more detail below, so as to effectively form a peripheral barrier member around the clip **38**. The clip liner **74** and goggle liner **36** cooperate with each other to prevent particulate from entering the goggles **16**, even though the clip **38** has compressed the foam **36** on the goggle **16**. Furthermore, the foam-against-foam arrangement between the clip liner **74** and goggle liner **36** adds to grip between the clip **38** and the goggle **16**. The peripheral foam liner **74** is preferably configured to enable air to pass therethrough to allow for ventilation.

FIG. **2** shows two clips **38** attached to the goggle **16** in spaced relation to each other, wherein each clip **38** includes its own peripheral foam liner **74**. In another embodiment, the pair of clips **38** includes a common foam liner (see FIGS. **20**, **22-24**, and **27-28**) which includes a bridge section that extends over the nose. When the pair of clips **38** having a common foam liner is used, it causes the goggle **16** to set slightly farther from the nose, creating more of a gap, which increases the space between the magnetic member and the user's nose allowing for greater dilation of the nose.

Referring now specifically to FIGS. **9-14**, there is depicted a second embodiment of a clip **138**. The primary distinction between the second embodiment of the clip **138** and the first embodiment of the clip **38** is that the second embodiment of the clip **138** includes a pair of magnets **170** coupled thereto, as well as attachment arms **141** for securing the foam liner **174** to the clip **138**. The basic structural attributes of the second embodiment of the clip **138** are similar to the basic structural attributes of the first embodiment of the clip **38**. In particular, the clip **138** includes a first clip member **142** and a second clip member **144** pivotally connected to the first clip member **142** via a hinge **145**. The first and second clip members **142**, **144** form opposing locking tabs defining a clip channel **146** (see FIG. **14**) therebetween, wherein the clip channel **146** is sized and adapted to receive a portion of the goggle frame **20** to allow the clip **138** to clamp onto the frame **20**. The clip **138** further includes a locking arm **156** which operates in a manner similar to the locking arm **56** of the clip **38**.

As noted above, the clip **138** includes a pair of attachment arms **141** extending laterally outward from the first clip member **142**. The attachment arms **141** are adapted to extend through corresponding openings **143** formed in the foam liner **174** to secure the foam liner **174** to the clip **138**. In this respect, the clip **138** and liner **174** are configured to enable selective removal of the liner **174** from the clip. As such, liners **174** with different thicknesses may be used to accommodate different types of foam liners on different goggles.

Two magnets **170** are connected to the clip **138** to enhance the magnetic attraction, compared to just a single magnet. The magnets **170** may be arranged in a side-by-side configuration, wherein the magnetic poles of the magnets **170** are opposite to each other. The external engagement surfaces of the magnets **70** may be slightly offset from each other to define a generally concave configuration to enhance engagement with a corresponding "domed" or arcuately shaped metallic nasal elements.

Each nasal element (e.g., nasal applique) **17** may be secured to the wearer's nose **18** via an adhesive layer **55** located on the underside of the nasal element **17**. The use of separate nasal elements **17** allows the user to pinpoint the exact location of each nasal element **17** on the user. Each nasal element **17** may be configured for a one-time use and thus several nasal elements **17** may be packaged and sold as a set. Referring now to FIG. **15-16**, there is depicted a cross sectional view of a nasal element **17**, which includes a base layer **55** and an outer layer **57** which collectively encapsulate a magnetically attractable element **59**, such as a ferrous material (e.g., a metallic element).

According to one embodiment, the metallic element **59** is preferably located in a generally central location relative to the underlying base layer **55**. Such central positioning causes the central portion of the base layer **55** to be pulled toward the magnetic element **59** when the magnetic element **70** is placed adjacent the metallic element **59**. The centrally

applied force on the base layer **55** creates a shear force between the base layer **55** and the user's nose **10**. In this respect, although the magnetic attraction between the magnet **70** and the metallic element **59** pulls the metallic element **59** along an axis extending between the magnet **70** and the metallic element **59**, the generally central location of the metallic element **59** relative to the base layer **55** distributes a portion of the force created by the attraction of the metallic element **59** and the magnets **70** to the compliant area around the metallic element **59** which substantially translates the force to shear in a plane along the skin of the user's nose, which is generally offset from the axis extending between the magnet **70** and the metallic element **59**, and in some instances, may be perpendicular to such axis. The shear component allows for a much more aggressive dilation compared to systems that pull generally perpendicularly to the skin, as the adhesives are much stronger in shear.

One or more surfaces of the metallic element **59** may define an arcuate or "domed" configuration to allow contact between the magnet **70** and the nasal element **17** without flat-to-flat attachment which may create uncomfortable torque on the nostril. The base layer **55** may include a peel-off liner **61** which may be removed to expose adhesive for securing the nasal element **17** to the user's nose **18**. The peel-off liner **61** may include a single continuous strip or a segmented strip. The exposed surface of the outer layer **57** may be imprinted with indicia or logos associated with the goggle manufacturer, clip manufacturer, athlete/team sponsor(s)/advertiser(s), nasal strip manufacturer, sports team, school, the wearer's initials, etc.

Although the foregoing describes the nasal element **17** as being attached to the wearer via an adhesive, it is also contemplated that nasal element **17** may be coupled to the wearer via piercings. It is also contemplated that the nasal element **17** may be coupled to the wearer via a clip which clamps onto the wearer's nose by having one portion that is inserted inside the nostril, and another portion which extends outside the nostril. In this respect, it is understood that any means may be used to attach the nasal element **17** to the wearer to position the nasal element **17** for magnetic coupling to the goggle.

With the basic structural features of one embodiment of the system **10** described above, operation of the system **10** will now be described. Prior to placing the goggles **16** on the wearer's head, the wearer **14** places the nasal elements **17** on his nose **18** such adjacent the wearer's nostrils (see FIGS. **1** and **16**). The nasal elements **17** may have a protective lining covering an adhesive layer, and thus, the wearer **14** may have to peel the protective lining away from each nasal element **17** to expose the adhesive layer. When the adhesive layer is exposed, the wearer presses the nasal element **17** against the wearer's nose **18** to couple the nasal element **17** to the nose **18**.

The wearer **14** also attaches the clips **38** to the goggle frame **20** adjacent the bridge section **32** of the frame **20**. In particular, the clips **38** are positioned on opposed sides of a bridge apex, such that each clip **38** will be positioned adjacent a respective one of the wearer's nostrils when the goggles **16** are placed on the wearer **14**. The clips **38** are attached to the goggle frame **20** from transitioning the clip **38** from the open position toward the closed position, as described in more detail above. When the clips **38** are attached to the goggle frame **20**, each clip **38** forms a recess or depression within the foam liner **36** on the goggle **16**.

With the nasal element **17** attached to the wearer **14** and the goggle clip **38** attached to the goggles **16**, the wearer **14** places the goggles **16** on the wearer's head. Referring now specifically to FIG. **16**, as the goggles **16** move toward the wearer's head, the clips **38** move closer to the nasal element **17**, thereby causing the magnetic attraction between the clip magnet **70** and the ferrous body **59** to become stronger. When the goggles **16** are placed in their final position, the clip **38** acts as a "perch" or "locator" for the nasal element **17**, such that the ferrous body **59** is drawn to a predetermined fixed distance into magnetic engagement with the clip magnets **70**, which in turn causes the nasal passages **12** of the user to dilate. In particular, the nasal elements **17** are displaced outward and forward relative to their previous position to dilate the user's nose **18**. The dilated nasal passage **12** allows the wearer **14** to breathe easier during physical activity so as to maintain elevated oxygen levels in the body.

Although the foregoing describes the nasal elements **17** and clip **38** as being engageable with magnets **70**, it is also contemplated that other connectors may be used to connect the nasal elements **17** to the clip **38** without departing from the spirit and scope of the present invention. For instance, the engagement between the nasal element **17** and the goggle clip **38** may be by way of hook and loop fasteners, magnets, adhesives, or other engagement mechanisms known in the art.

Furthermore, although the embodiment of the clip **38** described above includes separate first and second clip members **42**, **44** which are pivotally connected to each other, it is understood that other embodiments of the clip **38** may be used without departing from the spirit and scope of the present invention. Along these lines, the clip **38** may include a single, unitary body having a pair of opposed tabs which are flexible to enable placement of the clip onto the goggle frame **20**.

Referring now to FIGS. **17-19**, there is depicted various alternatives to the embodiment described above in relation to FIGS. **1-16**. In particular, FIGS. **17-19** show a nasal attachment member **115** including a single nasal strip having a pair of attachment regions **117** on opposed ends of the nasal strip. Each attachment region **117** includes a ferrous body configured to be selectively engageable with a magnet **70** on a corresponding clip **38**. The nasal strip **115** preferably includes an adhesive layer to allow the nasal strip **115** to be coupled to the wearer's nose **18**.

FIGS. **18** and **19** also show an additional embodiment of a set of goggles **116** having magnets **170** coupled thereto without the use of a separate clip. The goggles **116** include a frame **120** having a frame opening with a lens **122** positioned therein. The frame **120** includes opposed lateral end portions **124**, **126**, a top portion **128**, and an opposing bottom portion **130** having a bridge section **132** which fits over the nose **18** of the wearer **14**. A headband or strap **134** may be connected to the opposed lateral end portions **124**, **126** of the frame **120** for securing the frame **120** to the wearer's head.

In the embodiment depicted in FIGS. **18** and **19**, the magnets **170** are located within the frame **120** between the inner and outer surfaces **123**, **125** of the frame **120** and on opposite sides of the bridge apex. The magnets **170** may be embedded within the frame **120**, or alternatively, located within a slot formed within the frame **120** to enable removal and replacement of the magnets **170**. When the goggles **116** are worn by the wearer **14**, the magnets **170** are positioned such that the magnets **170** are magnetically attracted to the magnets in the nasal attachment member **115**.

The goggles **116** may be used with various implementations of the nasal attachment member, including a single nasal strip or separate nasal elements. In this respect,

although the goggles **116** are specifically shown in FIGS. **18** and **19** as being used with a pair of nasal attachment members **117**, it is also contemplated that the goggles **116** may also be used with the nasal strip **15** depicted in FIG. **1**.

Those skilled in the art will readily appreciate that although the foregoing discussion describes the magnets as being incorporated in the clip or goggles, and the ferrous body being incorporated into the nasal element or nasal strip, other embodiments may have a reverse configuration, i.e., the magnet is incorporated into the nasal element or nasal strip and the ferrous body is incorporated into the clip or goggle.

It is contemplated that the system **10** may be packaged and sold as a complete set, including goggles, clips and nasal attachment member(s). Alternatively, the clips and nasal attachment member(s) may be sold separately as a set or individually. For instance, the system **10** may be sold as a kit, including two clips, four foam liners for the clips, wherein the foam liners are of two different foam thicknesses, as well as eight nose elements. Of course, other kits may include different numbers of items without departing from the spirit and scope of the present invention.

Referring now to FIGS. **20-28**, there is depicted another embodiment of a breathing enhancement system **210** which generally includes a pair of nasal appliques **212**, a pair of clips **214**, and a clip liner **216**. The breathing enhancement system **210** shown in FIGS. **20-28** is adapted for use with eyewear, such as goggles **218**.

Each nasal applique **212** generally includes a base layer, a cover layer and a metallic element **220** located between the base layer and the cover layer, similar to the cross sectional configuration depicted in FIG. **15**. The nasal applique **212** includes a peripheral configuration similar to an hour-glass or butterfly, and in this respect, includes two enlarged end portions **222** and a narrow middle portion **224**. The narrow middle portion **224** is defined by a pair of opposed cutouts. When the nasal applique **212** is applied to the nose, the cutouts are placed over the crease on the user's nose that extends generally around a flared nostril. This provides a cutout around the crease of the user's nose, which becomes very active when breathing. Having that portion of the nose uncovered allows for dilating and breathing motion without initiating peeling of the applique. The opposed cutouts allow for use of the applique **212** on either side of the user's nose. However, it is also contemplated that the applique **212** may be specifically formed for use on only one side of the nose, and thus, such appliques may only have one cutout.

According to one embodiment, the base layer and cover layer are both configured to extend radially outward beyond the outer periphery of the metallic element **220** to define a peripheral ring portion. As such, the metallic element **220** is positioned over a central region of the base layer and is surrounded by a peripheral region of the base layer. In the exemplary embodiment, the outer peripheries of the cover layer and the base layer are substantially equal. However, it is understood that prior to being joined to the metallic element **220** and base layer, the cover layer may define a peripheral dimension that is larger than the base layer so as to accommodate the thickness of the metallic element.

The metallic element **220** may take on many forms, including a solid metallic disc, or alternatively, the metallic element may include a metallic powder, which may be embedded within the applique **212** (e.g., located between the base layer and the cover layer) or spread over an outer surface of the applique. Essentially, the metallic element **220** may include any form or configuration that may be magnetically attractable to a respective one of the clips.



An adhesive may be applied to the outer surface of the base layer to facilitate attachment of the applique **212** to the user's nose. According to one embodiment, the adhesive is adapted to increase the adhesive force between the base layer and the user's skin after remaining on the user's skin for a period of time. For instance, one particular adhesive may be adapted to impart a larger adhering force between the user's skin and the base layer approximately four minutes after being applied to the user's skin. In this respect, the adhesive is considered to have a "residency period" as the time between the initial placement of the applique **212** on the user's skin and the time at which the magnitude of the adhesive force reaches a maximum magnitude. It is understood that the residency period may vary from one adhesive to the next, and may be as small as a couple seconds, and as long as several minutes. The benefit of having an adhesive adapted to become stronger over time is that as the user begins to use the applique, the increasing adhesive strength mitigates inadvertent removal of the applique from the user's skin. Thus, although the user may begin to sweat and participate in rigorous physical activity while wearing the applique **212**, the bond between the user's skin and the applique **212** may actually become stronger after initial placement of the applique **212** on the user. The adhesive may include polyethylene tape, polyolefin tape, or other adhesives known in the art to increase their adhesive strength over time. Exemplary adhesives are manufactured by 3M and include 1503 tape, 1521 tape, 1523 tape, 1525L tape, 1526 tape, 9865 tape, 1527 tape, 1527L tape, 1527EP tape, 9835 tape. Of course, those skilled in the art will readily appreciate that other adhesives may also be used without departing from the spirit and scope of the present disclosure.

The nasal appliques **212** are adapted to interface with metallic elements located on respective ones of the pair of clips **214**. Both clips **214** are coupled to the clip liner **216**, which includes a bridge section extending between the clips **214**. According to one embodiment, each clip **214** includes a first clip member **226** and a second clip member **228** pivotally connected to the first clip member **226** via a hinge. The first and second clip members **226**, **228** form opposing locking members defining a clip channel therebetween sized and adapted to receive a portion of the goggle frame to allow the clip **214** to clamp onto the goggle frame. The first and second clip members **226**, **228** may be configured to be selectively locked (closed) and unlocked (open), as described above in relation to the clips shown in FIGS. **1-19**.

According to one embodiment, the first clip member **226** includes a primary wall having a pair of opposed lateral edges defining a maximum first length, $L_1$ (see FIG. **24**), which is larger than a second length, $L_2$, defined by the distance between opposed lateral edges of the second clip member **228**. The primary wall includes a plurality of tabs **230** adapted to extend through corresponding openings formed in the liner **216**, as will be described in more detail below. In the exemplary embodiment, the tabs **230** are located adjacent a bottom edge of the primary wall, although the tabs **230** may be located at other locations of the primary wall.

The primary wall may further include a pair of cutouts **232** (see FIG. **28**) along an edge opposite the tabs **230** and adjacent the second clip member **228**, to facilitate advancement of the middle portion of the first clip member **226** through an opening formed in the liner **216**. In this respect, once advanced through the liner **216**, the liner **216** may reside within the cutouts **232** formed within the primary wall.

One or more magnets **234** is connected to the clip **214** at an engagement region of the clip **214**. As shown in the figures, the magnets **234** reside within a cavity formed in the first clip member **226**.

As noted above, the liner **216** is adapted to engage with both clips **214** at the same time. According to one embodiment, the liner **216** includes a sheet of compressible material, such as foam, with the sheet including a plurality of openings formed therein, the openings being sized and adapted to allow the clips **214** to be engaged to the liner **216**. In particular, the liner **216** includes a pair of primary openings **236** each being sized to receive the second clip member **228** of one of the clips **214**, and a plurality of secondary openings **238** each being sized to receive one of the tabs **230** formed on the clips **214**. It is contemplated that the liner **216** is formed of a resilient material to allow the openings **236**, **238** to expand around the clip member or tab and contract around the clip member or tab for securing the liner **236** to the clip **214**.

The liner **216** further includes an outer periphery which includes an arcuate section **240** located in the middle of the liner **216**, with the arcuate section **240** being adapted to facilitate flexing or bending of the liner **216** to accommodate the contour of the goggle **218** and the anatomy of the wearer. The liner **216** may bend or flex about an axis, with the liner **216** having a substantially symmetrical configuration about the axis. In this respect, the pair of primary openings **236** may be disposed on opposite sides of the axis, and an equal number of secondary openings **238** may be disposed on opposite sides of the axis.

In order to use the breathing enhancement system **210** shown in FIGS. **20-28**, the user applies the nasal appliques **212** to both sides of the user's nose by placing a first nasal applique on a first lateral region (e.g., the ala of the nose) adjacent a first nostril opening, and a second nasal applique on a second lateral region adjacent a second nostril opening. Typically, the appliques **212** are placed on the nose near the transition of the nose bone. The adhesive located on the applique creates an adhesive force between the applique and the user's nose to secure the applique to the nose. The adhesive is preferably adapted to increase the adhesive force while the applique remains on the user's nose for a prescribed residency time.

The clips **214** are coupled to the liner **216** by passing each second clip member **228** through a respective one of the primary openings **236**, and the clip tabs **230** through respective ones of the secondary openings **238**. The clips **214** are then attached to the goggle frame, such that when the clips **214** are secured to the frame, the goggle liner is compressed in the region adjacent the clips **214**, with such compression oftentimes extending into the bridge region of the goggle. The clip liner **216** resides within the compressed region to maintain a "seal" or barrier against the user's faces to prevent debris (e.g., snow, dirt, etc.) from entering the area between the goggles **218** and the user's eyes. In this respect, the clip liner **216** extends between both clips **214** so as to reside within the compressed area of the goggle liner which may form between the clips **214** when the clips **214** are attached to the goggle **218**.

After the clips **214** are secured to the goggle **218**, and the appliques **212** are placed on the user's nose, the goggle **218** may be placed over the wearer's face. As the goggle **218** is moved into position, the magnets **234** on the clips **214** are moved closer to the metallic elements **220** on the appliques **212**, thereby creating a stronger magnetic attraction therebetween, which in turn "activates" the system. The magnetic attraction draws the metallic element **220** of the applique **212** toward the magnet **234** in the clip **214**, which dilates the wearer's nose to enhance the user's breathing.

One particular advantage of the breathing systems described herein is the ability of such systems to selectively transition between an ON (engaged) state and an OFF (disengaged) state without removing the nasal appliques from the user's nose. In the ON state, the nasal appliques are applied to the user's nose, and the clip or goggles carrying the magnet is engaged with the nasal appliques, which results in the dilating force being imparted on the user's nose. The breathing system may transition from the ON state to the OFF state by removing goggles (carrying the magnets) from the nasal appliques, which stops the application of the dilating force on the user's nose. In this regard, when the system is in the OFF state, the system is inactive. If the user subsequently wants to turn the system back ON, the user simply re-applies the goggles over the nose and into engagement with the nasal appliques.

The ability to selectively transition the system between ON and OFF states may be particularly advantageous, particularly when participating in sports-related activities, where the user may take breaks from time-to-time. For instance, many sports relates activities are divided into heats, periods, quarters, halves, etc., such that the user experiences extended periods of inactivity between extended active periods. The user may want to transition the system to the OFF state during periods of inactivity, and to the ON state during periods of activity. The configuration of the nasal appliques and the associated goggles allows for such quick and easy transition to give the user the enhanced ability to breathe when needed during the active periods. The selective transition of the system between an ON state and an OFF state may be analogous to a quarterback taking his mouthpiece out between plays.

The particulars shown herein are by way of example only for purposes of illustrative discussion, and are not presented in the cause of providing what is believed to be most useful and readily understood description of the principles and conceptual aspects of the various embodiments of the present disclosure. In this regard, no attempt is made to show any more detail than is necessary for a fundamental understanding of the different features of the various embodiments, the description taken with the drawings making apparent to those skilled in the art how these may be implemented in practice.

What is claimed is:

**1**. A disposable apparatus attachable to a nose of a wearer and useable with an external magnetic element positioned adjacent to the nose of the wearer, the disposable apparatus comprising:

a flexible base layer including a first surface and an opposing second surface;

an adhesive disposed on the first surface of the flexible base layer and capable of producing an adhesive force between the flexible base layer and the wearer for attaching the flexible base layer to the nose of the wearer, the adhesive being capable of increasing the adhesive force after the flexible base layer has been attached to the nose of the wearer; and

a metallic element coupled to the second surface of the base layer and being magnetically interactable with the magnetic element when the magnetic element is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, the metallic element including a metallic disc having an arcuate surface extending away from the second surface of the base layer, the magnetic interaction between

the metallic element and the magnetic element imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate, the metallic element being sized to reside adjacent only one of the nostrils on the nose of the wearer when the disposable apparatus is attached to the nose of the wearer;

the disposable apparatus being sized and shaped to be translatable relative to the magnetic element while the metallic element is magnetically coupled to the magnetic element;

the disposable apparatus being capable of residing on the nose of the wearer in an OFF state wherein no dilating force is imparted on the wearer by the disposable apparatus.

**2**. The disposable apparatus recited in claim **1**, wherein the adhesive is capable of increasing the adhesive force after the flexible base layer has been attached to the nose of the wearer for a prescribed residency period.

**3**. The disposable apparatus recited in claim **1**, wherein the adhesive includes polyethylene tape.

**4**. The disposable apparatus recited in claim **1**, wherein the metallic element includes a metallic powder.

**5**. The disposable apparatus recited in claim **1**, wherein at least a portion of the flexible base layer extends radially outward beyond the metallic element to define a flexible peripheral portion.

**6**. The disposable apparatus recited in claim **1**, wherein the metallic disc defines a circular periphery.

**7**. A method of attaching a nasal applique to a nose of a wearer, the method comprising the steps of:

positioning the nasal applique on a lateral surface adjacent a nostril opening of the nose of the wearer, the nasal applique comprising:

a flexible base layer including a first surface and an opposing second surface;

an adhesive disposed on the first surface of the flexible base layer and capable of producing an adhesive force between the flexible base layer and the wearer for attaching the flexible base layer to the nose of the wearer, the adhesive being capable of increasing the adhesive force after the flexible base layer has been attached to the nose of the wearer; and

a metallic element coupled to the second surface of the base layer and being magnetically interactable with a remote magnetic element when the remote magnetic element is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, the metallic element being sized and shaped to be translatable relative to the magnetic element while the metallic element is magnetically coupled to the magnetic element, the magnetic interaction between the local metallic element and the remote magnetic element imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate, the metallic element being sized to reside adjacent only one of the nostrils on the nose of the wearer when the nasal applique is positioned on the lateral surface;

pressing the nasal applique on the lateral surface of the nose of the wearer to attach the nasal applique to the wearer; and

allowing the nasal applique to reside on the nose of the wearer in an OFF state prior to magnetic interaction with the remote magnet, wherein the nasal applique does not impart a dilating force on the wearer when the nasal applique is in the OFF state.

**8**. The method recited in claim **7**, further comprising the step of allowing the nasal applique to remain on the wearer for a prescribed residency period, the adhesive force increasing during the residency period.

**9**. The method recited in claim **8**, wherein the residency period is approximately four minutes.

**10**. A breathing enhancement system for use with eyewear having a compressible liner, the breathing enhancement system comprising:

a pair of clips selectively attachable to the eyewear and capable of compressing the compressible liner when attached to the eyewear to define a compressed portion of the compressible liner;

a clip liner engageable with and extendable between the pair of clips, the clip liner being capable of residing within the compressed portion of the compressible liner; and

a pair of nasal appliques selectively placeable on respective lateral portions the nose of a user, each nasal applique capable of being magnetically urged toward a respective one of the pair of clips in response to placement of the eyewear adjacent the nose of the user to cause the nasal passage of the user to open.

**11**. The breathing enhancement system recited in claim **10**, wherein each nasal applique includes a base layer and an adhesive for producing an adhesive force between the base layer and the wearer for attaching the base layer to the nose of the wearer, the adhesive increasing the adhesive force after the base layer has been attached to the nose of the wearer.

**12**. The breathing enhancement system recited in claim **11**, wherein the adhesive increases the adhesive force after the flexible base layer has been attached to the nose of the wearer for a prescribed residency period.

**13**. The breathing enhancement system recited in claim **11**, wherein the adhesive includes polyethylene tape.

**14**. The breathing enhancement system recited in claim **10**, wherein the clip liner is interfaceable with the user to mitigate the passage of particulate between the eyewear and the user when the pair of clips is attached to the eyewear and the eyewear is placed adjacent the nose of the user.

**15**. The breathing enhancement system recited in claim **10**, comprising a pair of magnetic elements coupled to respective ones of the pair of clips and a pair of metallic elements coupled to respective ones of the pair of nasal appliques, the pair of magnetic elements being magnetically attractable to the pair of metallic elements.

**16**. The breathing enhancement system recited in claim **15**, wherein the pair of magnetic elements include magnets, and the pair of metallic elements include metallic powder.

**17**. The breathing enhancement system recited in claim **10**, wherein the clip liner includes a plurality of openings sized and shaped to receive respective ones of the pair of clips.

**18**. The breathing enhancement system recited in claim **10**, wherein each clip includes a first clip member and a second clip member pivotally coupled to the first clip member.

**19**. The breathing enhancement system recited in claim **18**, wherein the first clip member is pivotable relative to the second clip member between an open position and a closed position, an angle between the first and second clip members decreasing as the first and second clip members pivot from the open position toward the closed position.

**20**. The breathing enhancement system recited in claim **19**, wherein the first and second clip members are lockable when the first and second clip members are in the closed position.

* * * * *

# Exhibit 3

US009510969B2

(12) **United States Patent**
**Castillo**

(10) **Patent No.: US 9,510,969 B2**
(45) **Date of Patent: Dec. 6, 2016**

(54) **NASAL ELEMENT FOR A BREATHING SYSTEM**

(71) Applicant: **James D. Castillo**, Los Alamos, CA (US)

(72) Inventor: **James D. Castillo**, Los Alamos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/628,517**

(22) Filed: **Feb. 23, 2015**

(65) **Prior Publication Data**

US 2015/0182370 A1 Jul. 2, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/502,348, filed on Sep. 30, 2014.

(60) Provisional application No. 61/918,826, filed on Dec. 20, 2013, provisional application No. 61/937,018, filed on Feb. 7, 2014.

(51) **Int. Cl.**
*A61F 5/08* (2006.01)
*A61F 9/02* (2006.01)

(52) **U.S. Cl.**
CPC ................ ***A61F 5/08*** (2013.01); ***A61F 9/026*** (2013.01); ***A61F 9/029*** (2013.01)

(58) **Field of Classification Search**
CPC .................................... A61F 5/08; A61F 5/56
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,835,848 A 9/1974 Berner
5,533,503 A 7/1996 Doubek et al.
5,913,873 A 6/1999 Blach et al.
6,006,746 A 12/1999 Karell
6,033,422 A 3/2000 Blach et al.
6,352,548 B1 3/2002 Blach et al.
6,533,412 B1 3/2003 Wang et al.
6,676,681 B1 1/2004 Blach et al.
6,823,864 B2 11/2004 Blach et al.
7,091,634 B2 8/2006 Yi et al.
7,793,661 B2 * 9/2010 Macken .................. A61F 5/56 128/846
D639,762 S 6/2011 Brogden et al.
D644,324 S 8/2011 Brunner et al.
D644,325 S 8/2011 Brunner et al.
8,042,542 B2 10/2011 Ging et al.
D696,400 S 12/2013 Brogden et al.
D701,957 S 4/2014 Brunner et al.
D703,318 S 4/2014 Brunner et al.
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion for International Application No. PCT/US14/69817, Mar. 11, 2015, 11 pages.

*Primary Examiner* — Katherine M Shi
*Assistant Examiner* — Michael Mendoza
(74) *Attorney, Agent, or Firm* — Stetina Brunda Garred and Brucker

(57) **ABSTRACT**

Provided is a goggle kit including a goggle clip attachable to the goggle frame, and a corresponding nose element, which adheres to the user's nose. The nose element and the goggle clip are configured to be detachably engageable therewith, such that when the nose element is placed on the user's nose and the goggle is placed over the user's eyes, the goggle clip and nose element may be engaged with each other, thereby urging the nasal opening of the user to dilate.

**30 Claims, 7 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0105824 | A1 | 5/2007 | Erickson-Miller et al. |
| 2008/0097517 | A1 | 4/2008 | Holmes et al. |
| 2009/0188023 | A1 | 7/2009 | Hsu |
| 2011/0000483 | A1 | 1/2011 | Matthias et al. |
| 2012/0036607 | A1 | 2/2012 | Beliveau |
| 2012/0172923 | A1 | 7/2012 | Fenton et al. |

* cited by examiner




*Fig. 1*




*Fig. 2*




*Fig. 2A*




*Fig. 3*




*Fig. 4*




*Fig. 5*




*Fig. 6*




*Fig. 7*




*Fig. 8*




*Fig. 9*




*Fig. 10*




*Fig. 11*




*Fig. 12*




*Fig. 13*




*Fig. 14*




Fig. 15




Fig. 16


10
14
18
18
115
117
117
18
12
136
128
134
126
124
122
120
170
130
132
170
116

*Fig. 17*


12
117
117
18
115
116
120
170
123
170
125
132

*Fig. 18*


12
116
117
117
120
170
170
125
18
115

*Fig. 19*

Case 1:20-cv-00152-JLH Document 109-1 Filed 03/31/26 Page 92 of 157 PageID #: 14603





## NASAL ELEMENT FOR A BREATHING SYSTEM

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of prior U.S. application Ser. No. 14/502,348 filed Sep. 30, 2014, which claims the benefit of U.S. Provisional Application No. 61/918,826, filed Dec. 20, 2013, and U.S. Provisional Application No. 61/937,018, filed Feb. 7, 2014, the contents of which are expressly incorporated herein by reference.

### STATEMENT RE: FEDERALLY SPONSORED RESEARCH/DEVELOPMENT

Not Applicable

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to an eyewear accessory kit, and more specifically to an eyewear accessory kit designed to enhance nasal airflow for the wearer by urging the wearer's nostrils to a more open position.

2. Description of the Related Art

It is readily understood that breathing is important when playing sports or taking part in physical competition due to the increased demand for oxygen by the body. Breathing may be achieved by drawing air into the body through an individual's nostrils and/or through the individual's mouth. However, in some instances, it is preferable to breathe almost exclusively through the nostrils, as there may be a downside to breathing through one's mouth. Along these lines, breathing through the mouth may lead to rapid water loss and heat loss, both of which increase the likelihood of exercise-induced asthma.

It is also understood that eyewear is commonly used when participating in many sports and activities. Such eyewear may include protective eyewear, or vision-enhancing (e.g., prescription) eyewear. For instance, goggles are readily worn by many athletes participating in snowboarding, skiing, motocross, automotive racing, basketball, baseball, hockey, etc. Goggles are typically configured such that a portion of the goggle frame extends over the wearer's nose, and thus, goggles may impact one's ability to breathe through the wearer's nasal passage.

Moreover, many goggles are fitted with a foam liner which interfaces with the wearer's face to create a barrier or seal which prevents snow, rain, dirt or other debris from entering the goggles and creating a potential irritant in the wearer's eye. In order to create an effective seal or barrier around the goggles, the goggles are compressed against the wearer's face, typically through the use of an elastic band which is worn around the head. The compression of the foam liner against the wearer tends to compress the nasal passages of the wearer, which further inhibits the ability of the wearer to breathe through the nose.

Accordingly, there is a need in the art for a device which can be used with a goggle or other eyewear for enhancing the wearer's ability to breathe through the wearer's nasal passage. Various aspects of the present invention address this particular need, as will be discussed in more detail below.

### BRIEF SUMMARY OF THE INVENTION

In accordance with one embodiment of the present invention, there is provided a goggle kit including a goggle clip



attachable to the goggle frame, and a corresponding nose element, which adheres to the wearer's nose. The goggle clip attaches to the goggle frame to compress the foam liner to create space for the nose element to enable the nose element to move outward toward the clip. The nose element and the goggle clip are configured to be attachable to each other, such that the nose element is moved in an outward direction and/or forward direction to engage with the clip. The outward and/or forward movement of the nose element causes the nasal opening of the wearer to dilate. Therefore, even though the wearer is using goggles, the wearer can breathe more freely through his or her nasal passageway.

The goggle clip may include a pair of clip tabs which are transitional between an extended position and a clamping position for securing the goggle clip to the goggle frame. The clip tabs may move toward each other as the clip transitions from the extended position toward the clamping position. The goggle clip may include a spring clip, or may include a hinge to allow the clip to transition between the extended and clamping positions.

The nose element may include a pair of nose pieces positionable over respective ones of the user's nostrils. The nose element may also include a single strip which is extendable over the user's nose between the user's nostrils. The nose element may include an adhesive for temporarily securing the nose element to the user.

Engagement between the goggle clip and the nose element may be by way of magnetic attraction, hook and loop fasteners (e.g., VELCRO), adhesives, snaps, clips, friction, or other mechanical engagement mechanisms known in the art.

According to one embodiment, there is provided an eyewear system adapted to open a nasal passage of a user. The eyewear system includes a wearable frame having a bridge section configured to be placeable adjacent the nose of the user. A nasal attachment member is configured to be selectively placeable on the nose of the user adjacent the nasal passage. The nasal attachment member is adapted to be urged toward the wearable frame in response to placement of the wearable frame adjacent the nose of the user to cause the nasal passage of the user to open.

The system may include a liner coupled to the wearable frame and configured to interface with the user when the wearable frame is placed on the user. The liner may be formed from a compressible material. The system may additionally include a clip configured to be selectively attachable to the wearable frame and adapted to urge the nasal attachment member toward the wearable frame in response to placement of the wearable frame adjacent the nose of the user. A peripheral barrier member may be coupled to the clip and configured to interface with the user to mitigate the passage of particulate between the wearable frame and the user when the clip is attached to the wearable frame and the wearable frame is placed adjacent the nose of the user.

The clip may include a first clip member and a second clip member pivotally coupled to the first clip member. The first clip member may be pivotable relative to the second clip member between an open position and a closed position. An angle between the first and second clip members may decrease as the first and second clip members pivot from the open position toward the closed position. The first and second clip members may be configured to become locked when the first and second slip members are in the closed position.

The nasal attachment member may be configured to be magnetically urged toward the wearable frame. The system

may include a frame magnet coupled to the wearable frame and magnetically attractable to the nasal attachment member.

According to another embodiment, there is provided a method of enhancing a nasal airway of a user wearing goggles having a compressible barrier member. The method includes compressing the compressible barrier member on the goggles to form a recess within the barrier member, attaching a nasal attachment member to the user adjacent the user's nostrils, and placing the goggles on the wearer after the compressible barrier member has been compressed, placement of the goggles on the wearer urges the nasal attachment member to move into the recess formed within the barrier member, movement of the nasal attachment member into the recess causes the nasal airway of the user to dilate.

The present invention will be best understood by reference to the following detailed description when read in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other features and advantages of the various embodiments disclosed herein will be better understood with respect to the following description and drawings, in which:

FIG. **1** is a front view of a user wearing a pair of nasal elements and goggles having clips attached thereto which cooperate with the nasal elements to open the nasal passage;

FIG. **2** is rear perspective view of the goggles and clips depicted in FIG. **1**;

FIG. **2A** is an upper perspective view of the clip shown in FIG. **2** having a barrier member attached thereto;

FIG. **3** is a perspective view of the clip shown in FIG. **2** with the foam liner removed, wherein the clip is in an open position;

FIG. **4** is a perspective view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **5** is a top view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **6** is a front view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **7** is a side view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **8** is a rear view of the clip shown in FIG. **3**, wherein the clip is in the closed position;

FIG. **9** is a front upper perspective view of a second embodiment of a clip having a foam liner and a pair of magnets;

FIG. **10** is a rear upper perspective view of the clip shown in FIG. **9**, wherein an end portion of the foam liner has been moved relative to its position shown in FIG. **9**;

FIG. **11** is a top view of the clip shown in FIG. **9**;

FIG. **12** is an upper perspective view of the clip depicted in FIG. **9**;

FIG. **13** is a front view of the clip depicted in FIG. **9**;

FIG. **14** is a side view of the clip depicted in FIG. **9**;

FIG. **15** is a side sectional view of a nose element having a peel-away liner partially removed therefrom;

FIG. **16** is a bottom view of the goggle being brought into alignment with the wearer and nasal elements worn by the wearer;

FIG. **17** is a front view of a user wearing a nasal strip and goggles having embedded magnets which urge the nasal strip toward the goggles to open the user's nasal passage when the goggles are worn;

FIG. **18** is a bottom view of the goggles and clips being brought into alignment with the wearer and the nasal strip; and

FIG. **19** is a bottom view of the goggles and the clips urging the nasal strip toward the goggle frame to open the wearer's nasal passage.

Common reference numerals are used throughout the drawings and the detailed description to indicate the same elements.

## DETAILED DESCRIPTION OF THE INVENTION

The detailed description set forth below in connection with the appended drawings is intended as a description of certain embodiments of a goggle breathing system and is not intended to represent the only forms that may be developed or utilized. The description sets forth the various structure and/or functions in connection with the illustrated embodiments, but it is to be understood, however, that the same or equivalent structure and/or functions may be accomplished by different embodiments that are also intended to be encompassed within the scope of the present disclosure. It is further understood that the use of relational terms such as first and second, and the like are used solely to distinguish one entity from another without necessarily requiring or implying any actual such relationship or order between such entities.

Referring now to the drawings, wherein the showings are for purposes of illustrating a preferred embodiment of the present invention only, and are not for purposes of limiting the same, there is depicted a system **10** configured to open or dilate the nasal passages **12** of an individual **14** wearing eyewear, such a goggles **16**. The system **10** generally includes a nasal attachment member **15** including a pair of nasal elements **17** which are worn by the wearer **14** adjacent the wearer's nostrils. The system **10** is configured such that when the goggles **16** are placed on the wearer **14**, the nasal attachment member **15** is urged toward the goggle frame **20**, which results in dilation of the nasal opening, thereby making it easier for the wearer **14** to breathe, despite the existence of the goggles **16** extending over the wearer's nose **18**.

Referring now specifically to FIG. **1**, there is depicted a set of goggles **16** having a wearable frame **20** including a frame opening, within which is positioned a lens **22**. The frame **20** includes opposed lateral end portions **24**, **26**, a top portion **28**, and an opposing bottom portion **30** having a bridge section **32** which fits over the nose **18** of the wearer **14**. The frame **20** may be fabricated from plastic, rubber, or other materials known by those skilled in the art. A headband or strap **34** may be connected to the opposed lateral end portions **24**, **26** of the frame **20** for securing the frame **20** to the wearer's head.

Although the exemplary embodiment shows the wearable frame **20** as being a frame for goggles **16**, it is understood that the term wearable frame may broadly refer to other frames which may be worn by a wearer, such as frames associated with various helmet systems and the like.

A foam liner **36** extends around an inner peripheral portion of the frame **20** and rests against the wearer's head when the goggles **16** are worn by the wearer **14**. The foam liner **36** is designed to interface with the wearer's face to create a seal or barrier around the frame **20** so as to prevent unwanted debris or particulate from passing between the goggles **16** and the wearer **14** so as to protect the wearer's eyes. The liner **36** is preferably formed of a breathable

material so as to allow air to pass therethrough to allow for ventilation within the goggles **16**.

It is understood that goggles **16** come in various shapes, sizes and configurations depending on the particular size of the wearer **14**, as well as the intended use of the goggles **16**. Consequently, the term "goggles" refers broadly to any eyewear that is worn while snowboarding, snow skiing, motorcycle racing (e.g. motocross), automobile racing, or playing a wide variety of sports such as basketball, baseball, football, hockey, etc., for the purpose of protecting the wearer's eyes, or for providing enhanced visibility.

One embodiment of system **10** additionally includes a goggle attachment member or clip(s) **38**, which may be selectively and securely attached to the frame **20** of the goggle **16**. Each clip **38** is specifically adapted to engage with a corresponding nasal element **17** through complimentary fastening members. The engagement between the clip **38** and the nasal element **17** causes dilation of the nasal passageways, as will be described in more detail below. When the clip **38** is attached to the goggle **16**, the clip **38** compresses the liner **36** to create space around the wearer's nose **18** to allow the nasal element **17** to be drawn outwardly and forwardly thereby causing the nose **18** to dilate.

According to one embodiment, and referring now specifically to FIGS. **2-8**, a first embodiment of a clip **38** is shown, which includes a first clip member **42** and a second clip member **44** pivotally connected to the first clip member **42** via a hinge **45**. The first and second clip members **42**, **44** form opposing locking tabs defining a clip channel **46** (see FIG. **7**) therebetween sized and adapted to receive a portion of the goggle frame **20** to allow the clip **38** to clamp onto the goggle frame **20**.

As shown in FIGS. **3-8**, the first clip member **42** includes a pair of opposing lateral arms **48**, **50** which are interconnected by a connecting arm **52**. The opposing lateral arms **48**, **50** and the connecting arm **52** collectively define a first clamping surface **54** (see FIG. **7**), which faces the clip channel **46**. The first clip member **42** further includes a locking arm **56** extending from the connecting arm **52**, wherein the locking arm **56** includes a first locking surface **58** (see FIG. **3**), a second locking surface **60**, and an outer cam surface **61**, the purposes of which will be described in more detail below.

The second clip member **44** includes a primary wall **62** having a second clamping surface **64** facing the clip channel **46** in opposed relation to the first clamping surface **54** of the first clip member **42**. The first and second clamping surfaces **54**, **64** define an angle θ (see FIG. **7**) therebetween. The second clip member **44** further includes an outer surface **65** (see FIG. **7**) opposite the second clamping surface **64**. A secondary wall **66** extends from the primary wall **62** and includes a pair of lateral arms **63**, **67**, and a distal arm **69** extending between the lateral arms **63**, **67**. An opening **68** is formed within the secondary wall **66**, wherein the opening **68** is sized and adapted to receive the locking arm **56** of the first clip member **42**.

The first clip member **42** is adapted to be selectively transitional relative to the second clip member **44** between an open position and a closed position. In particular, the angle Θ between the first clamping surface **54** and the second clamping surface **64** decreases when the first and second clip members **42**, **44** transition from the open position toward the closed position. Conversely, the angle Θ between the first clamping surface **54** and the second clamping surface **64** increases when the first and second clip members **42**, **44** transition from the closed position toward the open position.



When the clip **38** is in the open position (see FIG. **3**), the locking arm **56** of the first clip member **42** extends through the opening **68** formed in the secondary wall **66** of the second clip member **44**. Furthermore, the distal arm **69** rests against the outer cam surface **61**, which prevents the clip **38** from freely moving from the open position toward the closed position. For the clip **38** to be transitioned from the open position toward the closed position, the user presses the first clip member **42** toward the second clip member **44**. This causes the locking arm **56** to flex, which in turn, allows the distal arm **69** to move along the locking arm **56** toward the locking surfaces **58**, **60**, and the locking arm **56** to retract through the opening **68** until a portion of the secondary wall **66** interfaces with the first and second locking surfaces **58**, **60** of the locking arm **56**. Once the clip **38** is in the closed position, the engagement between the secondary wall **66** and the locking arm **56**, specifically, the second locking surface **60**, prevents the clip **38** from moving from the closed position toward the open position. Therefore, the clip **38** may be adapted to prevent free movement between the open position and the closed position.

In order to move the clip **38** from the closed position toward the open position, the locking arm **56** is disengaged from the secondary wall **66**, typically by pressing the locking arm **56** toward the primary wall **62** of the second clip member **44** until the locking arm **56** can be advanced through the opening **68**. In this respect, the first clip member **42** is constructed from a material having suitable flexibility to enable flexing of the locking arm **56** relative to the connecting arm **52**.

One or more magnets **70** is connected to the clip **38** at an engagement region of the clip **38**. The magnet **70** is nested within a cavity extending into the clip **38** from the outer surface **65**. The magnet **70** and the cavity within which the magnet **70** is nested are preferably configured such that the outer surface of the magnet **70** is substantially flush with the outer surface **65** of the second clip member **44** when the magnet **70** is nested within the cavity. The magnet **70** is adapted to magnetically urge the nasal attachment member **15** worn by the wearer **14** toward the goggle frame **20** for purposes of opening or dilating the nasal passages of the wearer **14**.

According to one embodiment, the magnet **70** is a neodymium, N42 grade magnet, although magnets of differing grades or materials may also be used without departing from the spirit and scope of the present invention. Furthermore, the size of the magnet **70** may range from approximately 0.25"-0.75" in diameter. For instance, the magnet **70** may be ⅜" or ½" in diameter, although other sizes may also be used.

When the clip **38** is placed on the goggle frame **20**, the clip **38** compresses the foam **36** lining the inner perimeter of the goggle **16** to create a cavity. This cavity creates space within the liner **36** adjacent the wearer's nostril to allow the nasal element **17** to move outwardly causing the nostril to dilate. However, compressing the foam **36** on the goggle **16** may compromise the seal or barrier around the goggle **16** and allow rain, snow, dirt or other particulate to enter the goggle **16** and interfere with the wearer's **14** vision. Therefore, according to one embodiment, and referring now to FIGS. **2** and **2A**, a peripheral foam liner **74** is coupled to the clip **38** and operates as a peripheral barrier member around the clip **38** by extending between the clip **38** and the foam **36** on the goggle **16**. The clip liner **74** and goggle liner **36** cooperate with each other to prevent particulate from entering the goggles **16**, even though the clip **38** has compressed the foam **36** on the goggle **16**. Furthermore, the foam-against-foam arrangement between the clip liner **74** and

goggle liner **36** adds to grip between the clip **38** and the goggle **16**. The peripheral foam liner **74** is preferably configured to enable air to pass therethrough to allow for ventilation.

FIG. **2** shows two clips **38** attached to the goggle **16** in spaced relation to each other, wherein each clip **38** includes its own peripheral foam liner **74**. In another embodiment, the pair of clips **38** includes a common foam liner (not shown) which includes a bridge section that extends over the nose. When the pair of clips **38** having a common foam liner is used, it causes the goggle **16** to set slightly farther from the nose, creating more of a gap, which increases the space between the magnetic member and the user's nose allowing for greater dilation of the nose.

Referring now specifically to FIGS. **9-14**, there is depicted a second embodiment of a clip **138**. The primary distinction between the second embodiment of the clip **138** and the first embodiment of the clip **38** is that the second embodiment of the clip **138** includes a pair of magnets **170** coupled thereto, as well as attachment arms **141** for securing the foam liner **174** to the clip **138**. The basic structural attributes of the second embodiment of the clip **138** are similar to the basic structural attributes of the first embodiment of the clip **38**. In particular, the clip **138** includes a first clip member **142** and a second clip member **144** pivotally connected to the first clip member **142** via a hinge **145**. The first and second clip members **142**, **144** form opposing locking tabs defining a clip channel **146** (see FIG. **14**) therebetween, wherein the clip channel **146** is sized and adapted to receive a portion of the goggle frame **20** to allow the clip **138** to clamp onto the frame **20**. The clip **138** further includes a locking arm **156** which operates in a manner similar to the locking arm **56** of the clip **38**.

As noted above, the clip **138** includes a pair of attachment arms **141** extending laterally outward from the first clip member **142**. The attachment arms **141** are adapted to extend through corresponding openings **143** formed in the foam liner **174** to secure the foam liner **174** to the clip **138**. In this respect, the clip **138** and liner **174** are configured to enable selective removal of the liner **174** from the clip. As such, liners **174** with different thicknesses may be used to accommodate different types of foam liners on different goggles.

Two magnets **170** are connected to the clip **138** to enhance the magnetic attraction, compared to just a single magnet. The magnets **170** may be arranged in a side-by-side configuration, wherein the magnetic poles of the magnets **170** are opposite to each other. The external engagement surfaces of the magnets **70** may be slightly offset from each other to define a generally concave configuration to enhance engagement with a corresponding "domed" or arcuately shaped metallic nasal elements.

Each nasal element **17** may be secured to the wearer's nose **18** via an adhesive layer **55** located on the underside of the nasal element **17**. The use of separate nasal elements **17** allows the user to pinpoint the exact location of each nasal element **17** on the user. Each nasal element **17** may be configured for a one-time use and thus several nasal elements **17** may be packaged and sold as a set. Referring now to FIG. **15-16**, there is depicted a cross sectional view of a nasal element **17**, which includes a base layer **55** and an outer layer **57** which collectively encapsulate a magnetically attractable element **59**, such as a ferrous material. One or more surfaces of the magnetically attractable element **59** may define an arcuate or "domed" configuration to allow contact between the magnet **70** and the nasal element **17** without flat-to-flat attachment which may create uncomfortable torque on the nostril. The base layer **55** may include a peel-off liner **61** which may be removed to expose adhesive for securing the nasal element **17** to the user's nose **18**. The peel-off liner **61** may include a single continuous strip or a segmented strip. The exposed surface of the outer layer **57** may be imprinted with indicia or logos associated with the goggle manufacturer, clip manufacturer, nasal strip manufacturer, sports team, school, the wearer's initials, etc.

Although the foregoing describes the nasal element **17** as being attached to the wearer via an adhesive, it is also contemplated that nasal element **17** may be coupled to the wearer via piercings. It is also contemplated that the nasal element **17** may be coupled to the wearer via a clip which clamps onto the wearer's nose by having one portion that is inserted inside the nostril, and another portion which extends outside the nostril. In this respect, it is understood that any means may be used to attach the nasal element **17** to the wearer to position the nasal element **17** for magnetic coupling to the goggle.

With the basic structural features of one embodiment of the system **10** described above, operation of the system **10** will now be described. Prior to placing the goggles **16** on the wearer's head, the wearer **14** places the nasal attachment members **17** on his nose **18** adjacent the wearer's nostrils (see FIGS. **1** and **16**). The nasal elements **17** may have a protective lining covering an adhesive layer, and thus, the wearer **14** may have to peel the protective lining away from each nasal element **17** to expose the adhesive layer. When the adhesive layer is exposed, the wearer presses the nasal element **17** against the wearer's nose **18** to couple the nasal element **17** to the nose **18**.

The wearer **14** also attaches the clips **38** to the goggle frame **20** adjacent the bridge section **32** of the frame **20**. In particular, the clips **38** are positioned on opposed sides of a bridge apex, such that each clip **38** will be positioned adjacent a respective one of the wearer's nostrils when the goggles **16** are placed on the wearer **14**. The clips **38** are attached to the goggle frame **20** from transitioning the clip **38** from the open position toward the closed position, as described in more detail above. When the clips **38** are attached to the goggle frame **20**, each clip **38** forms a recess or depression within the foam liner **36** on the goggle **16**.

With the nasal attachment members **17** attached to the wearer **14** and the goggle clip **38** attached to the goggles **16**, the wearer **14** places the goggles **16** on the wearer's head. Referring now specifically to FIG. **16**, as the goggles **16** move toward the wearer's head, the clips **38** move closer to the nasal element **17**, thereby causing the magnetic attraction between the clip magnet **70** and the ferrous body **59** to become stronger. When the goggles **16** are placed in their final position, the clip **38** acts as a "perch" or "locator" for the nasal element **17**, such that the ferrous body **59** is drawn into magnetic engagement with the clip magnets **70**, which in turn causes the nasal passages **12** of the user to dilate. In particular, the nasal attachment members **17** are displaced outward and forward relative to their previous position to dilate the user's nose **18**. The dilated nasal passage **12** allows the wearer **14** to breathe easier during physical activity so as to maintain elevated oxygen levels in the body.

Although the foregoing describes the nasal elements **17** and clip **38** as being engageable with magnets **70**, it is also contemplated that other connectors may be used to connect the nasal elements **17** to the clip **38** without departing from the spirit and scope of the present invention. For instance, the engagement between the nasal element **17** and the goggle clip **38** may be by way of hook and loop fasteners, magnets, adhesives, or other engagement mechanisms known in the art.

Furthermore, although the embodiment of the clip **38** described above includes separate first and second clip members **42**, **44** which are pivotally connected to each other, it is understood that other embodiments of the clip **38** may be used without departing from the spirit and scope of the present invention. Along these lines, the clip **38** may include a single, unitary body having a pair of opposed tabs which are flexible to enable placement of the clip onto the goggle frame **20**.

Referring now to FIGS. **17-19**, there is depicted various alternatives to the embodiments described above in relation to FIGS. **1-16**. In particular, FIGS. **17-19** show a nasal attachment member **115** including a single nasal strip having a pair of attachment regions **117** on opposed ends of the nasal strip. Each attachment region **117** includes a ferrous body configured to be selectively engageable with a magnet **70** on a corresponding clip **38**. The nasal strip **115** preferably includes an adhesive layer to allow the nasal strip **115** to be coupled to the wearer's nose **18**.

FIGS. **18** and **19** also show an additional embodiment of a set of goggles **116** having magnets **170** coupled thereto without the use of a separate clip. The goggles **116** include a frame **120** having a frame opening with a lens **122** positioned therein. The frame **120** includes opposed lateral end portions **124**, **126**, a top portion **128**, and an opposing bottom portion **130** having a bridge section **132** which fits over the nose **18** of the wearer **14**. A headband or strap **134** may be connected to the opposed lateral end portions **124**, **126** of the frame **120** for securing the frame **120** to the wearer's head.

In the embodiment depicted in FIGS. **18** and **19**, the magnets **170** are located within the frame **120** between the inner and outer surfaces **123**, **125** of the frame **120** and on opposite sides of the bridge apex. The magnets **170** may be embedded within the frame **120**, or alternatively, located within a slot formed within the frame **120** to enable removal and replacement of the magnets **170**. When the goggles **116** are worn by the wearer **14**, the magnets **170** are positioned such that the magnets **170** are magnetically attracted to the ferrous bodies **117** in the nasal attachment member **115**.

The goggles **116** may be used with various implementations of the nasal attachment member, including a single nasal strip or separate nasal elements. In this respect, although the goggles **116** are specifically shown in FIGS. **18** and **19** as being used with a pair of nasal attachment members **117**, it is also contemplated that the goggles **116** may also be used with the nasal strip **15** depicted in FIG. **1**.

Those skilled in the art will readily appreciate that although the foregoing discussion describes the magnets as being incorporated in the clip or goggles, and the ferrous body being incorporated into the nasal element or nasal strip, other embodiments may have a reverse configuration, i.e., the magnet is incorporated into the nasal element or nasal strip and the ferrous body is incorporated into the clip or goggle.

It is contemplated that the system **10** may be packaged and sold as a complete set, including goggles, clips and nasal attachment member(s). Alternatively, the clips and nasal attachment member(s) may be sold separately as a set or individually. For instance, the system **10** may be sold as a kit, including two clips, four foam liners for the clips, wherein the foam liners are of two different foam thicknesses, as well as eight nose elements. Of course, other kits may include different numbers of items without departing from the spirit and scope of the present invention.

The particulars shown herein are by way of example only for purposes of illustrative discussion, and are not presented in the cause of providing what is believed to be most useful and readily understood description of the principles and conceptual aspects of the various embodiments of the present disclosure. In this regard, no attempt is made to show any more detail than is necessary for a fundamental understanding of the different features of the various embodiments, the description taken with the drawings making apparent to those skilled in the art how these may be implemented in practice.

What is claimed is:

**1**. A disposable apparatus attachable to a nose of a wearer and configured for use with a magnet positioned adjacent to the nose of the wearer, the disposable apparatus comprising:

a flexible base layer including a first surface and an opposing second surface, the first surface having an adhesive disposed thereon to enable the first surface to be selectively attachable to the nose of the wearer;

a metallic element coupled to the second surface of the base layer and being configured to interact with the magnet when the magnet is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, the interaction between the metallic element and the magnet imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate; and

an outer layer coupled to the base layer and extending over the metallic element to at least partially cover the metallic element;

at least a portion of the flexible base layer extending radially outward beyond the metallic element to define a flexible peripheral portion;

the metallic element being configured to allow for movement of the magnet relative to the metallic element when the magnet is magnetically engaged with the metallic element;

the disposable apparatus, while being attached to the nose of the wearer, being selectively transitional between an active state and an inactive state, in the active state, the metallic element magnetically interacts with the magnet to impart the dilating force on the nose of the wearer, in the inactive state, the metallic element is magnetically decoupled from the magnet to cease imparting of the dilating force on the nose of the wearer.

**2**. The disposable apparatus recited in claim **1**, wherein the metallic element is configured to impart the dilating force only in response to interaction between the metallic element and the magnet.

**3**. The disposable apparatus recited in claim **1**, wherein the metallic element is of sufficient rigidity to retain its shape when the flexible base layer is attached to the nose.

**4**. The disposable apparatus recited in claim **1**, further comprising a peel-away layer coupled to the first surface of the flexible base layer and covering the adhesive disposed on the first surface.

**5**. The disposable apparatus recited in claim **1**, wherein the base layer and the outer layer completely encapsulate the metallic element.

**6**. The disposable apparatus recited in claim **1**, further comprising indicia formed on the outer layer.

**7**. The disposable apparatus recited in claim **1**, further comprising indicia formed on the base layer.

**8**. The disposable apparatus recited in claim **1**, wherein the metallic element is circular.

**9**. The disposable apparatus recited in claim **1**, wherein the base layer is circular.

10. The disposable apparatus recited in claim 1, wherein the base layer defines a base diameter and the metallic element defines a metallic element diameter, the base diameter being larger than the metallic element diameter.

11. The disposable apparatus recited in claim 1, wherein the base layer defines an outer periphery that is larger than an outer periphery of the metallic element.

12. The disposable apparatus recited in claim 1, wherein an outer periphery of the base layer completely circumnavigates the metallic element.

13. The disposable apparatus recited in claim 1, wherein the base layer defines a base layer plane, the metallic element having a generally planar first surface substantially parallel to the base layer plane, and an arcuate second surface coupled to the first surface.

14. The disposable apparatus recited in claim 1, wherein the metallic element includes a convex outer surface.

15. The disposable apparatus recited in claim 1, wherein the metallic element is disposed about an axis and is of a maximum thickness at the axis.

16. The disposable apparatus recited in claim 1, wherein the metallic element and the magnet are configured to disallow mechanical coupling between the metallic element and the magnet when the magnet is magnetically interacting with the metallic element.

17. The disposable apparatus recited in claim 1, wherein the metallic element is substantially inflexible.

18. The disposable apparatus recited in claim 1, wherein the metallic element is configured to allow for unrestricted movement of the magnet relative to the metallic element along at least two axes when the magnet is magnetically held adjacent to the metallic element.

19. A disposable apparatus attachable to a nose of a wearer and configured for use with a metallic element positioned adjacent to the nose of the wearer, the disposable apparatus comprising:

a flexible base layer including a first surface and an opposing second surface, the first surface having an adhesive disposed thereon to enable the first surface to be selectively attachable to the nose of the wearer;

a magnetic element coupled to the second surface of the base layer and being configured to interact with the metallic element when the metallic element is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, the interaction between the magnetic element and the metallic element imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate; and

an outer layer coupled to the base layer and extending over the magnetic element to at least partially cover the magnetic element;

at least a portion of the flexible base layer extending radially outward beyond the metallic element to define a flexible apparatus peripheral portion;

the magnetic element being configured to allow for movement of the metallic element relative to the magnetic element when the metallic element is magnetically engaged with the magnetic element;

the disposable apparatus, while being attached to the nose of the wearer, being selectively transitional between an active state and an inactive state, in the active state, the magnetic element magnetically interacts with the metallic element to impart the dilating force on the nose of the wearer, in the inactive state, the magnetic element is magnetically decoupled from the metallic element to cease imparting of the dilating force on the nose of the wearer.

20. The disposable apparatus recited in claim 19, wherein the magnetic element is configured to impart the dilating force only in response to interaction between the magnetic element and the metallic element.

21. The disposable apparatus recited in claim 19, wherein the magnetic element is of sufficient rigidity to retain its shape when the flexible base layer is attached to the nose.

22. The disposable apparatus recited in claim 19, wherein the magnetic element is circular.

23. The disposable apparatus recited in claim 19, wherein the base layer is circular.

24. The disposable apparatus recited in claim 19, wherein the base layer defines a base diameter and the magnet element defines a magnetic element diameter, the base diameter being larger than the magnetic element diameter.

25. The disposable apparatus recited in claim 19, wherein an outer periphery of the base layer completely circumnavigates the magnetic element.

26. An externally applied nose dilating system for use on a nose of a wearer, the nose dilating system comprising:

a magnet positionable adjacent the nose of the wearer;

a flexible attachment layer configured to be selectively attachable to the nose of the wearer, the flexible attachment layer having a middle portion and a peripheral portion surrounding the middle portion;

a rigid metallic element coupled to the middle portion of the flexible attachment layer, the rigid metallic element being configured to interact with the magnet when the magnet is positioned adjacent the nose of the wearer and the flexible attachment layer is attached to the nose of the wearer, the interaction between the metallic element and the magnet imparting a dilating force on the nose of the wearer from the middle portion of the flexible attachment layer causing the nose of the wearer to dilate; and

an outer layer coupled to the flexible attachment layer and extending over the metallic element to at least partially cover the metallic element;

the metallic element being configured to allow for movement of the magnet relative to the metallic element when the magnet is magnetically engaged with the metallic element;

the flexible attachment layer and rigid metallic element collectively being configured such that while the flexible attachment layer is attached to the nose of the wearer, the system is selectively transitional between an active state and an inactive state, in the active state, the metallic element magnetically interacts with the magnet to impart the dilating force on the nose of the wearer, in the inactive state, the metallic element is magnetically decoupled from the magnet to cease imparting of the dilating force on the nose of the wearer.

27. The system recited in claim 26, wherein the metallic element is configured to impart the dilating force only in response to interaction between the metallic element and the magnet.

28. The system recited in claim 26, wherein the metallic element is of sufficient rigidity to retain its shape when the flexible attachment layer is attached to the nose.

29. The system recited in claim 26, wherein the metallic element is circular.

30. The system recited in claim 26, wherein the flexible attachment layer defines an attachment layer diameter and

Case 1:19-cv-01529-JLH Document 101-1 Filed 03/31/22 Page 598 of 1157 PageID #: 4566



the metallic element defines a metallic element diameter, the attachment layer diameter being larger than the metallic element diameter.

* * * * *

# Exhibit 4

**Registration Number**
**VAu 1-542-204**
**Effective Date of Registration:**
December 16, 2024
**Registration Decision Date:**
January 02, 2025

## Copyright Registration for a Group of Unpublished Photographs

Registration issued pursuant to 37 C.F.R. § 202.4(j)

### Title

**Title of Group:** INTAKE BREATHING SYSTEM
**Number of Photographs in Group:** 146

### Completion/Publication

**Year of Completion:** 2019

### Author

- **Author:** INTAKE BREATHING TECNOLOGY LLC
  **Author Created:** photographs
  **Work made for hire:** Yes

### Copyright Claimant

**Copyright Claimant:** INTAKE BREATHING TECNOLOGY LLC
614 Santa Barbara St Suite A, SANTA BARBARA, CA, 93101, United States

### Certification

**Name:** ALEX HAUCK
**Date:** December 16, 2024

---

**Correspondence:** Yes
**Copyright Office notes:** Regarding title information: Deposit contains complete list of titles that correspond to the individual photographs included in this group.

Regarding group registration: A group of unpublished photographs may be registered on one application with one filing fee only under limited circumstances. ALL of the following are required: 1. All photographs (a) are unpublished AND (b) were created by the same author AND (c) are owned by the same copyright claimant AND 2. The group contains 750 photographs or less AND 3. A sequentially numbered list of photographs containing the title and file name for each photograph included in the group must be uploaded along with other required application materials. The list must be submitted in an approved document format such as .XLS or .PDF. The file name for the numbered list must contain the title of the group and the Case Number assigned to the application.

# Exhibit 5

Doctor Recommended. Champion Approved.

Shop all | Blog's | Our Story | Track your Order | Contact Us | histrips. | USD $ | English




# HiStrips Magnetic Nasal Strips

**$56.95** ~~$79~~ Save 28%

LIMITED DEAL | 1755 LEFT

**Breathing Optimization Kit** $56.95 ~~$79~~

- 30 HiStrips Nasal Tabs (30 nights)
- 4 Nasal Bands (Reusable)
- Bonus: 2x Free Breathing Ebooks | $30 Value!
- Bonus: Free Skin Prep Wipes | $10 Value!
- Free Shipping

– 1 + **Add to cart**

30 Days Money Back Guarantee

Shipping & Returns +

Will HiStrips fit my nose? +

Description +

Will they stay on during intense workouts? +

Are HiStrips safe for my skin? +

What makes HiStrips different from other nasal strips? +

## Complete the Set




**Skin-Prep Wipes**
$9.95
SHOP NOW




**Essential Nasal Sticks**
$26.95 ~~$47.95~~
SHOP NOW

Fermin Aldeguer
MotoGP rider for GRESINI

juanlebron
Pro Padel Player

Teamvisma
World Tour Cycling Team

bensmithlive
Best Seller Author

pablo.svg
Health Coach

carlitosalcarazz
Tennis Player

brianwallack
Gym Coach

afonsogaida
Hyrox Athlete

# Next-Gen Nasal Tech

HiStrips Magnetic Nasal Strips use precision-aligned micro-magnets to gently pull and hold your nasal passages open.

- Dynamic Lift Design
- Sweat-Proof Adhesive Matrix
- 40% More Oxygen Per Breath



AS SEEN IN OLITAN ELLE goop Forbes People VOGUE Women'sHealth O THE OPRAH MAGAZINE COSMOPOLITAN ELLE goop




## Clinically Designed. Backed by Experts in Sleep & Respiratory Health.

**93%** Of users report waking up less groggy and feeling more rested.

**97%** Of athletes feel immediate improvement in nasal airflow, with more energy and focus during training.

SHOP NASAL STRIPS

Study References







**Bridge-heavy pressure**

Applies force directly to the nose bridge, often leaving dents or discomfort.

**Adhesive gives out**

**Opens from the sides, not the bridge**

Designed to gently lift airflow zones without pinching the center of your nose.

**Locks in with magnets**

Moisture or oil on your skin? Say goodbye to grip.

### Designed for short use

Not made for hours of wear, especially not through movement or sweat.

### Peels skin

Often takes skin with it.

### Not built for performance

Slides, wrinkles, loosens. Especially under real-world conditions.

### Locks in with magnets

No adhesives to fail. Secure magnetic hold that stays put during sleep or sweat.

### Overnight comfort

Built for long wear. You'll forget it's there , until you realize you slept better.

### No skin damage

Soft, medical-grade tabs sit off sensitive areas. No tugging, no redness.

### Works in real life

From post-shower humidity to heavy workouts, it holds strong through it all.

## Backed by Experts & Trusted by Everyday Performers

Clinically driven, customer validated. From health researchers to active professionals, Histrips is a go-to for optimized breathing and recovery.



"My patients struggling with chronic nasal blockage often miss how big of an impact it has on their sleep and focus. Histrips provides a non-invasive way to support better oxygen flow and quality of life."

**Samuel A.**
ENT Specialist & Clinical Researcher



"Most of my clients dealing with chronic mouth breathing don't realize how much it disrupts their sleep and recovery. Histrips offers a non-invasive way to restore natural airflow."

**Sommer L.**
Sleep Advisor



"Nasal breathing matters for oral health. Patients who use Histrips at night report less dry mouth, better tolerance of their night guard, and calmer sleep. It's a small habit with a big quality-of-life payoff."

**Ercan A.**
Dentis & Hygienist

## Save On Our Bundles




**Athlete's Favorite (Black Strips)**
$47.95 ~~$75~~
SHOP NOW




**Elite Performer Kit**
$70.95 ~~$122~~
SHOP NOW




**Perfect Sleep Kit (Pearl White Sleep Mask)**
$74.95 ~~$137~~
SHOP NOW




**Black Nasal Strips [YEAR SUPPLY]**
$189.95 ~~$480~~
SHOP NOW

★★★★★ 8,793 Reviews

Write a review












**Claudia G.** Verified

★★★★★

Perfect! Customer service was very efficient with my inquiry.

Auto-translated from Spanish. Show original

Athlete's Favorite (Black Strips)



**Antonioli E.** Verified

★★★★★

FANTASTIC! Absolutely a marked improvement in breathing!

Auto-translated from Italian. Show original

Pink Nasal Strips



**Pedro A.** Verified

★★★★★

Amazing

Nasal Strips - Lebron Edition



**Jevgenijs S.** Verified

★★★★★

The best !

Free Xmas Gift



**Matt B.** Verified

★★★★★

First time I've been able to wear nasal strips without them coming off. Stay on overnight and for fasted cardio the next morning. Will be buying again.

Black Nasal Strips




**Petru B.** Verified

★★★★★

Really impressed with these nasal strips. They open up the nostrils noticeably and make breathing much easier, especially during training. Comfortable to wear and actually effective.

Black Nasal Strips



**Bora K.** Verified

★★★★★

My husband snores so much at night. I bought this for him so he uses for his sports sessions instead he decided to keep them for night. No more snoring!!! Hallelujah I can sleep well finally!!! Thank you! You should make a version for people with snoring issues!

Athlete's Favorite (Black Strips)



**Gheorghe Viorel Marian G.** Verified

★★★★★

I can feel a difference!

Mystery Gift



**Ssu-yu S.** Verified

★★★★★

Nice to help breath to be more stable







Case 1:99-mc-09999 Document 109-1 Filed 02/10/26 Page 69 of 111 PageID #: 15590

Website captured: 1/23/2026



Antonello S. Verified

★★★★☆

You can really breathe better

Auto-translated from Italian. Show original

Black Nasal Strips



Isidoro C. Verified

★★★★★

Great product and it really works

Auto-translated from Italian. Show original

Blue Nasal Strips





Luceri A. Verified

★★★★★

they're fantastic i started to breathe after i wear them ❤️ ❤️

Pink Nasal Strips



Toni H. Verified

★★★★★

I started Nasal breathing whilst running this year. Struggled at first until I found HiStrips - they definitely helped me achieve this challenge!!!

Pink Nasal Strips





Nico L. Verified

★★★★★

definitely can breathe better working out and sleeping

Black Nasal Strips



Daniele C. Verified

★★★★★

Valencia hal marathon super hi strips

[FREE] Histrips E-Books (x2)




Mystery Gift



Sebastian M. Verified

★★★★★

Best performance guaranteed

Blue Nasal Strips



Emiliano C. Verified

★★★★★

Perfect and I love the histrips

Black Nasal Strips



**Mark Jayson G.** Verified

★★★★★

It clearly helps in breathing during training!! Love the product!!

Pink Nasal Strips

**Ercan A.** Verified

★★★★★

These nasal strips are real game changers – they help me get more air through my nose while running 💪

Pink Nasal Strips




**Marco C.** Verified

★★★★★

Top product!!
I recommend it to everyone!!!
I learned about it thanks to Camilla Massa.
I'm Marco, a Hyrox coach and athlete, and I've tried several similar products, but this is definitely the best.

Auto-translated from Italian. Show original

Athlete's Favorite (Black Strips)

Show more reviews

# Frequently Asked Questions

Get quick solutions to your common concerns, from shipping to application method.

Do you ship overseas? +

Do you ship to my country? +

How long will it take to get my orders? +

What is Histrips nasal? +

How does it work? +

Histrips nasal are safe to use? +

Other questions? +

# You may also like




**HiStrips Magnetic Nasal Strip**
$56.95 ~~$79~~
SHOP NOW




**Nasal Sleeping Strips - White**
$29.95 ~~$40~~
SHOP NOW




**Cotton Mouth Tape**
$26.95 ~~$35~~
SHOP NOW




**Camo Nasal Strips [YEAR SUPPLY]**
$189.95 ~~$480~~
SHOP NOW












**Athlete's Favorite (Black Strips)**
**$47.95** ~~$75~~
SHOP NOW

**White Nasal Strips [YEAR SUPPLY]**
**$189.95** ~~$480~~
SHOP NOW

**Essential Nasal Sticks**
**$26.95** ~~$47.95~~
SHOP NOW

**Nasal Sleeping Strips - Black**
**$29.95** ~~$40~~
SHOP NOW

## @histripscom











## Stay in the loop

Sign up to unlock first-access offers and science-led breathing insights. From elite sleep tips to expert-backed breathing strategies,straight to your inbox.

Enter your Email

Submit

By Clicking, you agree with our privacy policy

**histrips.**

Our only support e-mail is:
support@histrips.com

HiStrips. // Stay Limitless LLC
228 Park Ave S PMB 43559

**Shop**
- Bestsellers
- Magnetic Nasal Strips
- Classic Nasal Strips
- Cotton Mouth Tape
- Essential Nasal Sticks
- Elite Performer Kit
- Limited Editions

**Important Links**
- Our Story
- Athlete Program
- Manage Subscriptions
- Stockist
- Blogs
- Search
- Terms of Service

**Legal Pages**
- Terms of Service
- Shipping Policy
- Privacy Policy
- Order Cancellation Policy
- Return & Refund Policy
- Subscription Policy

New York, New York 10003-1502 US

Open Monday to Friday from 9:00 a.m. to 6:00 p.m.

Store Locator

© 2026, HiStrips

USD $ English

×


histrips.
SLEEP & SPORT
Black Magnetic Nasal Strips
ONE A DAY
30
DAYS OF BETTER BREATHING

‹ 1 / 8 ›




×

histrips.com/products/magnetic-nasal-strips 144.0.7559.110 Windows 10 Enterprise 24H2 (64-bit Build 26100) 2/6/2026 8:45:51 AM




Sizing For All Noses

## Guaranteed Fit.

Our Starter Kit comes in fourversatile sizes for a guaranteed fit no matter the size of your nose.

‹ 3 / 8 ›

×




4 / 8

×




histrips.com/products/magnetic-nasal-strips 144.0.7559.110 Windows 10 Enterprise 24H2 (64-bit Build 26100) 2/6/2026 8:48:48 AM

×




‹ 6 / 8 ›

histrips.com/products/magnetic-nasal-strips 144.0.7559.110 Windows 10 Enterprise 24H2 (64-bit Build 26100) 2/6/2026 8:49:10 AM

×


histrips
SLEEP & SPORT
Black Magnetic Nasal Strips
7 / 8

×




‹ 8 / 8 ›

histrips.com/products/magnetic-nasal-strips 144.0.7559.110 Windows 10 Enterprise 24H2 (64-bit Build 26100) 2/6/2026 8:49:51 AM

# Exhibit 6

| US Patent No. 10,675,174 B2 | Infringing Product |
|---|---|
| 1. A breathing system adapted to open a nasal passage of a user's nose, the breathing system comprising: |     |

| US Patent No. 10,675,174 B2 | Infringing Product |
|---|---|
| | "[O]ur magnetic strips…keep you breathing at your best." *See* https://histrips.com/products/magnetic-nasal-strips (annotations added).  |
| a bridge member having a pair of distal portions, a middle portion positioned between the pair of distal portions, and an inner surface that defines a concave configuration, |   |

Case 1:19-cv-01529-JLH Document 106-1 Filed 03/31/26 Page 85 of 115 PageID #: 14906

| US Patent No. 10,675,174 B2 | Infringing Product |
|---|---|
| |   |
| the bridge member being configured to be positionable adjacent the user's nose, with the inner surface facing the user's nose and each distal portion residing adjacent a respective lateral region of the user's nose; and |   |

| US Patent No. 10,675,174 B2 | Infringing Product |
|---|---|
| at least one nasal applique adapted to be attachable to a respective lateral region of the user's nose, | <br>At least one nasal applique adapted to be attachable to a respective lateral region of the user's nose<br>at least one nasal applique<br><br><br>applique adapted to be attachable to a respective lateral region of the user's nose |

| US Patent No. 10,675,174 B2 | Infringing Product |
|---|---|
| |  <br>*See id*. (annotations added). |
| each nasal applique being magnetically attractable to a respective one of the pair of distal portions, |  <br>  |

| US Patent No. 10,675,174 B2 | Infringing Product |
|---|---|
| the attraction between the at least one nasal applique and the bridge member imparting a dilating force on the user's nose to dilate the nasal passage; | Attraction between the at least one nasal applique and the bridge member  Imparting a dilating force on the user's nose to dilate the nasal passage<br>*Compare to no interaction with bridge member:*  |
| the bridge member being of sufficient rigidity so as to retain the concave configuration of the inner surface when the bridge member is detached from the at least one nasal applique. | detached from the at least one applique   sufficient rigidity so as to retain the concave configuration of the inner surface |

# Exhibit 7

| US Patent No. 10,556,095 B2 | Infringing Product |
|---|---|
| 1. A disposable apparatus attachable to a nose of a wearer and useable with an external magnetic element positioned adjacent to the nose of the wearer, the disposable apparatus comprising: |     *See* https://histrips.com/products/magnetic-nasal-strips (annotations added). |

| US Patent No. 10,556,095 B2 | Infringing Product |
|---|---|
| a flexible base layer including a first surface and an opposing second surface, |     |

| US Patent No. 10,556,095 B2 | Infringing Product |
|---|---|
| |     |

| US Patent No. 10,556,095 B2 | Infringing Product |
| --- | --- |
| an adhesive disposed on the first surface of the flexible base layer and capable of producing an adhesive force between the flexible base layer and the wearer for attaching the flexible base layer to the nose of the wearer, the adhesive being capable of increasing the adhesive force after the flexible base layer has been attached to the nose of the wearer; and | <br><br><br><br> |

| US Patent No. 10,556,095 B2 | Infringing Product |
| --- | --- |
| a metallic element coupled to the second surface of the base layer and being magnetically interactable with the magnetic element when the magnetic element is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, the metallic element including a metallic disc having an arcuate surface extending away from the second surface of the base layer, |     |

| US Patent No. 10,556,095 B2 | Infringing Product |
| --- | --- |
| |     |

| US Patent No. 10,556,095 B2 | Infringing Product |
|---|---|
| the magnetic interaction between the metallic element and the magnetic element imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate, the metallic element being sized to reside adjacent only one of the nostrils on the nose of the wearer when the disposable apparatus is attached to the nose of the wearer; | <br><br>*Compare to no di ating orce:*<br><br>*See d.* (annotations added). |

| US Patent No. 10,556,095 B2 | Infringing Product |
|---|---|
| the disposable apparatus being sized and shaped to be translatable relative to the magnetic element while the metallic element is magnetically coupled to the magnetic element; | <br><br> |

| US Patent No. 10,556,095 B2 | Infringing Product |
|---|---|
| the disposable apparatus being capable of residing on the nose of the wearer in an OFF state wherein no dilating force is imparted on the wearer by the disposable apparatus. |  <br>*Compare to di ating  orce:*<br> |

# Exhibit 8

| US Patent No. 9,510,969 B2 | Infringing Product |
| --- | --- |
| 1. A disposable apparatus attachable to a nose of a wearer and configured for use with a magnet positioned adjacent to the nose of the wearer, the disposable apparatus comprising: | <br><br><br><br>*See* https://histrips.com/products/magnetic-nasal-strips (annotations added). |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| a flexible base layer including a first surface and an opposing second surface, |     |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| | <br> |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| the first surface having an adhesive disposed thereon to enable the first surface to be selectively attachable to the nose of the wearer; |     |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| |    |

| US Patent No. 9,510,969 B2 | Infringing Product |
| --- | --- |
| a metallic element coupled to the second surface of the base layer and being configured to interact with the magnet when the magnet is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, | <br> |

Case 1:26-mc-00999-JLH Document 1-1 Filed 02/03/26 Page 104 of 115 PageID #: 147

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| |  <br>*See id* (annotations added). |
| the interaction between the metallic element and the magnet imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate; and |  <br>*See id*. (annotations added). |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| | <br><br>*Compare to no di ating orce:*<br> |
| an outer layer coupled to the base layer and extending over the metallic element to at least partially cover the metallic element; | <br> |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| |     |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| at least a portion of the flexible base layer extending radially outward beyond the metallic element to define a flexible peripheral portion; |    |

| US Patent No. 9,510,969 B2 | Infringing Product |
| --- | --- |
| the metallic element being configured to allow for movement of the magnet relative to the metallic element when the magnet is magnetically engaged with the metallic element; |  Magnet coupled to metallic element in a first position <br>  Magnet coupled to metallic element in a moved second position <br>  Magnet coupled to metallic element in a moved third position |

| US Patent No. 9,510,969 B2 | Infringing Product |
|---|---|
| the disposable apparatus, while being attached to the nose of the wearer, being selectively transitional between an active state and an inactive state, | *See* images below. |
| in the active state, the metallic element magnetically interacts with the magnet to impart the dilating force on the nose of the wearer, |  |
| in the inactive state, the metallic element is magnetically decoupled from the magnet to cease imparting of the dilating force on the nose of the wearer. |  |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTAKE BREATHING TECHNOLOGY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>STAY LIMITLESS LLC D/B/A HISTRIPS,<br><br>Defendant. | Case No. ____________ |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, Plaintiff Intake Breathing Technology, LLC states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: February 10, 2026

OF COUNSEL:

Dawn M. David (*pro hac vice forthcoming*)
QUARLES & BRADY LLP
411 E Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
(414) 277-5000
dawn.david@quarles.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Anne Shea Gaza
Anne Shea Gaza (No. 4093)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com

*Attorneys for Plaintiff Intake Breathing Technology, LLC*

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Intake Breathing Technology, LLC

**(b)** County of Residence of First Listed Plaintiff Santa Barbara County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Anne Shea Gaza, Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King St., Wilmington, DE 19801 (302) 571-6600

## DEFENDANTS

Stay Limitless LLC d/b/a/ HiStrips

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☒ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(*Do not cite jurisdictional statutes unless diversity*)**:
35 U.S.C. §§ 1, et seq. and 17 U.S.C. §§ 101, et seq.

Brief description of cause:
Patent infringement, trade dress infringement, and copyright infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE DOCKET NUMBER See attached list

DATE 2-10-2026

SIGNATURE OF ATTORNEY OF RECORD /s/ Anne Shea Gaza (No. 4093)

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

**ATTACHMENT TO CIVIL COVER SHEET**

**LIST OF RELATED ACTIONS**

Pending:

| Title | Civil Action No. | Court |
|---|---|---|
| *Yuanqu Hongyi Performing Arts Co., Ltd. v. Intake Breathing Technology, LLC, et al.* | 2-25-cv-02274 | W.D. Wa. |
| *Intake Breathing Technology, LLC v. JL Hub LLC* | 2-26-cv-01159 | C.D. Ca. |
| *Intake Breathing Technology LLC v. Yiwushi Daidaiku Riyongpin Youxian Gongsi* | 2-26-cv-00680 | C.D. Ca. |
| *Intake Breathing Technology, LLC v. Kierdorf & Reich GbR d/b/a Napify* | 2-25-cv-11681 | C.D. Ca. |
| *9878866 Canada Inc. v. Intake Breathing Technology, LLC* | 1-25-cv-02443 | D.D.C. |

Closed:

| Title | Civil Action No. | Court |
|---|---|---|
| *Yuanqu Hongyi Performing Arts Co., Ltd. v. Intake Breathing Technology, LLC, et al.* | 2-25-cv-02274 | W.D. Wa. |
| *Intake Breathing Technology, LLC v. JL Hub LLC* | 2-26-cv-01159 | C.D. Ca. |
| *Intake Breathing Technology LLC v. Yiwushi Daidaiku Riyongpin Youxian Gongsi* | 2-26-cv-00680 | C.D. Ca. |
| *Intake Breathing Technology, LLC v. Kierdorf & Reich GbR d/b/a Napify* | 2-25-cv-11681 | C.D. Ca. |
| *Intake Breathing Technology, LLC v. Lumi E-Commerce AB d/b/a/ Ark of Sweden* | 1-25-cv-10011 | N.D. Il. |
| *9878866 Canada Inc. v. Intake Breathing Technology, LLC* | 1-25-cv-02443 | D.D.C. |

| Title | Civil Action No. | Court |
|---|---|---|
| *Intake Breathing Technology, LLC v. The Individuals, Corporations, Limited Liability Companies, Partnerships, And Incorporated Associations Identified On Schedule A* | 1-25-cv-06831 | N.D. Il. |
| *Intake Breathing Technology, LLC v. Regenex Co.* | 1-25-cv-04751 | N.D. Il. |
| *Intake Breathing Technology, LLC v. Airway ESTD 2024* | 2-25-cv-00281 | M.D. Al. |

AO 121 (Rev. 06/16)

| TO: | |
|---|---|
| **Register of Copyrights**<br>**U.S. Copyright Office**<br>**101 Independence Ave. S.E.**<br>**Washington, D.C. 20559-6000** | **REPORT ON THE**<br>**FILING OR DETERMINATION OF AN**<br>**ACTION OR APPEAL**<br>**REGARDING A COPYRIGHT** |

In compliance with the provisions of 17 U.S.C. 508, you are hereby advised that a court action or appeal has been filed on the following copyright(s):

| ☑ ACTION ☐ APPEAL | | COURT NAME AND LOCATION |
|---|---|---|
| DOCKET NO. | DATE FILED<br>2/10/2026 | United States District Court for the District of Delaware<br>844 North King Street<br>Wilmington, DE 19801 |

| PLAINTIFF | DEFENDANT |
|---|---|
| Intake Breathing Technology, LLC | Stay Limitless LLC d/b/a HiStrips |

| COPYRIGHT REGISTRATION NO. | TITLE OF WORK | AUTHOR OR WORK |
|---|---|---|
| 1 VAu 1-542-204 | Intake Breathing System | Intake Breathing Technology, LLC |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following copyright(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment ☐ Answer ☐ Cross Bill ☐ Other Pleading | |
|---|---|---|
| **COPYRIGHT REGISTRATION NO.** | **TITLE OF WORK** | **AUTHOR OF WORK** |
| 1 | | |
| 2 | | |
| 3 | . | |

In the above-entitled case, a final decision was rendered on the date entered below. A copy of the order or judgment together with the written opinion, if any, of the court is attached.

| COPY ATTACHED | WRITTEN OPINION ATTACHED | DATE RENDERED |
|---|---|---|
| ☐ Order ☐ Judgment | ☐ Yes ☐ No | |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| | | |

**DISTRIBUTION:**

1) Upon initiation of action, mail copy to Register of Copyrights
2) Upon filing of document adding copyright(s), mail copy to Register of Copyrights
3) Upon termination of action, mail copy to Register of Copyrights
4) In the event of an appeal, forward copy to Appellate Court
5) Case File Copy

AO 120 (Rev. 08/10)

| TO: | REPORT ON THE FILING OR DETERMINATION OF AN ACTION REGARDING A PATENT OR TRADEMARK |
|---|---|
| **Mail Stop 8**<br>**Director of the U.S. Patent and Trademark Office**<br>**P.O. Box 1450**<br>**Alexandria, VA 22313-1450** | |

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court District of Delaware on the following

☐ Trademarks or ☑ Patents. ( ☐ the patent action involves 35 U.S.C. § 292.):

| DOCKET NO. | DATE FILED | U.S. DISTRICT COURT |
|---|---|---|
| | 2/10/2026 | District of Delaware |

| PLAINTIFF | DEFENDANT |
|---|---|
| Intrake Breathing Technology, LLC | Stay Limitless LLC d/b/a/ HiStrips |

| PATENT OR TRADEMARK NO. | DATE OF PATENT OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1 10,675,174 | 6/9/2020 | Intrake Breathing Technology, LLC |
| 2 10,556,095 | 2/11/2020 | Intrake Breathing Technology, LLC |
| 3 9,510,969 | 2/6/2016 | Intrake Breathing Technology, LLC |
| 4 | | |
| 5 | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY |
|---|---|
| | ☐ Amendment ☐ Answer ☐ Cross Bill ☐ Other Pleading |

| PATENT OR TRADEMARK NO. | DATE OF PATENT OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| | | |

**Copy 1—Upon initiation of action, mail this copy to Director** **Copy 3—Upon termination of action, mail this copy to Director**
**Copy 2—Upon filing document adding patent(s), mail this copy to Director** **Copy 4—Case file copy**